**In re CONAGRA FOODS, INC.**

**No. CV 11–05379 MMM (AGRx).**

United States District Court,
C.D. California.

Signed Feb. 23, 2015.

Ariana J. Tadler, Henry Kelston, Andrei V. Rado, Jessica J. Sleater, Milberg LLP, Kim E. Richman, Reese Richman LLP, Christopher A. Seeger, Seeger Weiss LLP, Antonio Vozzolo, Faruqi and Faruqi LLP, Scott A. Bursor, Bursor and Fisher PA, New York, NY, David E. Azar, Milberg LLP, Los Angeles, CA, Adam J. Levitt, Grant and Eisenhofer PA, Chicago, IL, Betsy C. Manifold, Edmund S. Aronowitz, Francis M. Gregorek, Patrick H. Moran, Rachele R. Rickert, Wolf Haldenstein Adler Freeman & Herz LLP, San Diego, CA, Michael R. Reese, Reese Richman LLP, Mission Viejo, CA, William Charles Wright, Wright Law Office, West Palm Beach, FL, Jonathan Shub, Scott Alan George Seeger Weiss LLP, Philadelphia, PA, David E. Bower, Faruqi and Faruqi LLP, Los Angeles, CA, Donald A. Ecklund, James E. Cecchi, Lindsey H. Taylor, Carella Byrne Checchi Olstein Brody and Agnello PC, Roseland, NJ, Lawrence Timothy Fisher, Sarah N. Westcot, Bursor and Fisher PA, Walnut Creek, CA, for Plaintiff.

Kenneth Abrams, Richard T. Taylor, McGuireWoods LLP, Richmond, VA, A. Brooks Gresham, Laura E. Coombe, McGuireWoods LLP, Los Angeles, CA, Andrew G. Phillips, Angela M. Spivey, McGuireWoods LLP, Atlanta, GA, Joan S. Dinsmore, McGuireWoods LLP, Raleigh, NC, for Defendant.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

MARGARET M. MORROW, District Judge.

On June 28, 2011, Robert Briseno filed a complaint against ConAgra;[1] between Oc-

tober and December 2011, the court consolidated several cases filed against ConAgra under the caption above.[2]

On January 12, 2012, plaintiffs filed a First Consolidated Amended Complaint.[3] On February 24, 2012, ConAgra filed a motion to dismiss,[4] which the court granted in part and denied in part on November 15, 2012.[5] On December 19, 2012, plaintiffs filed a Second Consolidated Amended Complaint.[6] On February 20, 2014, they filed a motion seeking an order permitting the withdrawal of several named plaintiffs and the dismissal of their claims;[7] the

court granted this motion on May 5, 2014.[8] The same day, plaintiffs filed a motion for class certification.[9] On June 2, 2014, ConAgra filed a motion to strike the declarations of plaintiffs' experts, Colin B. Weir and Charles M. Benbrook.[10] The next day, plaintiffs filed a motion seeking an order permitting the withdrawal of named plaintiffs Bonnie McDonald and Phyllis Scarpelli and the dismissal of their claims.[11] The court subsequently granted plaintiffs' motion and permitted McDonald and Scarpelli to withdraw as named plaintiffs on July 31, 2014.[12] On August 1,

1. Complaint, Docket No. 1 (June 28, 2011).

2. Minutes (In Chambers): Order Taking Off Calendar and Denying as Moot Motion of Plaintiffs Briseno and Toomer to Consolidate Related Actions and Designate Interim Class Counsel, Docket No. 33 (Oct. 6, 2011); Order Consolidating Cases, Docket No. 56 (Nov. 28, 2011); Order Re: Stipulation to Consolidate Related Actions, Docket No. 59 (Dec. 9, 2011); Amended Order Granting Stipulation Re: Amended Consolidated Complaint, Response to Amended Consolidated Complaint, and Consolidation of Additional Action, Docket No. 61 (Dec. 9, 2011). The consolidated cases are *Robert Briseno v. Conagra Foods, Inc.*, CV 11–05379 MMM (AGRx); *Christi Toomer v. Conagra Foods, Inc.*, CV 11–06127 MMM (AGRx); *Kelly McFadden v. Conagra Foods, Inc.*, CV 11–06402 MMM (AGRx); *Janeth Ruiz v. Conagra Foods, Inc.*, CV 11–06480 MMM (AGRx); *Brenda Krein v. Conagra Foods, Inc.*, CV 11–07097 MMM (AGRx); *Phyllis Scarpelli, et al. v. Conagra Foods, Inc.*, CV 11–05813 MMM (AGRx); *Michele Andrade v. Conagra Foods, Inc.*, CV 11–09208 MMM (AGRx); and *Lil Marie Virr v. Conagra Foods, Inc.*, CV 11–08421 MMM (AGRx).

3. Consolidated Amended Class Action Complaint, Docket No. 80 (Jan. 12, 2012).

4. Motion to Dismiss, Docket No. 84 (Feb. 24, 2012).

5. Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Docket No. 138 (Nov. 15, 2012).

6. Second Amended Class Action Complaint ("SAC"), Docket No. 143 (Dec. 19, 2012).

7. Motion for Order for Allowing Withdrawal and Voluntary Dismissal, Docket No. 190 (Feb. 20, 2014). See also Corrected Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Order Allowing Withdrawal and Voluntary Dismissal, Docket No. 191 (Feb. 20, 2014) at 4, 5, 6.

8. Order Granting Plaintiffs' Motion for Withdrawal and Voluntary Dismissal of Individual Claims, Docket No. 238 (May 2, 2014). Following the court's order, no named plaintiffs remained who reside in Washington or Wyoming; this required dismissal of the claims asserted by the putative Washington and Wyoming classes. (*Id.*).

9. Motion to Certify Class, Docket No. 241 (May 5, 2014). See also Memorandum of Points and Authorities in Support, Docket No. 241–1 (May 5, 2014).

10. Motion to Strike Declarations of Colin B. Weir and Charles M. Benbrook, Docket No. 262 (June 2, 2014).

11. Motion for Order Allowing Withdrawal and Voluntary Dismissal, Docket No. 273 (June 3, 2014). See also Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Order Allowing Withdrawal and Order of Voluntary Dismissal, Docket No. 273–2 (June 3, 2014).

12. Order Granting Plaintiffs' Motion for Withdrawal and Voluntary Dismissal of Individual

2014, the court denied plaintiffs' motion for class certification, but granted them leave to file an amended motion for class certification.[13]

Plaintiffs did so on September 8, 2014.[14] ConAgra opposed the amended motion on October 6, 2014.[15] The same day, it filed a motion to strike various declarations filed in support of plaintiffs' amended motion.[16] Plaintiffs oppose ConAgra's motion to strike.[17]

## I. BACKGROUND

### A. Factual Background

Plaintiffs are consumers residing in eleven different states who purchased Wesson Oils between January 2007 and their entry into this case. They allege that from at least June 27, 2007 to the present, ConAgra Foods, Inc. ("ConAgra") deceptively and misleadingly marketed its Wesson brand cooking oils, made from genetically-modified organisms ("GMO"), as "100% Natural." Throughout the proposed class period, every bottle of Wesson Oil carried a front label stating that the product was "100% Natural."[18]

Plaintiffs seek to certify eleven state-wide classes as follows:

"All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence (the 'Class Period') through the final disposition of this and any and all related actions."[19]

Plaintiffs allege claims for violation of state consumer protection laws, breach of express warranty, breach of the implied warranty of merchantability, and unjust enrichment. Specifically, they plead the following claims:

- *California:* (1) California Consumer Legal Remedies Act, California Civil Code §§ 1750 *et seq.* and California Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.* and §§ 17500 *et seq.;* (2) California Commercial Code § 2313; California Commercial Code § 2314.

- *Colorado:* (1) Colorado Consumer Protection Act, Colorado Revised Statutes §§ 6–1–101 *et seq.;* (2) Colorado Revised Statutes § 4–2–313; (3) Colo-

Claims, Docket No. 349 (July 31, 2014). Following the court's order, no named plaintiffs remained who resided in Massachusetts or New Jersey, requiring the dismissal of the claims asserted by the putative Massachusetts and New Jersey classes. (*Id.*).

13. Order Denying Plaintiffs' Motion for Class Certification; Granting in Part and Denying in Part Defendants' Motion to Strike ("Order"), Docket No. 350 (Aug. 1, 2014).

14. Notice of Motion and Amended Motion to Certify Class, Docket No. 363 (Sept. 8, 2014). See also Memorandum of Points and Authorities in Support of Amended Motion to Certify Class ("Class Cert. Motion"), Docket No. 371 (Sept. 8, 2014).

15. Memorandum in Opposition to Amended Motion to Certify Class ("Class Cert. Opp."), Docket No. 383 (Oct. 6, 2014).

16. Notice of Motion and Motion to Strike Declarations of Weir and Howlett in Support of Plaintiffs' Amended Motion for Class Certification ("Motion to Strike"), Docket No. 387 (Oct. 6, 2014).

17. Opposition Re: Motion to Strike Declarations of Weir and Howlett in Support of Plaintiffs' Amended Motion for Class Certification ("Motion to Strike Opp."), Docket No. 401 (Oct. 27, 2014).

18. Answer to Amended Complaint, Docket No. 145 (Jan. 16, 2013), ¶¶ 2, 11–31.

19. Class Cert. Motion at 2.

rado Revised Statutes § 4–2–314; (4) Unjust Enrichment.

- *Florida:* (1) Florida Deceptive and Unfair Trade Practices Act, Florida Statutes Annotated §§ 501.201 *et seq.;* (2) Unjust Enrichment.
- *Illinois:* (1) Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Illinois Compiled States §§ 505/1 *et seq.;* (2) Unjust Enrichment.
- *Indiana:* (1) Indiana Code § 26–1–2–313; (2) Indiana Code § 26–1–2–314; (3) Unjust Enrichment.
- *Nebraska:* (1) Nebraska Consumer Protection Act, Nebraska Revised Statutes §§ 59–1601 *et seq.;* (2) Nebraska Revised Statutes § 2–313; (3) Nebraska Revised Statutes § 2–314; (4) Unjust Enrichment.
- *New York:* (1) New York Consumer Protection Act, New York General Business Law §§ 349 *et seq.;* (2) N.Y. U.C.C. Law § 2–313; (3) Unjust Enrichment.
- *Ohio:* (1) Ohio Consumer Sales Practices Act, Ohio Revised Code §§ 1345.01 *et seq.;* (2) Unjust Enrichment.
- *Oregon:* (1) Oregon Unfair Trade Practices Act, Oregon Revised Statutes §§ 646.605 et seq.; (2) Oregon Revised Statutes § 72–3130; (3) Unjust Enrichment.
- *South Dakota:* (1) South Dakota Deceptive Trade Practices and Consumer Protection Law, South Dakota Codified Laws §§ 37–24–1 *et seq.;* (2) S.D. Cod. Laws § 57A–2–313; (3) South Dakota Codified Laws § 57A–2–314; (4) Unjust Enrichment.
- *Texas:* (1) Texas Deceptive Trade Practices–Consumer Protection Act, Texas Business & Commerce Code §§ 17.41 *et seq.;* (2) Unjust Enrichment.[20]

## B. ConAgra's Request for Judicial Notice

ConAgra requests that the court take judicial notice of ten documents and various attached exhibits, each of which has previously been filed in this action, in support of its opposition to plaintiffs' amended motion for class certification.[21] Specifically, ConAgra asks that the court take judicial notice of: (1) the Declaration of Colin B. Weir in Support of Plaintiffs' Motion for Class Certification and for Appointment of Counsel, which plaintiffs filed on May 5, 2014 as Docket No. 243;[22] (2) the Declaration of Raquelle Hunter in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Counsel, which ConAgra filed on June 2, 2014 as Docket No. 266;[23] (3) the Declaration of Dominique M. Hanssens, Ph.D., in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Counsel, with attached appendices and exhibits, which ConAgra filed on June 2, 2014 as Docket No. 267;[24]

---

20. See Notice of Motion and Amended Motion to Certify Class, Docket No. 363 (Sept. 8, 2014) at 4–5.

21. ConAgra Foods, Inc.'s Amended Request for Judicial Notice in Support of its Opposition to Plaintiffs' Amended Motion for Class Certification ("RJN"), Docket No. 388 (Oct. 6, 2014).

22. See Declaration of Colin B. Weir in Support of Plaintiffs' Motion for Class Certifica- tion and for Appointment of Counsel, Docket No. 243 (May 5, 2014).

23. See Declaration of Raquelle Hunter in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Counsel ("Hunter Decl."), Docket No. 266 (June 2, 2014).

24. See Declaration of Dominique M. Hanssens, Ph.D., in Opposition to Plaintiffs' Motion for Class Certification and Appointment of Counsel, Docket No. 267 (June 2, 2014).

(4) the Declaration of Keith R. Ugone in Opposition to Plaintiffs' Motion for Class Certification, with attached appendices and exhibits, which ConAgra filed on June 2, 2014 as Docket No. 268; [25] (5) the Declaration of Robert B. Hawk in Opposition to Plaintiffs' Motion for Class Certification, with attached exhibits, which ConAgra filed on June 2, 2014 as Docket No. 269; [26] (6) the Declaration of Stacy R. Hovan in Opposition to Plaintiffs' Motion for Class Certification, with attached exhibits, which ConAgra filed on June 2, 2014 as Docket No. 270; [27] (7) the Declaration of Marcella Thompson in Opposition to Plaintiffs' Motion for Class Certification, which ConAgra filed on June 2, 2014 as Docket No. 271; [28] (8) the Rebuttal Declaration of Colin B. Weir in Support of Plaintiffs' Reply Memorandum of Points and Authorities in Further Support of Plaintiffs' Motion for Class Certification, which plaintiffs filed on June 30, 2014 as Docket No. 285; [29] (9) the Declaration of Dr. Elizabeth Howlett, which plaintiffs filed on June 30, 2014 as Docket No. 288; [30] and (10) the court's Order Denying Plaintiffs' Motion for Class Certification, which was entered on August 1, 2014 as Docket No. 350.[31]

■ It is well established that a court can take judicial notice of its own files and records under Rule 201 of the Federal Rules of Evidence. "Judicial notice is properly taken of public records, such as transcripts, orders, and decisions made by … courts or administrative agencies." See *Wayne v. Leal*, No. 07 CV 1605 JM (BLM), 2009 WL 2406299, *4 (S.D.Cal. Aug. 4, 2009); *Molus v. Swan*, No. 05cv452–MMA (WMc), 2009 WL 160937, *2 (S.D.Cal. Jan. 22, 2009) ("Courts also may take judicial notice of their own records," citing *United States v. Author Services*, 804 F.2d 1520, 1523 (9th Cir.1986)). The court may thus taken judicial notice of the filings and order referenced in ConAgra's request for judicial notice. See *NovelPoster v. Javitch Canfield Group*, No. 13–CV–05186–WHO, 2014 WL 5594969, *4, n. 7 (N.D.Cal. Nov. 3, 2014) ("In conjunction with the motion, defendants requested judicial notice of various documents, including NovelPoster's *ex parte* application for a temporary restraining order in this case and this Court's subsequent order…. Defendants' request for judicial notice of the TRO application and order is GRANTED"); see also *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 740 n. 7 (Bankr.D.Ariz.2010) (stating that "[t]he court takes judicial notice of its own records," specifically, a declaration attached to the opposition to a preliminary injunction motion, citing *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.1980)). Accordingly, the court grants ConAgra's request for judicial notice, "although [ConAgra] [is]

**25.** See Declaration of Keith R. Ugone in Opposition to Plaintiffs' Motion for Class Certification, Docket No. 268 (June 2, 2014).

**26.** See Declaration of Robert B. Hawk in Opposition to Plaintiffs' Motion for Class Certification, Docket No. 269 (June 2, 2014).

**27.** See Declaration of Stacy R. Hovan in Opposition to Plaintiffs' Motion for Class Certification, Docket No. 270 (June 2, 2014).

**28.** See Declaration of Marcella Thompson in Opposition to Plaintiffs' motion for Class Certification, Docket No. 271 (June 2, 2014).

**29.** See Rebuttal Declaration of Colin B. Weir in Support of Plaintiffs' Reply Memorandum of Points and Authorities in Further Support of Plaintiffs' Motion for Class Certification, Docket No. 285 (June 30, 2014).

**30.** See Declaration of Dr. Elizabeth Howlett, Docket No. 288 (June 30, 2014).

**31.** See Order.

advised for future reference that [it] need not seek judicial notice of documents previously filed in the same case." "An accurate citation will suffice." *NovelPoster*, 2014 WL 5594969 at *4 n. 7.

## II. DISCUSSION

### A. ConAgra's Motion to Strike and Evidentiary Objections

Before addressing the merits of the certification motion, the court must first consider ConAgra's challenges to declarations filed by the named plaintiffs and plaintiffs' experts. ConAgra contends that the expert declarations of Colin B. Weir and Elizabeth Howlett, Ph.D. submitted in support of plaintiffs' amended motion for class certification, as well as the reply declarations of Weir, Howlett, Benjamin M. Benbrook, Ph.D., and Dr. John C. Kozup, should be stricken because they are inadmissible and unreliable.[32] It also asserts that the court should strike the newly filed declarations of the named plaintiffs because each is a "sham" declaration that is immaterial to plaintiffs' amended motion for class certification.[33] Plaintiffs counter that the Weir and Howlett declarations are admissible expert testimony and that the named plaintiffs' new declarations are consistent with their prior deposition testimony.[34]

### 1. Evidentiary Objections to the Testimony of Plaintiffs' Experts

The court first considers ConAgra's challenges to plaintiffs' experts. While courts in this circuit previously held that expert testimony was admissible in evaluating class certification motions without conducting a rigorous analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court in *Dukes* expressed "doubt that this [was] so." *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2554, 180 L.Ed.2d 374 (2011). After *Dukes*, the Ninth Circuit approved analysis under *Daubert* of the admissibility of expert testimony presented in support of or opposition to a motion for class certification. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir.2011) ("In its analysis of Costco's motions to strike, the district court correctly applied the evidentiary standard set forth in *Daubert* ..."). As a result, the court applies that standard to the proffered testimony of the parties' expert witnesses.

Under Rule 702,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir.2002) ("[Rule 702] consists of three distinct but related require-

---

**32.** Motion to Strike at 1–3; Response in Support of Motion to Strike Declarations of Weir and Howlett in Support of Plaintiffs' Amended Motion for Class Certification ("Motion to Strike Reply"), Docket No. 405 (Nov. 3, 2014) at 1–3; see also Defendant ConAgra Foods, Inc.'s Evidentiary Objections to Plaintiffs' Evidence, Docket No. 407 (Nov. 3, 2014).

**33.** *Id.*

**34.** Motion to Strike Opp. at 1–2.

ments: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency,* 467 F.Supp.2d 1017, 1033 (S.D.Cal.2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

■ Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592–93, 113 S.Ct. 2786; see also *Ellis,* 657 F.3d at 982 ("Under *Daubert,* the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable"). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *United States v. Espinosa,* 827 F.2d 604, 611 (9th Cir.1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.,* No. CV 02–2258

JM (AJB), 2007 WL 935703, *4 (S.D.Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999) (in turn citing *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. 2786)); see also *Walker v. Contra Costa County,* No. C 03–3723 TEH, 2006 WL 3371438, *1 (N.D.Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States,* 483 U.S. 171, 172, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), and *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 744 (3d Cir.1994)).[35]

■ "In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.,* 155 F.3d 1130, 1134 (9th Cir.1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.,* 266 F.3d 993, 1004 (9th Cir.2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)). On a motion for class certification, it is not necessary that expert testimony resolve factual disputes going to the merits of plaintiff's claims; instead, the testimony must be relevant in assessing "whether there was a common pattern and practice that could affect the class as a whole." *Ellis,* 657 F.3d at 983.

### a. Plaintiffs' Expert Colin B. Weir

■ Colin Weir is plaintiffs' economic expert. Weir is Vice President of Economics and Technology, Inc. ("ETI"), a research and consulting firm specializing in economics, statistics, regulation, and public policy. Weir has worked at the

---

**35.** This showing must be by a preponderance of the evidence. See *Daubert,* 509 U.S. at 594 n. 10, 113 S.Ct. 2786 (citing *Bourjaily,* 483 U.S. at 175–76, 107 S.Ct. 2775).

firm for eleven years.[36] He holds an MBA from the High Technology program at Northeastern University, and a Bachelors of Arts degree in Business Economics from the College of Wooster.[37] Weir's academic studies included work on hedonic regression analysis and conjoint analysis.[38] His work at ETI involves econometric and statistical analysis, multiple linear regression, statistical sampling, micro and macroeconomic modeling, and other types of economic analyses.[39] Weir has testified as an expert in federal and state courts, and before the Federal Communications Commission and state regulatory commissions.[40] He has also consulted on a variety of consumer and wholesale products cases, calculating damages related to household appliances, herbal remedies, HBC beauty products, food products, electronics, and computers.[41]

Weir opines that:

"[I]t is possible to determine damages, with a reasonable degree of specificity, certainty, and accuracy, attributable to ConAgra's conduct of placing the '100% Natural' claim on the label of every bottle of Wesson Oil by applying the scientifically valid economic methodology of hedonic regression to common, classwide, aggregate historical retail price and attribute data for Wesson Oil and competing cooking oils to calculate a class wide Price Premium, and then multiplying that Price Premium by the total retail amounts all Class Members paid for Wesson Oil to yield total classwide damages." [42]

He also opines that it is possible to determine damages attributable to ConAgra's labeling of Wesson Oils as "100% Natural" through the use of a "conjoint analysis survey." [43]

In its August 1 order, the court struck Weir's declaration because he failed to provide a reliable damages model for calculating classwide damages. The court stated:

"Here, unlike the experts in *Ralston [v. Mortg. Investors Grp., Inc.*, No. 08–536–JF (PSG), 2011 WL 6002640, *9 (N.D.Cal. Nov. 30, 2011),] or *Hemmings [v. Tidyman's, Inc.*, 285 F.3d 1174 (9th Cir.2002) ], Weir does not provide a damages model that lacks certain variables or functionality. Rather, he provides no damages model at all. Although the methodologies he describes may very well be capable of calculating damages in this action, Weir has made no showing that this is the case. He does not identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied. The court is thus left with only Weir's assurance that he can build a model to calculate damages. Stated differently, his declaration is 'so incomplete as to be inadmissible as irrelevant.' *Hemmings*, 285 F.3d at 1188 (quoting *Bazemore [v. Friday* ], 478 U.S. [385,] 400 n. 10 [106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) ] ). See *Building Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir.2012)

---

**36.** Amended Expert Declaration of Colin B. Weir ("Am. Weir Decl."), Docket No. 367 (Sept. 8, 2014) at 3; Opp. Motion to Strike, Exh. C ("Weir Depo.") at 47:8–12.

**37.** *Id.*

**38.** *Id.* at 9:20–10:21; 13:13–14:7.

**39.** *Id.,* Exh. 1 at 1.

**40.** Am. Weir Decl. at 3.

**41.** *Id.*

**42.** *Id.,* ¶ 9.

**43.** *Id.,* ¶ 10.

(district court did not abuse its discretion in rejecting the declaration of an expert who 'offered unsupported assertions' with 'no data forming the basis for [the expert's] assumptions or conclusions'); see *id.* ('The party offering expert testimony has the burden of establishing its admissibility'). Accordingly, the court finds that Weir's declaration does not satisfy the requirements of Rule 702. The court therefore grants ConAgra's motion to strike Weir's declaration, and will not consider his testimony in deciding the certification motion." [44]

ConAgra argues that Weir's testimony continues to lack a reliable factual foundation and thus should be stricken by the court and not considered in deciding plaintiffs' amended motion for class certification.[45] It maintains that Weir's declaration is flawed in the same ways that his original declaration was defective. Specifically, ConAgra asserts that "Weir fails to identify any data in his possession to which the [hedonic regression] model can be applied or any variables that he intends to build into the model." [46] ConAgra contends that Weir's failure to identify the data that would form the basis for his regression analysis leaves the court with nothing but "assurances that are based on incomplete data, [that are] vague assertions regarding variables and likely outcomes, and [that] are, ultimately false." [47] The court does not agree.

As ConAgra notes,[48] the court previously rejected Weir's original declaration and proposed regression methodology because he failed to identify, *inter alia,* the variables he intended to build into the models and the data he possessed to which the models could be applied. Weir's declaration in support of plaintiffs' amended class certification remedies these shortcomings.

Weir has prepared a preliminary regression model, in which the dependent variable of the proposed methodology being measured is the product's price/price premium.[49] The model employs a number of independent variables as potential explanatory variables impacting price.[50] Weir states that his preliminary hedonic regression of the price of Wesson Oil products "analyze[s] twenty [ ] product attributes," including the brand of oil, the "natural" claim at issue in this litigation, other product label claims, oil variety (e.g., canola, corn, blend, or vegetable), the size of the bottle of oil, promotional prices, and time period.[51]

Weir used data from various spreadsheets and reports reflecting historical price, cost, profit and attribute information for Wesson Oils and competitor brands.[52] He obtained this data from twelve spreadsheets produced by ConAgra reflecting (1) internal data related to Wesson Oil products only, and (2) "scanner data" collected by market research companies such as Information Resources, Inc. ("IRI") and Nielsen, which registers, in real time, price, quantity, and other information about products as they are being pur-

---

44. Order at 13–14.

45. Motion to Strike at 7–9.

46. *Id.* at 8.

47. *Id.*

48. *Id.* at 7–9.

49. Am. Weir Decl., ¶¶ 65–70, 105, Exh. 3.

50. Motion to Strike Opp. at 6–7; see Am. Weir Decl., ¶¶ 100–105.

51. Am. Weir Decl., ¶¶ 102–103, Exh. 3.

52. *Id.,* ¶¶ 37–48.

chased by consumers.[53] Weir also received three spreadsheets directly from IRI, which reflect oil sales data from 2009 to mid–2014 on an national and state basis.[54] While Weir acknowledges that this is all the price, cost, and attribute data he has received at this point, the data "affirm[s] [his] understanding that more geographically and temporally specific" can be obtained, and can be used for "more refined regressions."[55]

ConAgra contends Weir has failed to show that the data required to perform a hedonic regression analysis exists or is obtainable; it asserts that the data it provided is not useful in performing the analysis, and becomes useful only after he has isolated the appropriate price premium.[56] It also argues that "Weir's attribute-related data (1) is incomplete and does not accurately reflect the attributes of [the] products [he] chose[ ] for analysis ..., (2) does not control for historical label claims and label changes, and (3) does not control for other variables that have been shown to affect prices (e.g., geographic locations, sales channels, and retailers)."[57] As support for its assertion that Weir has not shown that he can calculate a price premium associated with 100% Natural claim, ConAgra cites the opinions of its expert, Keith R. Ugone, Ph.D.[58] Dr. Ugone concludes that Weir's proposed methodology for calculating classwide damages is flawed in several respects; most notably, Ugone asserts that Weir's proposed regression analysis cannot isolate the price premium attributable to the purportedly unlawful

and misleading conduct plaintiffs allege here, i.e., leading consumers to believe that Wesson Oils do not contain GMOs when, in fact, they do.[59] He also contends that Weir improperly calculates damages on a nationwide basis, rather than on a state-by-state basis consistent with the subclasses proposed for each state, and that Weir inappropriately performed an "expansion" of his data set in an attempt to reflect the number of transactions he believed took place.[60]

The court is not persuaded that any of Ugone's criticisms indicate that Weir's methodology is unreliable or that he cannot offer an opinion in support of plaintiffs' amended motion for class certification. As respects Ugone's criticism that the methodology does not satisfy the requirement articulated in *Comcast Corp. v. Behrend,* —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013)—i.e., that damages be capable of measurement on a classwide basis—this does not affect the *admissibility* of Weir's opinions. Admissibility turns on whether Weir's methodology is sufficiently reliable; whether it satisfies *Comcast* and shows that a class should be certified is another question altogether—one which the court will address *infra* in conducting a Rule 23(b)(3) predominance analysis.

Ugone's remaining criticisms are similarly unavailing. While it is true that a damages model likely will have to calculate the alleged price premium for smaller geographic areas since plaintiffs seek certification of eleven state subclasses, and, as

---

53. *Id.,* ¶¶ 34–35.

54. *Id.,* ¶ 49.

55. *Id.,* ¶ 50.

56. Motion to Strike at 9.

57. *Id.*

58. See Reply Declaration of Keith R. Ugone in Support of Defendant's Opposition to Plaintiffs' Amended Motion for Class Certification ("Reply Ugone Decl."), Docket No. 385 (Oct. 6, 2014).

59. Reply Ugone Decl., ¶ 9.

60. *Id.*

both Weir and Ugone recognize, prices vary from one state to another, Weir's failure to perform a state-by-state regression analysis at the class certification stage does not compel the conclusion that his methodology is unreliable, and that his opinion should be stricken. Weir states that there is "more geographically and temporally specific information" available from IRI and Nielsen that he was not able to obtain prior to submitting his declaration in support of the certification motion.[61] He reports that the same preliminary regression analysis described in his declaration can be performed using more specific geographical and temporal data. While Ugone asserts that "significant price variation exists across geographic areas ... which could influence a price premium analysis ...,"[62] and that Weir may not "obtain[ ] the same claimed positive, significant [price premium] estimates [when he conducts a regression analysis on a statewide basis],[63] this suggests only that Weir's testimony may not be helpful to plaintiffs, not that his methodology is unreliable. Thus, the fact that Weir has not yet conducted a hedonic regression analysis with respect to each of plaintiffs' proposed state classes does not render his methodology unreliable, particularly given that he has identified the information he is attempting to obtain that will permit him to conduct such an analysis; that he has stated the state by state analysis will be conducted in the same manner as his nationwide analysis; and that he has explained why he is not in possession of the information needed to complete the analysis at this time.[64]

ConAgra also asserts that Weir expanded the data set so that he could opine—erroneously—that his results are statistically significant when they are not.[65] In reply, however, Weir notes that economists regularly use data expansion when performing hedonic regression.[66] More importantly, Weir asserts that "expansion of the data and analytic weights will produce an identical coefficient in the regression," i.e., the same coefficient used to measure the price premium attributable to the "100% Natural" claim.[67] Weir's reply declaration assuages the concerns raised in Ugone's reply declaration. The court therefore concludes that Weir's expansion of the data set does not undercut the reliability of his methodology. To the extent the parties' experts disagree on this point, the court concludes that the disagreements go to the weight of the results produced by Weir's regression methodology, not to its reliability. See, e.g., *Apple iPod iTunes Antitrust Litig.*, No. 05–CV–0037 YGR, 2014 WL 4809288, *5–6 (N.D.Cal. Sept. 26, 2014) ("Finally, the Court rejects Apple's argument that the analysis predicts a constant, immediate overcharge that Apple claims is not consistent with the notion of a gradual lock-in over time. Apple purports to demonstrate that Noll's own admissions 'are irreconcilable with the single, unchanging overcharge amount predicted by his damages model.' That argument ultimately is one of weight, not evidence of the unreliability of the regression analyses themselves"); *Edwards v. National Milk Producers Federation,* No. C 11–04766 JSW, 2014 WL 4643639, *6 (N.D.Cal. Sept. 16, 2014)

---

**61.** Am. Weir Decl., ¶ 50.

**62.** Reply Ugone Decl., ¶ 9.

**63.** *Id.,* ¶ 44(b).

**64.** Am. Weir Decl., ¶ 50.

**65.** Reply Ugone Decl., ¶ 9(c); see also *id.,* ¶¶ 66–68.

**66.** Reply Weir Decl., ¶¶ 27–28.

**67.** *Id.,* ¶ 28.

("Upon review of the evidence and Defendants' arguments regarding Dr. Connor's expert reports, the Court finds that any failure to consider relevant factors goes to the weight of the evidence, as opposed to admissibility"). For all these reasons, the court concludes that Weir's methodology is sufficiently reliable.[68] ConAgra's motion to strike his declaration is therefore denied.[69]

### b. Plaintiffs' Expert: Elizabeth Howlett, Ph.D.

ConAgra also moves to strike the expert declaration of Elizabeth Howlett, Ph.D.[70]

Specifically, it to exclude: (1) Howlett's opinions concerning the Kozup survey, as well as the underlying survey itself;[71] and (2) Howlett's opinions related to her proposed conjoint analysis methodology.[72]

#### (1) Kozup Survey

■ ConAgra first seeks to strike the Kozup survey, and Howlett's opinions concerning it, asserting that it is unreliable and inadmissible, and does not provide a sufficient foundation upon which Howlett can base expert opinions.[73] ConAgra cites several admissions by Howlett during her deposition that it contends render the sur-

---

**68.** Weir sets forth a second methodology in his amended declaration; specifically, he proposes that conjoint analysis be used to calculate the price premium associated with ConAgra's use of the purportedly misleading "100% Natural" label. (See Am. Weir Decl., ¶¶ 110–120.) Plaintiffs do not rely on Weir's conjoint analysis, however. Instead, they rely solely on the amended declaration of Dr. Howlett, who also proposes a conjoint analysis. (See Class Cert. Motion at 4, 64–66 (citing Howlett's amended declaration and discussing her conjoint analysis).) Because the plaintiffs do not rely on Weir's proposed conjoint, the court need not address whether it is sufficiently reliable to consider it in deciding the amended certification motion.

**69.** Ugone attacks Weir's regression methodology on several other bases in his reply declaration. He contends that the regression model cannot measure a classwide price premium tied to plaintiffs' theory of liability because, *inter alia*, the product data Weir uses is incomplete and does not accurately reflect the "natural" claims ConAgra has made regarding Wesson Oils and competitor products (Reply Ugone Decl. at 24–31); the data does not accurately reflect the classes plaintiffs seek to certify (*id.* at 32); and the single price premium Weir calculates does not take into account the different types of cooking oil, the length of time over which the price premium purportedly existed and price differentials during that period, and promotional pricing, making it impossible for Weir to calculate a price premium on a classwide basis. (*Id.* at 36–43.) As respects Ugone's first criticism concerning "inaccurate data," Weir proffers a reply dec-

laration that why the criticisms are misplaced; Weir states that he used Nielsen and IRI data, which Ugone recognizes as reliable and sufficient to support a hedonic regression analysis. (Reply Weir Decl., ¶¶ 33–35.) To the extent any data was omitted from the Nielsen and IRI data used (see Reply Ugone Decl., ¶¶ 80–82), Weir notes that the purportedly omitted data represents an infinitesimally small variation in the premium that was calculated and does not affect the statistical significance of his results. (See Reply Weir Decl., ¶¶ 39–42.) Regarding Ugone's second criticism, Weir has testified that his hedonic regression methodology can be refined to specific retail channels or geographic areas; accordingly, the fact that Weir used national data, rather than state-specific data, does not render his methodology unreliable. (See Reply Weir Decl., ¶¶ 36–38.) Finally, Ugone's criticisms of Weir's ability to calculate price premiums across different attributes unpersuasive. As the court has noted, Weir has demonstrated through his preliminary regression analysis that his hedonic regression can control for various attributes and can be refined and narrowed to focus only on particular product attributes and to control for "time," "sales channel," and "geography." (Reply Weir Decl., ¶¶ 36–38.)

**70.** Motion to Strike at 10.

**71.** *Id.* at 10–15.

**72.** *Id.* at 15–19.

**73.** *Id.* at 10.

vey, and her opinions, inadmissible: (1) Howlett admitted that the description of GMOs used in the Kozup survey "alarmed and confused survey respondents"; (2) she admitted that the survey sample was too small to provide accurate results for different states' populations; and (3) she admitted that the non-response rate was high and likely made the results unreliable.[74] Plaintiffs respond that any deficiencies in the survey affect its weight, not its admissibility.[75]

The Ninth Circuit has held that typically "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 814 (9th Cir.1997). See *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 n. 8 (9th Cir.1997) ("However, 'as long as they are conducted according to accepted principles,' survey evidence should ordinarily be found sufficiently reliable under *Daubert.* Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value," quoting *Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1292 (9th Cir.1992)); *id.* at 1143 (the fact that a survey that was conducted only in the southern portion of the state and asked leading questions went to the weight of the evidence, not the admissibility of the survey); see also *Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir.2001) ("Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge. Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility. These are issues for a jury or, in a bench trial, the judge"); *Alcantar v. Hobart Serv.,* No. ED CV 11–1600 PSG (SPx), 2013 WL 156530, *4 (C.D.Cal. Jan. 15, 2013) ("[A]ny problems with the response rate affect the weight, and not the admissibility of the study"); *Microsoft Corp. v. Motorola Inc.,* 904 F.Supp.2d 1109, 1120 (W.D.Wash.2012) (criticisms of a conjoint analysis concerned "issues of methodology, survey design, reliability, and critique of conclusions, and therefore [went] to the weight of the survey rather than admissibility"); *Harris v. Vector Marketing Corp.,* 753 F.Supp.2d 996, 1001–02 (N.D.Cal.2010) ("[Plaintiff] criticizes the content of the survey conducted and prepared by [defendant's expert] as well as the response rate to the survey. The problem for [Plaintiff] is that, as she herself admits in her brief, even challenges to defects in methodology normally affect the weight to be accorded the survey and not its admissibility"); *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.,* 780 F.Supp. 1283, 1296 (N.D.Cal.1991) (holding that the alleged under-inclusiveness of a survey in a copyright infringement action affected "the weight of the survey, not its admissibility"), aff'd, 964 F.2d 965 (9th Cir.1992), cert. denied, 507 U.S. 985, 113 S.Ct. 1582, 123 L.Ed.2d 149 (1993).

Recognizing that most challenges to a survey such as Kozup's go to its weight rather than its admissibility, ConAgra maintains that Howlett's admissions show that the underlying methodology used to conduct the survey is flawed and unreliable, and that it thus does not satisfy *Dau-*

**74.** *Id.*

**75.** Motion to Strike Opp. at 10.

*bert.*[76] The court agrees. The Ninth Circuit has held that before a survey can be admitted it must: (1) be "conducted according to accepted principles"; and (2) be "relevant" to the issues in the case. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1036 (9th Cir.2010); see also *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 121 (3d Cir.2004) (excluding survey results because the "methodology was fundamentally flawed," and rejecting a contention that flawed methodology went to the weight, rather than the admissibility, of the survey).

Howlett did not participate in designing or administering the Kozup survey.[77] She asserts, in conclusory fashion, however, that the "[s]urvey adheres to the guidelines and procedures [in the Reference Guide on Survey Research published by the American Bar Foundation] in order to ensure that this research can help inform the [c]ourt about important consumer beliefs and behaviors with regards to the '100% Natural' claim on the labels of Wesson Oils."[78] Howlett provides no spe-

cifics as to why she reached this conclusion regarding the survey's design and administration and does not respond substantively to ConAgra's critiques of the survey methodology.

ConAgra charges that the language the survey uses to describe GMOs—e.g., "bacteria," "virus," or "toxic to certain insects"[79]—may have alarmed and confused survey respondents, skewing the results. The court is not convinced, as ConAgra argues, that *Daubert* compels the use of definitions provided by the FDA or the USDA to ensure reliability. ConAgra cites the fact that 51 percent of respondents responded incorrectly to a "manipulation" question after reviewing this description of the GMO process, however; the manipulation question was designed to ensure that survey respondents understood the definition of the GMO process. Despite Howlett's assertion that the survey's description of the GMO process is accurate based on her work as an FDA consultant,[80] she concedes that the manipulation question indicates some misunderstanding among the survey respondents.[81]

76. Motion to Strike Reply at 14–15.

77. Amended Declaration of Dr. Elizabeth Howlett in Support of Plaintiffs' Amended Motion for Class Certification ("Am. Howlett Decl."), Docket No. 368 (Sept. 8, 2014), ¶ 67 ("I did not participate in the design or administration of the survey").

78. *Id.*, ¶ 70.

79. Motion to Strike at 11–12.

80. See Am. Howlett Decl., ¶ 78(a) ("To avoid uncertainty or confusion about terms such as 'GMOs,' 'genetically modified ingredients,' 'bioengineering,' or 'biotechnology,' rather than using those terms, Plaintiffs' survey provided descriptions of certain aspects of the genetic modification process. Using descriptions of the bioengineering process rather than 'GMOs' or similar terms avoided the obvious confounding of results due to confusion inherent in the terms. Furthermore, the

descriptions used in the survey are consistent with my understanding of the bioengineering processes based on my extensive work in the area of food labeling, including my work as a consultant to the FDA. The descriptions of bioengineering processes used in the questions are, in my expert opinion, factual, straightforward, and understandable to the average customer").

81. See Declaration of Laura Coombe in Opposition to Amended Motion to Certify Class ("Coombe Decl."), Docket No. 386 (Oct. 6, 2014), Exh. B (Deposition of Dr. Elizabeth Howlett ("Howlett Depo.")) at 191:7–16 ("Q. So because of the 51 respondents it leads you to believe that the question was unclear in some way? A. I—I—yes, I agree that there are some, it's clear, that there are at least 11 consumers. Q. 51, not 11? A. Well, the strongly disagree, the people that very strongly disagree. I think it's clear that there's a little bit of misunderstanding").

Given this fact, and the fact that she did not participate in designing or administering the survey, the court cannot credit her conclusory assertion that the methodology of the survey is reliable.

ConAgra also argues that the survey's sample size is too small to provide valid and reliable evidence about the studied population. Courts regularly find that concerns that a survey's sample size is too small or unrepresentative do not preclude its admission, but go to the weight to be accorded the survey results. See *Southland Sod Farms*, 108 F.3d at 1143 n. 8 ("However, 'as long as they are conducted according to accepted principles,' survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value," quoting *Gallo Winery*, 967 F.2d at 1292); *id.* at 1143 (the fact that a survey was conducted only in the southern portion of the state and that it asked leading questions went to the weight of the evidence, not the admissibility of the survey); *Lewis Galoob Toys, Inc.*, 780 F.Supp. at 1296 (holding that the alleged under-inclusiveness of a survey in a copyright infringement action affected "the weight of the survey, not its admissibility"). Courts generally reach this conclusion once they are satisfied that the survey

has been "conducted according to accepted principles," however. *Fortune Dynamic, Inc.*, 618 F.3d at 1036. Howlett concedes that she does not know the sampling method used in the Kozup survey, and additionally that the sample does not approximate the relevant characteristics of the population being surveyed.[82]

Howlett further acknowledges that the non-responsive rate on the Kozup survey was 95%, which is even higher than the 92% non-responsive rate that formed the basis for his opinion that the Hanssen survey was unreliable.[83] Although the court previously noted that a survey's non-responsive rate generally goes to the weight of the results rather than their admissibility,[84] given Howlett's inability to validate that the survey was reliably designed and administered, such concerns reasonably suggest that the survey's methodology may be flawed.

Finally, ConAgra notes that 53 of the survey respondents failed an "attention check" question designed to ensure the validity of the results.[85] Howlett testified that the responses of individuals who failed the "attention check" question should have been excluded from the survey; she was unsure, however, whether they had been.[86]

In sum, Howlett's testimony demonstrates that she is not sufficiently familiar with the methodology used to design and

---

82. *Id.* at 161:20–162:5 ("Q. With probability sampling, you'd agree that the results from probability sampling are to be extrapolated out for the population, not for a larger population, correct? A. That's correct. Q. That's not what was done here, correct? ... Q. Is that what's done here? A. No"); *id.* at 144:5–8 ("Q. Are you aware of a term that's used to describe the sampling method that was used in plaintiffs' survey? A. No").

83. *Id.* at 200:10–16 ("Q. In paragraph 62 of your declaration, the June 30 Exhibit A, you describe Han[ssen's] survey non-response rate

of 92 percent as quite high. Yours was 95 percent, right? A. It was. Q. Would it be very high? Higher? A. Quite high").

84. Order at 29–30.

85. Motion to Strike at 14–15.

86. Coombe Decl., Howlett Depo. at 177:9–13 ("A. This report. I'm—I'm—I'm just looking back through if—you know, I don't know these—I don't know if these items were—if these respondents were dropped or not now that I look at this").

administer the survey to opine that it was "conducted according to accepted principles" and reliable. See *In re TMI Litigation Cases Consolidated II*, 922 F.Supp. 1038, 1046–48 (M.D.Pa.1996) (excluding as unreliable an epidemiological analysis in which the epidemiologist did not include a description of study design and at his deposition acknowledged that he had not participated in conducting the study).[87]

### (2) Conjoint Analysis

■ ConAgra next seeks to exclude Howlett's opinions on the basis that she is not qualified to offer testimony concerning the conjoint analysis she states can be used to calculate damages.[88] ConAgra contends that Howlett lacks relevant training and experience to opine on conjoint analysis.[89] It notes that Howlett has published only one peer-reviewed article concerning conjoint analysis, which appeared in the 1990's. It asserts she has never been qualified by any court to testify as an expert on conjoint analysis, has never performed a conjoint analysis to determine or assign a price premium for a particular feature of a product, and is not aware of any conjoint analysis that has been used to estimate a fair price premium.[90]

**87.** In her reply declaration discussed *infra*, Howlett offers additional opinions concerning, *inter alia*, the Kozup survey methodology and validity. Specifically, Howlett addresses the attention check question, the survey's manipulation check, and the sampling methodology Kozup employed. ConAgra challenged each of these aspects of the survey in its motion to strike Howlett's amended declaration and the Kozup survey. (Reply Declaration of Dr. Elizabeth Howlett in Support of Amended Motion for Class Certification ("Reply Howlett Decl."), Docket No. 396 (Oct. 27, 2014) at 3–9.) Howlett asserts that after a post-deposition review of the survey and "obtain[ing] additional information from [ ] Dr. John C. Kozup," she "stand[s] by and reaffirm[s] [her] conclusions and opinions set forth in [her] Amended Declaration." (*Id.*, ¶¶ 5–6.) She first responds to ConAgra's contention that the words used to describe the genetic engineering process were inflammatory, asserting that the definition used is accurate. (*Id.*, ¶¶ 7–20.) This conclusion is consistent with her amended declaration, where Howlett stated that the definition was accurate based on her work for the FDA. (See Am. Howlett Decl., ¶ 78(a).)

Howlett also responds substantively to ConAgra's critique of the survey methodology, which affects its admissibility. (See Reply Howlett Decl. at 7.) Although Howlett defends the survey's attention check question, manipulation check question, and sampling methodology, her statements do not, in the court's view, demonstrate that the survey is valid and admissible. Each of Howlett's statements is based on a post-deposition conversation with Kozup and his opinions concerning the validity of the survey. (See *id.*, ¶ 26 ("Following my deposition, I contacted Dr. Kozup to ask him about the specific issues that ConAgra's counsel raised during my deposition, and he provided me with responses, which he is also submitting to the Court through his own declaration. I have reviewed Kozup's soon to be filed declaration, and based on that review and as explained below, I believe his explanations clarify the issues, and indicate that the attention check, manipulation check, and sampling methodology was appropriate").) As discussed *infra*, plaintiffs failed to designate Kozup as an expert witness for purposes of the amended motion for class certification. Plaintiffs' failure to advise ConAgra that they would rely on Kozup's testimony gave ConAgra no opportunity to test his opinions or explanations of the survey methodology, with the result that plaintiffs cannot now rely on Kozup's opinions to show that the survey is reliable. Howlett defends the reliability of the survey on the basis that Kozup believes the methodology is sound. (See *id.*, ¶ 26 ("[H]is explanations clarify the issues, and indicate that the attention check, manipulation check, and sampling methodology was appropriate").) She does not offer opinions based on her own review and analysis of the methodology. As a consequence, and because the court concludes *infra* that plaintiffs cannot rely on Kozup's opinions, Howlett's reply declaration does not change the court's view that the survey must be stricken.

**88.** *Id.* at 15–19.

**89.** *Id.* at 15–16.

■ In the Ninth Circuit, an expert may be qualified to offer a particular opinion either as a result of practical training or academic experience. *Thomas v. Newton Int'l Enterprises,* 42 F.3d 1266, 1269 (9th Cir.1994) ("[T]he advisory committee notes emphasize that Rule 702 is broadly phrased and intended to embrace more than a narrow definition of qualified expert"); *Rogers v. Raymark Industries, Inc.,* 922 F.2d 1426, 1429 (9th Cir.1991) ("A witness can qualify as an expert through practical experience in a particular field, not just through academic training"). See also *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

■ "The threshold for qualification is low for purposes of admissibility; minimal foundation of knowledge, skill, and experience suffices." *PixArt Imaging, Inc. v. Avago Tech. Gen. IP (Singapore) Pte. Ltd.,* No. C 10–00544 JW, 2011 WL 5417090, *4 (N.D.Cal. Oct. 27, 2011). Prior experience need not consist of prior expert testimony on the same issue. See *Matuez v. Lewis,* No. CV 11–7411–JVS (JPR), 2012 WL 3582122, *8 (C.D.Cal. May 9, 2012), report and recommendation adopted, 2012 WL 3582629 (C.D.Cal. Aug. 20, 2012) ("If witnesses could not testify for the first time as experts, we would have no experts").

Howlett's academic training and practical experience qualify her to testify to the calculation of damages using a conjoint analysis. She holds a Ph.D. from Duke University in Marketing, with a focus on Behavioral Decision Research and Theory; her coursework involved conjoint analysis.[91] Howlett has also taught conjoint analysis extensively at the undergraduate and graduate levels, and has conducted more than thirty studies using conjoint analysis.[92] She serves on the editorial review board of the *Journal of Consumer Affairs* and the *Journal of Public Policy & Marketing,* both of which extensively cover conjoint analysis techniques. Finally, she has been retained as an expert on conjoint analysis in two cases in this district—*Forcellati v. Hyland's, Inc.,* CV 12–1983 GHK (MRWx), and *Fagan v. Neutrogena Corp.,* CV 13–01316 SVW (OPx).[93] Her combination of educational training and professional experience suffices to qualify her under Rule 702.

■ ConAgra next argues that Howlett's testimony lacks a reliable factual foundation because she "has [not previously] combined the results of a hedonic regression analysis and a conjoint analysis . . ., and is unaware" that "anyone else in any peer-reviewed article . . . has ever [done so] . . . to assign a price premium to a sub-feature."[94] ConAgra contends Howlett's conjoint analysis is unreliable because: (1) she admits that "hedonic regression is 'over her head,'" but accepts Weir's analysis without question; (2) she identifies only six attributes to include in the conjoint analysis, but does not explain how she selected these six; and (3) she proposes a novel and unsupported method of conducting a conjoint analysis.[95]

90. *Id.*

91. Am. Howlett Decl., ¶¶ 10, 19.

92. *Id.,* ¶ 19.

93. *Id.*

94. Motion to Strike at 16–19.

95. *Id.*

Plaintiffs counter that ConAgra's criticisms of Howlett's proposed conjoint analysis go to the weight, but not the admissibility, of her opinions.[96] They assert that ConAgra's criticism of Weir's hedonic regression analysis does not impact Howlett's methodology because conjoint analysis occurs independent of hedonic regression; Howlett's conjoint analysis assesses the percentage of the "100% Natural" claim that is attributable to the absence of GMOs as opposed to other "non-natural" aspects of the Wesson Oils. This percentage can then be multiplied against the price premium associated with the "100% Natural" calculated by Weir.[97] Plaintiffs also dispute ConAgra's claim that Howlett has not fully designed the proposed conjoint analysis, noting that she describes at length the procedures and rationale supporting her methodology.[98]

ConAgra's arguments are unavailing. As an initial matter, the court has rejected ConAgra's challenges to Weir's methodology. More fundamentally, as plaintiffs note, Howlett's conjoint analysis will be used to calculate a *percentage* of the price premium attributable to the "100% Natural" label that reflects consumers' belief it means the product contains no GMOs.[99] Even if Weir's methodology were unreliable, this would not make Howlett's methodology unreliable as well; at most, it would affect the accuracy of the damages

calculation reached by combining the results of hedonic regression and conjoint analysis. Contrary to ConAgra's suggestion, moreover, Howlett does explain why she chose to limit her analysis to six attributes and why she chose the attributes she did.[100] Finally, the fact that conjoint analysis has not been used to isolate the exact attribute for which Howlett uses it here does not automatically render her methodology and conclusions unreliable. It is Howlett's experience with conjoint analysis and the details of her proposed methodology that determine reliability. Having considered these factors, the court concludes that Howlett's thorough explanation of her methodology and her background in performing similar conjoint analyses suffice to satisfy *Daubert* and Rule 702. Accordingly, ConAgra's motion to strike Howlett's testimony concerning her conjoint analysis is denied.

## 2. Evidentiary Objections to the Reply Declarations of Plaintiffs' Experts

Plaintiffs submitted reply declarations from their experts Weir, Howlett, Benbrook, and Kozup in response to ConAgra's opposition to plaintiffs' amended certification motion and ConAgra's motion to strike.[101] ConAgra contends each declaration contains improper new evidence, argument, and opinion raised for the first time in reply and should not be considered by the court.[102]

---

96. Motion to Strike Opp. at 14–15.

97. *Id.* at 15.

98. *Id.*

99. *Id.*

100. See Am. Howlett Decl., ¶¶ 109–121.

101. See Reply Declaration of Colin B. Weir in Support of Amended Motion for Class Certification ("Reply Weir Decl."), Docket No. 394 (Oct. 27, 2014); Reply Declaration of Charles M. Benbrook, Ph.D. in Support of Amended

Motion for Class Certification ("Reply Benbrook Decl."), Docket No. 395 (Oct. 27, 2014); Reply Declaration of Dr. Elizabeth Howlett in Support of Amended Motion for Class Certification ("Reply Howlett Decl."), Docket No. 396 (Oct. 27, 2014); Reply Declaration of Dr. John C. Kozup in Support of Amended Motion for Class Certification ("Reply Kozup Decl."), Docket No. 400 (Oct. 27, 2014).

102. Motion to Strike Reply at 19–24.

■ In general, a court will not consider evidence submitted for the first time in reply without giving the opposing party an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir.1996) (the district court should not consider new evidence presented in a reply without giving the non-movant an opportunity to respond); see *Green v. Baca*, 219 F.R.D. 485, 487 n. 1 (C.D.Cal.2003) (exercising discretion to consider evidence presented in reply but affording plaintiff an opportunity to depose a key declarant). Evidence submitted in direct response to evidence raised in the opposition, however, is not "new." *Edwards v. Toys "R" Us*, 527 F.Supp.2d 1197, 1205 n. 31 (C.D.Cal.2007) ("Evidence is not 'new,' however, if it is submitted in direct response to proof adduced in opposition to a motion"); see *Terrell v. Contra Costa County*, 232 Fed. Appx. 626, 629 n. 2 (9th Cir.2007) (Unpub. Disp.) (evidence adduced in reply was not new where "[t]he Reply Brief addressed the same set of facts supplied in Terrell's opposition to the motion but provides the full context to Terrell's selected recitation of the facts").

### a. Weir Reply Declaration

■ ConAgra seeks to strike paragraphs 2–8, 10–11, 13–60, and 64–72 of

Weir's reply declaration because "Weir goes far beyond his original opinions, attempting to lend support to Dr. Howlett's methods." [103] The court cannot agree with ConAgra's contention that each paragraph identified in the reply supporting their motion to strike and in their evidentiary objections [104] constitutes "new evidence" or opinions not directly responsive to the arguments in ConAgra's opposition. Paragraphs 2 through 8 provide a summary of Dr. Ugone's criticisms of Weir's amended declaration and his regression methodology, and Weir's responses to each.[105] The information in these paragraphs is directly responsive to Dr. Ugone's critique and ConAgra's arguments and is thus properly submitted in reply.[106]

Similarly, paragraphs 10 and 11 of the Weir reply declaration do not offer new evidence or opinion; rather, they reiterate Weir's "opinion that, if Plaintiffs are correct as to their theory of liability—that it was a violation of law for ConAgra to have placed the '100% Natural' claim on the label of each bottle of Wesson Oil—then the total (i.e. Class-wide) economic harm suffered by Plaintiffs and all other members of the proposed Class is the amount of additional money they paid for Wesson Oil because of the presence of the '100% Natural' claim on the label of every bottle

---

**103.** *Id.*

**104.** Evidentiary Objections in Opposition to Plaintiffs' Declarations in Support of Reply in Support of Plaintiffs' Amended Motion for Class Certification, Docket No. 407 (Nov. 3, 2014).

**105.** See Reply Weir Decl., ¶¶ 2–8.

**106.** There is only one reference made to Dr. Howlett's declaration and methodology in these paragraphs, but Weir provides no substantive opinion regarding either her declaration or methodology. (See Reply Weir Decl., ¶ 4 ("Dr. Keith R. Ugone filed a reply declaration criticizing certain aspects of my

Amended Declaration as well as the Amended Declaration of Dr. Elizabeth Howlett and the survey of Dr. John C. Kozup. Also on October 6, 2014, ConAgra filed a Motion to Strike Evidence, including my Amended Declaration and Dr. Howlett's declaration on the ground that they fail to meet the standards for admissibility of expert opinions set forth in Federal Rule of Evidence 702 and *Daubert* ").) Because Weir offers no new evidence or opinion in this paragraph, even though it references Dr. Howlett's declaration and the Kozup survey, the court refuses to strike this paragraph.

of Wesson Oil they purchased."[107] Because this is not new argument or opinion, and is directly responsive to ConAgra's opposition, the court declines to strike paragraphs 10 and 11 of Weir's reply declaration.

The court also finds unpersuasive ConAgra's assertion that paragraphs 13 through 49 of Weir's reply declaration should be stricken. The information in these paragraphs is *directly responsive* to Dr. Ugone's criticisms of Weir's hedonic regression analysis—indeed, as can be seen from the headings Weir uses,[108] his reply declaration is structured to respond to *each* criticism Ugone makes. The court thus declines to strike the paragraphs.

The remaining portions of the Weir reply declaration that ConAgra seeks to strike—paragraphs 50–60 and 64–72—are a closer question. As ConAgra notes, Weir proffers opinions concerning the reliability of Howlett's conjoint analysis, and thus does more than respond to ConAgra's criticism of his methodology and opinions. As the court noted in the first class certification order, however, and as ConAgra is aware, Weir was designated as an expert *both* with respect to hedonic regression analysis and conjoint analysis.[109] Because Weir offers opinions concerning the reliability of Howlett's conjoint analysis that respond directly to ConAgra's criticisms of her methodology, his reply declaration is appropriate. ConAgra cites no authority indicating that an expert who has been designated to testify on a subject cannot file a reply declaration responding to the opposing party's criticism of a second expert's opinions on that subject. Accordingly, the court declines to strike the remaining paragraphs of Weir's reply declaration because they do not constitute "new evidence," and respond directly to evidence proffered by ConAgra in its opposition. See *Edwards v. Toys 'R' Us*, 527 F.Supp.2d 1197, 1205 n. 31 (C.D.Cal.2007) ("Evidence is not 'new,' however if it is submitted in direct response to proof adduced in opposition to a motion"); see also *Terrell v. Contra Costa County*, 232 Fed.Appx. 626, 629 n. 2 (9th Cir.2007) (Unpub. Disp.) (holding that evidence adduced in reply was not new where "[t]he Reply Brief addressed the same set of facts supplied in Terrell's opposition to the motion but provides the full context to Terrell's selected recitation of the facts").

**107.** See *id.*, ¶ 10; see also *id.*, ¶ 11 ("In his recent deposition, Defendant's expert Dr. Ugone appears to agree: 'A. The—so, for example, I don't know if I got a picture here or not. I don't have one here. But my understanding is that the claim in dispute is the natural claim and my understanding is that that claim was on the product throughout the class period' ").

**108.** See *id.*, ¶¶ 18–49 (separating opinions and responses under the following headings: "cross-sectional data is appropriate for use in this litigation"; "Dr. Ugone's technical criticisms of the preliminary results"; "The use of national data and CAG31947"; "The use of expansion in the dataset"; "The accuracy and usefulness of Nielsen/ IRI data"; "Variations such as retail channel, geography, and time can be controlled for in a hedonic regres-

sion"; "Omitted variation in labeling claims is insignificant"; "The hedonic regression results are consistent with economic theory"; "There are myriad reasons why the affirmative 'GMO' coefficient might be larger than 'Natural' "; "Dr. Ugone's calculation of a negative price premium for corn oils is erroneous"; "Claims administration does not overwhelm the benefit to the class").

**109.** See Order at 10 ("The court concludes that Weir's academic training and practical experience qualify him to testify to the calculation of damages using hedonic regression *and conjoint analysis*") (emphasis added). Weir, in fact, offered a conjoint analysis proposal both in his declaration in support of plaintiffs' original motion for class certification and in his declaration supporting the amended motion.

### b. Howlett Reply Declaration

ConAgra next argues that the court should strike paragraphs 5–70 of Howlett's reply declaration because in those paragraphs, she offers opinions based on her "post-deposition review" of the Kozup survey, as well as new opinions derived from conversations she had with Dr. Kozup about the survey.[110] It asserts that the new evidence would be prejudicial because it will be unable to respond substantively to the information. The court cannot agree. As an initial matter, the opinions in Howlett's reply declaration respond directly to ConAgra's criticisms of Kozup's survey in its motion to strike. More fundamentally, plaintiffs do not rely on the declaration as support for their amended certification motion. Rather, it is apparent that Howlett offers the declaration solely in opposition to ConAgra's motion to strike her original declaration. Accordingly, the new "evidence" and "opinions" are not offered in "reply," but rather in opposition to the motion to strike. ConAgra had adequate opportunity to respond substantively to the declaration in *its* reply supporting the motion to strike; it could, had it wanted, proffered additional evidence that responded directly to the opinions offered in Howlett's declaration. Accordingly, the court concludes that Howlett's

reply declaration is not new evidence offered for the first time in reply, and denies ConAgra's request to strike paragraphs 5–70 of the declaration.[111]

### c. Benbrook Reply Declaration

ConAgra next argues that Dr. Benbrook should not be permitted to explain his definition of genetically modified food products—which was included in the Kozup survey—because Howlett, who initially presented the survey, was unable to explain why such an "inflammatory description" was used.[112] The court is not persuaded that Benbrook's declaration constitutes "new evidence." Benbrook's opinion responds directly to ConAgra's attack on the definitional language in its opposition and its citation of Howlett's testimony concerning the biased nature of the word choice.[113] Accordingly, ConAgra's request that Benbrook's reply declaration be stricken is denied.

### d. Kozup Reply Declaration

■ Finally, ConAgra contends that Dr. Kozup's reply declaration should be stricken in its entirety because, at no time during the pendency of the litigation have plaintiffs designated Kozup as an expert witness.[114] As a result, ConAgra contends, it has not had an opportunity to depose

---

**110.** *Id.* at 21.

**111.** The court notes, however, that to the extent Howlett recounts the opinions of Dr. Kozup regarding the validity and methodology of the survey, the court declines to consider those opinions because, as discussed *infra*, plaintiffs did not afford ConAgra sufficient opportunity to depose Kozup in connection with the amended certification motion and the court has excluded his reply declaration as a result. Plaintiffs cannot present Kozup's opinions through Howlett to circumvent the court's ruling regarding Kozup.

**112.** *Id.* at 22.

**113.** See, e.g., Benbrook Reply Decl., ¶ 20 ("Thus, the description of the GE process in the Kozup Survey *uses terminology that is commonly found in government, industry, media, regulatory, academic, and organizational documents on the genetic engineering of plants* ") (emphasis original); *id.*, ¶¶ 21–31 (discussing publicly available information supporting his description of the genetic engineering process as involving "genetic material from species other than plants (for example certain bacteria or viruses) [being] inserted into the DNA of those plants to make them resistant to certain herbicides and toxic to certain insects").

**114.** *Id.* at 22–25.

Kozup or otherwise test the veracity of his statements.[115] Plaintiffs respond that ConAgra cannot claim prejudice because it "knew of Dr. Kozup's involvement since at least June 30, and it could have noticed his deposition at any time but did not." [116]

The purpose of the disclosure requirements of Rule 26 is to avoid surprise and allow each party to prepare to cross-examine those experts the opponent has indicated will be called at trial. See *Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc.,* 725 F.3d 1377, 1381 (Fed.Cir.2013) ("The purpose of the expert disclosure rule is to 'provide opposing parties reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses,'" quoting *Reese v. Herbert,* 527 F.3d 1253, 1265 (11th Cir.2008)). Here, the court issued a modified scheduling order that addressed, *inter alia,* the filing of an amended motion for class certification and set specific dates by which plaintiffs and defendant had to make expert witnesses on whom they intended to rely in connection with the amended mo-

tion available for deposition.[117] Plaintiffs did not submit Dr. Kozup's declaration in support of their original class certification motion; rather, they proffered Howlett's testimony to offer opinions concerning the survey. Nor did plaintiffs indicate, at any prior to the filing of his declaration in support of their reply, that they intended to rely on Dr. Kozup's testimony in connection with the amended motion. Given this history, ConAgra could not reasonably have been expected to intuit that plaintiffs intended to offer Kozup's testimony *in reply* to its opposition to the amended motion.

Because ConAgra had no notice that plaintiffs intended to rely on Dr. Kozup as an expert witness and thus no opportunity to depose him or otherwise test the veracity of his statements and opinions, Kozup's expert declaration, filed for the first time with plaintiffs' reply, is untimely. Thus, the court strikes the Kozup declaration in its entirety and will not consider it in deciding the amended certification motion.[118] See *Provenz,* 102 F.3d at 1483.

115. *Id.*

116. Motion to Strike Opp. at 13, n. 31.

117. Order Setting Briefing Schedule and Continuing Case Management Dates, Docket No. 358 (Aug. 29, 2014).

118. Plaintiffs contend that Dr. Kozup's declaration is admissible because "the operative scheduling order and the understanding of the parties confirm that Plaintiffs were under no obligation to formally designate Dr. Kozup or any other expert prior to filing their Amended Motion, or to provide advance disclosure of any experts they might have used on rebuttal for class certification." (Plaintiffs' Response to Defendant ConAgra Foods, Inc.'s Evidentiary Objections to Plaintiffs' Evidence, Docket No. 410 (Nov. 10, 2014) at 16). As noted, the court issued an order that set a specific date by which experts who were going to submit declarations in support of the amended class certification motion were to be

made available for deposition. (See Order Setting Briefing Schedule and Continuing Case Management Dates, Docket No. 358 (Aug. 29, 2014) at 1 (setting "[d]ates for Plaintiff to make experts submitting reports available for deposition").) Plaintiffs' insistence that Kozup was "available" for deposition even though they at no point indicated he would provide a report or declaration in connection with the amended class certification motion is inconsistent with both the letter and the spirit of the court's order. While ConAgra certainly could have noticed Kozup's deposition, it had no reason to believe that taking the deposition was necessary because plaintiffs did not designate him as an expert or make him available for deposition in connection with the amended certification motion. The fact that Kozup's declaration may respond to the arguments in ConAgra's opposition (Plaintiffs' Response to Defendant ConAgra Foods, Inc.'s Evidentiary Objections to Plaintiffs' Evidence, Docket No. 410 (Nov. 10, 2014) at 14–16) does not alter the fact that

### 3. Evidentiary Objections to the Testimony of Named Plaintiffs

In support of their amended motion for class certification, plaintiffs submitted the declarations of: (1) Robert Briseno; (2) Jill Crouch; (3) Julie Palmer; (4) Pauline Michael; (5) Dee Hopper–Kercheval; (6) Kelly McFadden; (7) Maureen Towey; (8) Rona Johnston; and (9) Anita Willman.[119] With the exception of Michael, each plaintiff asserts, *inter alia*, that he or she would be "very interested" in buying Wesson Oils labeled "100% Natural" if they did not contain GMOs;[120] each plaintiff alternatively states that he or she "might consider"[121] or "will consider"[122] purchasing Wesson Oils in the future if they continue to contain GMOs and ConAgra stops labeling them "100% Natural." ConAgra contends that the declarations "strain credulity past the breaking point and should be disregarded by this Court as 'shams' because they are demonstrably attorney-drafted, preprinted forms, placed in front of complicit witnesses and signed without any serious thought by those witnesses as to the truth of the matter asserted, and contrary to all of their prior averments and/or testimony."[123]

### a. Whether the Declarations Should Be Stricken Because They Were Not Prepared by the Declarant

■ As an initial matter, ConAgra contends that the court should strike the declarations because they are "shams"—drafted by someone other than the declarants and signed by the declarants "without any serious thought ... as to the truth of the matter asserted."[124] As ConAgra and its attorneys well know, most declarations submitted in connection with civil litigation in state and federal courts are prepared by attorneys for clients and witnesses, and thereafter executed by the clients and/or witnesses under penalty of perjury. If the declaration a lawyer has prepared is incorrect or inconsistent with the declarant's recollection or beliefs, the declarant can refuse to sign the document that has been

---

plaintiffs failed to adhere to the court's August 29, 2014 order.

**119.** See Declarations of Named Plaintiffs in Support of Plaintiffs' Amended Motion for Class Certification ("Plaintiffs' Decls."), Docket No. 370 (Sept. 8, 2014), Exh. A (Declaration of Robert Briseno in Support of Plaintiffs' Motion for Class Certification); Exh. B (Declaration of Plaintiff Jill Crouch in Support of Plaintiffs' Amended Motion for Class Certification); Exh. C (Declaration of Plaintiff Julie Palmer in Support of Plaintiffs' Amended Motion for Class Certification); Exh. D (Reply Declaration of Plaintiff Pauline Michael in Support of Plaintiffs' Motion for Class Certification); Exh. E (Declaration of Plaintiff Dee Hopper–Kercheval in Support of Plaintiffs' Motion for Class Certification); Exh. F (Declaration of Plaintiff Kelly McFadden in Support of Plaintiffs' Motion for Class Certification); Exh. G (Declaration of Plaintiff Maureen Towey in Support of Plaintiffs' Motion for Class Certification); Exh. H (Declaration of Plaintiff Rona Johnston in Support of Plaintiffs' Motion for Class Certification);

Exh. I (Declaration of Plaintiff Anita Willman in Support of Plaintiffs' Amended Motion for Class Certification). See also Reply Declaration of Plaintiff Pauline Michael in Support of Plaintiffs' Motion for Class Certification, Docket No. 286 (June 30, 2014).

**120.** See *id.*, Exh. A, ¶ 8; Exh. B, ¶ 7; Exh. C, ¶ 7; Exh. E, ¶ 6 ("I intend and plan on [purchasing Wesson Oil] in the event that ConAgra stops including GMOs in its '100% Natural' Wesson Oil products"); Exh. F, ¶ 6 ("I intend and plan on [purchasing Wesson Oil] in the event that ConAgra stops including GMOs in its '100% Natural' Wesson Oil products"); Exh. G, ¶ 7; Exh. H, ¶ 7; Exh. I, ¶ 7.

**121.** See *id.*, Exh. A, ¶ 9; Exh. B, ¶ 8; Exh. C, ¶ 7; Exh. G, ¶ 8; Exh. H, ¶ 7; Exh. I, ¶ 8.

**122.** See *id.*, Exh. E, ¶ 7; Exh. F, ¶ 7.

**123.** Motion to Strike at 19–20.

**124.** *Id.*

prepared. See *Kuntz v. Sea Eagle Diving Adventures Corp.,* 199 F.R.D. 665, 669 (D.Haw.2001) ("The court is at a loss to understand Kuntz's argument that the Declarations Procedure forces his attorneys to 'create' evidence by requiring them to decide what to include and what to omit from a declaration. Attorneys consider exactly the same issues in deciding what to say and what not to say during live testimony. Presumably counsel who questions a live witness is well aware from discovery what counsel may justifiably expect the witness to say. Counsel has the same background with the witness when drafting a declaration. With both live testimony and a declaration, a witness may refuse to state what counsel anticipates. The ethics of the situation simply do not change depending on the medium").[125] The court therefore denies ConAgra's motion to strike the named plaintiffs' declarations on the basis that they were attorney-drafted and signed "without serious thought" by the declarants.

### b. Whether the Declarations Should Be Stricken Under the "Sham Affidavit" Rule

ConAgra next asserts that the named plaintiffs' declarations conflict with their theory of the case, and with their prior discovery responses and deposition testimony. In their responses and at their depositions, plaintiffs indicated that they no longer purchased Wesson Oils after learning that they contained GMOs. The declarations they filed in support of the amended certification motion state, however, that they would consider purchasing the products *even if they contained GMOs*

so long as ConAgra were required to remove the "100% Natural" label.[126] Plaintiffs counter that the affidavits are not "shams," but provide context for their prior responses and clarify them.[127]

Under the "sham affidavit rule," which is most often invoked in the context of a motion for summary judgment, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v. International Game Technology,* 577 F.3d 989, 998 (9th Cir.2009) (citing *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991)); see *Agricola Baja Best, S. De. R.L. de C.V. v. Harris Moran Seed Co.,* 44 F.Supp.3d 974, 984, 2014 WL 4385450, *6 (S.D.Cal.2014) ("Harris Moran argues that Baja Best's experts' declarations are inadmissible because the declarations contradict prior deposition testimony. Under the sham affidavit rule, 'a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony,'" citing *Yeager v. Bowlin,* 693 F.3d 1076, 1080 (9th Cir.2012) (in turn quoting *Van Asdale,* 577 F.3d at 998)); *Pacific Ins. Co. v. Kent,* 120 F.Supp.2d 1205, 1213 (C.D.Cal.2000) ("Kent points to his later deposition testimony as proof of a genuine issue of fact concerning his ownership experience. But, the 'general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony,'" citing *Kennedy,* 952 F.2d at 266). Where a declaration appears to contradict an earlier declaration or deposition testimony, the court must make a factual determination

---

125. Chief Judge Mollway made these observations in addressing a plaintiff's request for relief from her civil bench trial procedures, "which, in most cases, require[d] that direct testimony be presented in the form of affidavits or declarations, with witnesses subject to

live cross-examination and live redirect examination." *Kuntz,* 199 F.R.D. at 666.

126. *Id.*

127. Motion to Strike Opp. at 18–20.

as to whether the declaration is an attempt to create a "sham" issue of fact. *Kennedy,* 952 F.2d at 267.

■■ An affidavit is not a sham if: (1) it "merely elaborat[es] upon, explain[s] or clarif[ies] prior testimony," *Messick v. Horizon Industries, Inc.,* 62 F.3d 1227, 1231 (9th Cir.1995); (2) if "the witness was confused at that time of the earlier testimony and provides an explanation for the confusion," *Kent,* 120 F.Supp.2d at 1213 (citing *Kennedy,* 952 F.2d at 266); or (3) if the declaration concerns newly discovered evidence, *id.* See *Agricola,* 44 F.Supp.3d at 984, 2014 WL 4385450 at *6 ("To ensure appropriate application of the rule, the Ninth Circuit imposes two limitations. First, the Court must 'make a factual determination that the contradiction [is] actually a sham.' This limitation is intended to ensure the Court 'does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony.' Second, 'the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous.' A declaration that 'elaborates upon, explains, or clarifies prior testimony elicited by opposing counsel on deposition and minor inconsistencies that result from an honest discrepancy [or] a mistake ... afford no basis for excluding an opposition affidavit' " (citations omitted)).

■■ A court should apply the sham affidavit rule "with caution," *Van Asdale,* 577 F.3d at 998, and only in situations where "the inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous," *id.* See also *Agricola,* 44 F.Supp.3d at 984, 2014 WL 4385450 at *6 ("[I]nvoking the rule too aggressively may 'ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys,' " citing *Van Asdale,* 577 F.3d at 998).

**(1) Whether the Court Should Strike Plaintiffs' Declarations Because They Conflict With the Second Amended Complaint and Plaintiffs' Discovery Responses**

■■ ConAgra first asserts that the declarations must be stricken because they are "inconsistent with [p]laintiffs' theory of the case and discovery responses." [128] It cites allegations in the second amended complaint pleading that plaintiffs were harmed because they were "induced" to "consume a product with a GMO," and that they would not have purchased Wesson Oil "but for" the "100% Natural" label and a belief that it did not contain GMOs.[129] ConAgra also cites interrogatory responses submitted by plaintiffs Johnston, McFadden, Kerchaval, and Willman, which state that "since becoming aware of GMOs in Wesson cooking oils, ... [they have] not purchased any Wesson cooking oils." [130]

The court cannot conclude that the declarations are shams on the basis that they conflict with plaintiffs' "theory of the case." While the declarations may negatively affect plaintiffs' ability to prove materiality, causation, and/or reliance, this does not compel the conclusion that they are false or directly contradictory of prior testimony.

ConAgra's assertion that the declarations conflict with plaintiffs' interrogatory responses has more force. Ultimately,

---

**128.** Motion to Strike at 22.

**129.** *Id.* (citing SAC, ¶¶ 4, 11–31).

**130.** *Id.* (citing RJN, Exh. M (Interrogatory Responses of Plaintiffs Johnston, McFadden, Kerchaval, and Willman, Nos. 1 and 9)).

however, the court does not believe it is appropriate to strike the declarations on this basis. ConAgra maintains that plaintiffs' statements that they "might" or "will consider" purchasing Wesson Oils that contain GMOs if the "100% Natural" label is removed directly conflict with their interrogatory responses. The court discerns no "direct conflict," however. Johnston, McFadden, Kerchaval, and Willman stated in their interrogatory responses that they "have not purchased any Wesson cooking oils" since learning that the products contained GMOs.[131] The responses concern each plaintiff's present purchasing practices. In contrast, their declarations reference potential future purchasing practices.[132]

While ConAgra may contend that plaintiffs' possible willingness to purchase Wesson Oils in the future is not sufficiently definite to give them standing to represent an injunctive relief class under Rule 23(b)(2), that is a question that must resolved in deciding whether to certify a class. It is not a basis for striking the declarations. The declarations can only be stricken if they clearly and unambiguously contradict sworn statements made earlier in this litigation. Because plaintiffs' interrogatory responses do not address whether they would purchase Wesson Oils in the future, the court cannot conclude that their declarations are "shams." Rather, they appear to "merely elaborat[e] upon . . . prior testimony." *Messick*, 62 F.3d at 1231.

### (2) Whether the Court Should Strike Briseno's, Crouch's, and Towey's Declarations Because They Conflict With Prior Deposition Testimony

#### (a) Robert Briseno

■ ConAgra next contends that the declarations of plaintiffs Briseno, Crouch, and Towey contradict their prior deposition testimony. ConAgra cites Briseno's testimony that he tries to avoid ingesting GMOs and tries to ensure that his family does not as well.[133] ConAgra also cites Briseno's answer to a question concerning his willingness to purchase Wesson Oil:

"Q. If Wesson Oil was priced at a lower price point today, would you buy it?
A. No.
Q. Why not?
A. I feel that, you know, Wesson Oil had—they built up a certain trust and loyalty within me. I wouldn't use other products that I feel the same way about. I wouldn't do business with someone who lied to me, and I feel the same way about Wesson."[134]

Plaintiffs counter that Briseno's declaration does not directly contradict his deposition testimony because he testified that on the day of his deposition he was not interested in purchasing Wesson Oils, but said nothing that foreclosed the possibility he might at some point consider purchasing the products in the future.[135] While, on the surface, Briseno's testimony that he would not purchase Wesson Oil products again, even if offered at a lower price point, appears to conflict directly with the

131. See RJN, Exh. M (Interrogatory Responses of Plaintiffs Johnston, McFadden, Kerchaval, and Willman, Nos. 1 and 9).

132. See Plaintiffs' Decls., Exhs. A–I.

133. Motion to Strike at 23; see Declaration of Laura Coombe in Support of ConAgra Foods, Inc.'s Opposition to Plaintiffs' Amended Motion for Class Certification and Motion to Strike Evidence ("Coombe Decl."), Docket No. 386 (Oct. 6, 2014), Exh. D (Deposition Transcript of Plaintiff Robert Briseno ("Briseno Depo.")) at 100:8–12.

134. Briseno Depo. at 154:24–155:9.

135. Motion to Strike Opp. at 18–19.

statement in his declaration that he would consider purchasing Wesson Oils in the future if the "100% Natural" label were removed, his declaration offers an explanation for the apparent facial conflict. Briseno states that he testified at deposition that he would not purchase Wesson Oils even at a lower price because he felt that he had been misled by ConAgra regarding the presence of GMOs in its products.[136] He notes that if the labeling were corrected, he might consider purchasing Wesson Oils, presumably because ConAgra would no longer be misrepresenting the nature of the product. While close, the court cannot find that the declaration directly contradicts Briseno's deposition testimony; rather it "clariff[ies] [that] prior testimony" by showing that his willingness to purchase Wesson Oils turns primarily on his view of the accuracy of ConAgra's product claims.

Moreover, the fact Briseno states that he would consider purchasing Wesson Oils in the future even if they contained GMOs does not contradict his prior deposition testimony that he "tr[ies] to avoid" products with GMOs when similar products without GMOs are available.[137] Indeed, rather than contradicting this testimony, Briseno's declaration merely elaborates on his deposition answer; he explains that he takes many factors into account in deciding which foods to purchase. Only one of these, he asserts, is whether the food contains GMOs; as a result, his "preference to avoid GMOs [is] not always absolute." [138]

For all of these reasons, the court cannot find that Briseno's declaration is a sham. *Van Asdale,* 577 F.3d at 998 (stating that the sham affidavit rule can be invoked only if "the inconsistency between a party's deposition testimony and subsequent affidavit ... [is] clear and unambiguous"); see *School District No. 1J v. ACandS, Inc.,* 5 F.3d 1255, 1264 (9th Cir. 1993) (stating that the sham affidavit rule "should be applied with caution"); *King v. ADT Sec. Services,* Civil No. 06–0519–WS–C, 2007 WL 2713212, *3 (S.D.Ala. Sept. 17, 2007) ("There being nothing more than a *possible* inconsistency, and certainly much less than an *inherent* inconsistency, between [a declaration and deposition testimony], the sham affidavit rule has no application"); see also *Brown v. Showboat Atlantic City Propco, LLC,* No. 08–5145(NLH), 2010 WL 5237855, * 4 (D.N.J. Dec. 16, 2010) ("An inherent requirement of a sham affidavit is that the affiant's statement must contradict deposition testi-

---

**136.** See Briseno Decl., ¶ 7.

**137.** See Briseno Depo. at 100:8–101:14 ("Q. So it's a challenge, but you—it's your testimony that you try to avoid purchasing GMO-ingredient foods for yourself and your family. Is that your testimony? A. Yes. We try to avoid it. Q. And those attempts to avoid it include what? A. Again, being aware of the products that are out there. So for instance, a piece of salmon we know has no GMOs in it. But we have to, at the same token, be aware that any type of wheat product is going to have some sort of genetically modified organism in it. So we try to cut back on those things that aren't whole proteins. The carbohydrates we have to maintain, but we try to eliminate the amount. I don't think we can eliminate them from our lives at this point, especially in a developed country where we're not growing our own food. Q. What do you do, if anything, to avoid food products that contain GMO corn? A. Try to eat less corn products. Q. What, if anything, do you do to try to avoid products that contain GMO soy? A. That would be a hard question, because I don't think I eat very much so, so ... Q. What do you do to try and avoid buying for your family GMO canola? A. We have greatly reduced our number of fried foods that we eat, so we're utilizing less canola oil. So across the board, I think those questions can be answered by avoidance").

**138.** Briseno Decl., ¶ 5; see also *id.,* ¶ 6 (stating that Briseno sometimes buys canola oil because it is better for frying food, although he knows it may contain GMOs).

mony. Statements in an affidavit that 'merely ... conflicts to some degree with an earlier deposition' cannot be disregarded as shams.... Courts do not declare these affidavits shams because they do not flatly contradict deposition testimony and, therefore, a reasonable jury may find the affidavit credible and conclude that any discrepancy is inadvertent[,]" citing *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir.2004)).

### (b) Jill Crouch

■ ConAgra charges that Jill Crouch also submitted a sham affidavit that "directly contradict[s] [her] sworn deposition testimony" in an effort to cure the deficiencies noted in the court's first class certification order regarding the standing requirements for a Rule 23(b)(2) injunctive relief class.[139] It cites Crouch's deposition testimony that at the time of the deposition, she would not purchase Wesson Oils, even at a lower price point, because she felt deceived by ConAgra:

"Q. Would you buy Wesson oil today if it were at a lower price point?

A. I don't think so.

Q. Would you buy Wesson oil today if it changed its label but the contents were the same?

A. I don't know." [140]

ConAgra also cites various statements Crouch made at her deposition suggesting that "she opposed the use of GMOs categorically" because "[she] do[esn't] know what the outcome is going to be for human beings." [141]

Crouch's statement in her declaration that if ConAgra removed the "100% Natural" label, she "might consider buying Wesson Oil in the future depending on the price and the other products conveniently available" does not directly contradict her deposition testimony that she *did not know* whether she would purchase Wesson Oil "if it changed its label but the contents were the same." Crouch's declaration "elaborates" on prior ambiguous testimony. A statement that she might consider purchasing in the future does not directly conflict with her testimony that she did not know one way or the other whether she would be willing to purchase the products. Rather, it represents an evolution of her thinking on the subject, and cannot reasonably be considered a "sham." Crouch's testimony that she finds GMOs and the genetic modification of food products objectionable similarly does not conflict directly with the statements in her declaration. There is nothing "inherently inconsistent" or irreconcilable about an individual's preference for a certain type of food product, i.e., one that is not genetically modified, and the fact that the individual might purchase that type of product de-

---

**139.** Motion to Strike at 23–24.

**140.** Motion to Strike at 23; Coombe Decl., Exh. E (Transcript of Deposition of Jill Crouch ("Crouch Depo.")) at 180:19–24.

**141.** Motion to Strike at 23; see Crouch Depo. at 76:23–77:1 ("Q. Do you object to modifying plants for that reason? A. I'm not comfortable with any genetic modifying right now"); *id.* at 78:14–21 ("Q. Do you object to the use of genetic modification for that purpose? A. I'm not comfortable with any form of genetic modification. Q. And that's true even if it would reduce food costs? A. I don't know what the outcome is going to be for human

beings"); *id.* at 80:10–25 ("Q. And you don't believe it should be done in any circumstances regardless of the possible benefits of genetic engineering, either for prices or for feeding of populations? ... A. I'm not sure that we should be messing with the DNA levels of food items until we know more about what it's going to do to us. Q. Is that a yes, you don't believe it should be done regardless of the purposes? A. Correct"); *id.* at 82: 6–10 ("A. I don't care for the genetic modification. I—Q. So regardless of the purpose for which the Canola was modified, you object? A. Yes").

pending on the type and price of products conveniently available. See *King,* 2007 WL 2713212 at *3. Accordingly, the court declines to strike Crouch's declaration in support of the amended motion for class certification.

### (c) Maureen Towey

ConAgra argues finally that Maureen Towey's deposition testimony directly conflicts with statements in her declaration.[142] ConAgra cites several excerpts from Towey's deposition in which she stated that she does not purchase canola oil because it contains GMOs and that she typically does not purchase food products that she knows have been genetically modified.[143] ConAgra contends that the statement in her declaration that, if they were no longer labeled "100% Natural," she "might consider buying Wesson Oils depending on the price and the other products conveniently available" directly contradicts Towey's testimony that she does not purchase products that she knows contain GMOs.[144] Plaintiffs counter that Towey's declaration *is consistent* with and elaborates on her deposition answer. They note she states that while she "tr[ies] to avoid products made from GMO ingredients," she realizes that it would be "extremely difficult . . . to

avoid GMO ingredients completely," and thus she would consider purchasing Wesson Oils, even if they contained GMOs, if ConAgra removed the "100% Natural" label.[145]

Whether Towey's declaration directly contradicts her prior deposition testimony is a close question. Her deposition testimony was relatively absolute—"if I know that it's GMO, I don't buy it." Nonetheless, the court concludes that the better view of her declaration is that it clarifies her deposition answers. Towey clarifies that she "realizes that it would be extremely difficult . . . to avoid GMO ingredients entirely," and that her purchasing decisions necessarily depend on "price and the products conveniently available."[146] The court therefore declines to strike Towey's declaration as a sham.

### 4. Conclusion Regarding ConAgra's Motion to Strike

■■■ For the reasons stated, the court denies ConAgra's motion to strike Weir's amended declaration and Howlett's amended declaration. The court also denies ConAgra's motion to strike the supplemental declarations of the named plaintiffs.[147]

---

**142.** Motion to Strike at 23–25.

**143.** See Coombe Decl., Exh. F (Transcript of Deposition of Maureen Towey ("Towey Depo.")) at 58:2–8 ("Q. And do you buy products that say natural on the label that have canola or rapeseed as an ingredient? A. No. Q. Why is that? A. Well, now I don't because I know that canola is—uses GMO"); *id.* at 61:2–7 ("Q. Your knowledge of GMOs, has it changed the way you purchase foods? A. Yes. Q. How so? A. I don't—if I know that it's GMO, I don't buy it"); *id.* at 74:13–18 ("Q. You don't bake bread anymore? A. No, not a lot anymore. Q. The Wesson canola oil that you used for baking bread, is that the only time that you baked bread? A. Yeah"); *id.* at 130:16–20 ("Q. Is it fair to say you've never purchased canola oil as a general practice,

that when you purchased it in 2010 it was sort of a one-time thing? A. Yeah, yes").

**144.** Motion to Strike at 23–25.

**145.** Motion to Strike Opp. at 19–20.

**146.** Towey Decl., ¶¶ 6, 8.

**147.** Plaintiffs filed various evidentiary objections to the Declaration of Raquelle Hunter submitted in support of ConAgra's opposition to plaintiffs' initial class certification motion; the court took judicial notice of the Hunter declaration above. (See Plaintiffs' Evidentiary Objections to the Declaration of Raquelle Hunter ("Hunter Objections"), Docket No. 397 (Oct. 27, 2014)). For the most part, plaintiffs object that the statements in Hunter's declaration lack foundation. (See *id.* at 3–10.).

## B. Plaintiffs' Amended Motion for Class Certification

### 1. Legal Standard Governing Class Certification

A district court may certify a class only if:

"(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

FED.R.CIV.PROC. 23(a).

In addition, a district court must also find that at least one of the several conditions set forth in Rule 23(b) is met. "Rule 23(b)(1) allows a class to be maintained where 'prosecuting separate actions by or against individual class members would create a risk of' either '(A) inconsistent or varying adjudications,' or '(B) adjudications ... that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede[ ] their ability to protect their interests.'" *Dukes*, 131 S.Ct. at 2549 n. 2.

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED.R.CIV.PROC. 23(b)(2). The Supreme Court has not yet decided whether this rule "applies only to requests for such injunctive or declaratory relief and does not authorize the class certification of monetary claims at all." *Dukes*, 131 S.Ct. at 2557. It has concluded, however, "that, at a minimum, claims for individualized relief ... do not satisfy the Rule." *Id.* Thus, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*

"Rule 23(b)(3) states that a class may be maintained where 'questions of law or fact common to class members predominate over any questions affecting only individual members,' and a class action would be 'superior to other available methods for

Since a motion for class certification is a preliminary procedure, courts do not require strict adherence to the Federal Rules of Civil Procedure or the Federal Rules of Evidence. See *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (the class certification procedure "is not accompanied by traditional rules and procedures applicable to civil trials"). At the class certification stage, "the court makes no findings of fact and announces no ultimate conclusions on Plaintiffs' claims." *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 519 (C.D.Cal. 2011) (quoting *Mazza v. Am. Honda Motor Co.*, 254 F.R.D. 610, 616 (C.D.Cal.2008)). Therefore, the court can consider inadmissible evidence in deciding whether it is appropriate to certify a class. *Keilholtz v. Lennox Hearth Prods., Inc.*, 268 F.R.D. 330, 337 n. 3 (N.D.Cal.2010) ("On a motion for class certification, the Court may consider evidence that may not be admissible at trial"); see also *Waine–Golston v. Time Warner Entertainment–Advance/New House P'ship*, No. 11CV1057–GPB (RBB), 2012 WL 6591610, *9 (S.D.Cal. Dec. 18, 2012) (overruling objections to evidence because "the Court may consider inadmissible evidence at the class certification stage"); *Alonzo*, 275 F.R.D. at 519 ("The court need not address the ultimate admissibility of the parties' proffered exhibits, documents and testimony at this stage, and may consider them where necessary for resolution of the [Motion for Class Certification]" (alteration original)). Because the court need not adhere strictly to the Federal Rules of Evidence in deciding the class certification question, it overrules plaintiffs' evidentiary objections to Hunter's declaration.

fairly and efficiently adjudicating the controversy.'" *Id.* at 2549 n. 2.

■■■ "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* at 2551. Thus, "[t]he party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir.), amended, 273 F.3d 1266 (9th Cir.2001); see also *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992). A class can be certified only if the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160–61, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). As the Supreme Court has noted, "[f]requently ... 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S.Ct. at 2551.

Plaintiffs seeks to certify twelve state-wide classes as follows:

> "All persons who reside in the States of California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, or Texas who have purchased Wesson Oils within the applicable statute of limitations periods established by the laws of their state of residence (the 'Class Period') through the final disposition of this and any and all related actions." [148]

**148.** Class Cert. Motion at 2.

**149.** Class Cert. Opp. at 22.

## 2. Whether the Proposed Class Should Be Certified

### a. Standing

■■ As a threshold matter, ConAgra contends that the named plaintiffs lack standing because they have suffered no injury.[149] Specifically, ConAgra argues that after filing the lawsuit, plaintiffs continued to purchase cooking oils and other products that were labeled "natural" but contained non-organic GMO ingredients.[150] ConAgra asserts that plaintiffs cannot prove measurable damages because although they allege they paid a premium for Wesson Oils as a result of the "100% Natural" label, they are unable to determine the price they paid for Wesson products and have no means of acquiring this information.[151]

ConAgra made these same arguments in opposition to plaintiffs' original motion for class certification; the court found them unconvincing and continues to do so. As the court noted in its prior order, each plaintiff has testified that he or she purchased Wesson Oils during the class period. Plaintiffs contend they were damaged because ConAgra misleadingly labeled the products "100% Natural," which caused them to pay higher market prices for the products than they would have otherwise have paid. Although plaintiffs' subsequent purchase of products labeled "natural" that contained GMO ingredients may seriously undercut their claim that their purchasing decision was influenced by the "100% Natural" label, the purchases do not deprive plaintiffs of standing to assert the claims they plead in this action. Moreover, although ConAgra argues that plaintiffs' supplemental declarations also indicate

**150.** *Id.* at 22–23.

**151.** *Id.*

they were not injured by the allegedly misleading label, the court cannot agree. As with the plaintiffs' subsequent purchases of products containing GMOs, the fact that the named plaintiffs "might consider" or "will consider" purchasing Wesson Oil products in the future, even if they contain GMOs, does not deprive them of Article III standing to assert the claims they plead in their second amended complaint. Such statements are properly considered in assessing the "materiality" of the alleged misrepresentation, but do not compel a conclusion that the named plaintiffs have not suffered the requisite injury in fact to confer Article III standing.

ConAgra also argues that plaintiffs lack standing to represent the putative classes because they "can only speculate as to their damages." Specifically, it asserts that plaintiffs "have not saved receipts, cannot recall what they paid over time, and have no way of finding out."[152] ConAgra contends plaintiffs cannot adduce "foundational evidence" demonstrating that they paid "a 'premium' because they do not recall the specific price that they paid...."[153] The court cannot agree. As an initial matter, the court has denied ConAgra's motion to strike Weir's declaration in support of the amended certification motion. Thus, plaintiffs have proffered a methodology that they contend can be used to calculate the price premium associated with the "100% Natural" label on Wesson Oils as a percentage of total purchase price.[154]

The fact that plaintiffs cannot recall the specific price they paid for Wesson Oils does not deprive them of standing. Weir states that it is "possible to determine damages, with a reasonable degree of specificity, certainty, and accuracy, attributable to ConAgra's conduct of placing the '100% Natural' claim on the label of every bottle of Wesson Oil" by performing a hedonic regression analysis using "aggregate historical retail price" data.[155] He states that his damages model would rely, *inter alia*, on "scanner data" from market research companies IRI and Nielsen; this data reflects the price paid by consumers in a particular state at a particular time during the class period. Specifically, Weir reports that IRI's scanner data shows the unit price of Wesson Oils on a four-week basis both nationwide and by state.[156] Because plaintiffs' theory, and Weir's regression model, posit that consumers paid a price premium for every bottle of Wesson Oil purchased during the class period, and because Weir states he can obtain data that reflects the historical prices paid by consumers, named plaintiffs' failure to produce evidence of the specific price that each paid does not compel the conclusion that they cannot show injury in fact and lack Article III standing. Moreover, Weir noted that the data in his possession and other data that is obtainable can be formatted to account for variations in pricing among geographical regions and/or pricing changes over time; thus, plaintiffs' failure to provide specifics about "variations in pricing"[157] does not deprive them of stand-

---

**152.** *Id.* at 23–24.

**153.** *Id.*

**154.** Although plaintiffs assert that this methodology can be used to calculate classwide damages, the court considers *infra* whether it is sufficiently reliable to meet the requirements set forth in *Comcast.*

**155.** Am. Weir Decl., ¶ 9.

**156.** *Id.,* ¶ 36.

**157.** Class Cert. Opp. at 23–24.

ing to assert their claims as ConAgra asserts.

In short, the data plaintiffs and Weir have identified or proffered provide sufficient "foundational evidence" from which a price premium attributable to ConAgra's use of a "100% Natural" label on Wesson Oils can be calculated. At this stage of the proceedings, the court concludes that plaintiffs have adequately shown that they suffered injury in fact sufficient to confer standing on them to pursue the class claims. Accordingly, the court turns to the merits of plaintiffs' amended motion for class certification.

### b. Rule 23(a) Requirements

### (1) Whether Plaintiffs Have Proposed an Ascertainable Class

■ Although not specifically mentioned in Rule 23, plaintiffs must, in addition to showing numerosity, commonality, typicality and adequacy, demonstrate that the members of the class are ascertainable. See, e.g., *Lukovsky v. San Francisco,* No. C 05–00389 WHA, 2006 WL 140574, *2 (N.D.Cal. Jan. 17, 2006) (" 'Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed,' " quoting *Schwartz v. Upper Deck Co.,* 183 F.R.D. 672, 679–80 (S.D.Cal.1999)); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,* 209 F.R.D. 159, 163 (C.D.Cal.2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class. Once an ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote omitted)); *O'Connor v. Boeing North American, Inc.,*

184 F.R.D. 311, 319 (C.D.Cal.1998) (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop v. Saab Automobile A.B.,* No. CV 95–0721 JGD (JRx), 1996 WL 33150020, *4 (C.D.Cal. Feb. 16, 1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class that they purport to represent at the time the class action is certified. The named plaintiffs must also demonstrate that the class is ascertainable" (citation omitted)).

■ A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor,* 184 F.R.D. at 319; accord *Davoll v. Webb,* 160 F.R.D. 142, 143 (D.Colo. 1995); see also *Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 347 (S.D.Ga.1996) ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,' " quoting *Pottinger v. Miami,* 720 F.Supp. 955, 957 (S.D.Fla.1989)).

■ Plaintiffs argue that the classes they propose are ascertainable because membership in each is governed by a single objective criterion—whether an individual purchased Wesson Oils during the class period.[158] ConAgra argues, as it did in opposition to the original class certification motion, that the classes are not ascertainable because there is no way to determine the identity of consumers who purchased its products. It contends the vast majority of possible class members will be unable "truthfully [to] self-identify by providing the most basic information about qualifying purchases—did they make a purchase or purchases within the class period, how many, what sizes, at

**158.** Class Cert. Motion at 8–9.

what prices?"[159] As the court recognized in its class certification order, "district courts in this circuit are split as to whether the inability to identify the specific members of a putative class of consumers of low priced products makes the class unascertainable."[160] Compare *In re POM Wonderful LLC,* No. ML 10–02199 DDP (RZx), 2014 WL 1225184, *6 (C.D.Cal. Mar. 25, 2014) (observing that "[i]n situations where purported class members purchase an inexpensive product for a variety of reasons, and are unlikely to retain receipts or other transaction records, class actions may present such daunting administrative challenges that class treatment is not feasible," and holding that a class of consumers of a juice product was not ascertainable, particularly where "[n]o bottle, label, or package included any of the alleged misrepresentations"); *Sethavanish v. ZonePerfect Nutrition Co.,* No. 12–2907–SC, 2014 WL 580696, *56 (N.D.Cal. Feb. 13, 2014) ("Plaintiff has yet to present any method for determining class membership, let alone an administratively feasible method. It is unclear how Plaintiff intends to determine who purchased ZonePerfect bars during the proposed class period, or how many ZonePerfect bars each of these putative class members purchased. It is also unclear how Plaintiff intends to weed out inaccurate or fraudulent claims. Without more, the Court cannot find that the proposed class is ascertainable") with *Forcellati v. Hyland's, Inc.,* No. CV 12–1983–GHK (MRWx), 2014 WL 1410264, *5 (C.D.Cal. Apr. 9, 2014) (rejecting an argument that a putative class of consumers of children's cold/ flu products was not ascertainable, and stating that "[g]iven that facilitating small claims is '[t]he policy at the very core of the class action mechanism,' we

decline to follow *Carrera* [*v. Bayer Corp.,* 727 F.3d 300 (3d Cir.2013),]" quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); *McCrary v. Elations Co., LLC,* No. EDCV 13–00242 JGB (OPx), 2014 WL 1779243, *8 (C.D.Cal. Jan. 13, 2014) ("*Carrera* eviscerates low purchase price consumer class actions in the Third Circuit. It appears that pursuant to *Carrera* in any case where the consumer does not have a verifiable record of its purchase, such as a receipt, and the manufacturer or seller does not keep a record of buyers, *Carrera* prohibits certification of the class. While this may now be the law in the Third Circuit, it is not currently the law in the Ninth Circuit. In this Circuit, it is enough that the class definition describes 'a set of common characteristics sufficient to allow' a prospective plaintiff to 'identify himself or herself as having a right to recover based on the description.' As discussed above, the class definition clearly defines the characteristics of a class member by providing a description of the allegedly offending product and the eligible dates of purchase. A prospective plaintiff would have sufficient information to determine whether he or she was an Elations customer who viewed the specified label during the stated time period,'" quoting *Moreno v. AutoZone, Inc.,* 251 F.R.D. 417, 421 (N.D.Cal.2008) (citations omitted)).

The court continues to agree with those courts that have found classes, such as those proposed by plaintiffs, ascertainable. As the court previously noted: "ConAgra's argument would effectively prohibit class actions involving low priced consumer goods—the very type of claims that would not be filed individually—thereby upend-

---

**159.** Class Cert. Opp. at 26–27.

**160.** Order at 37.

ing '[t]he policy at the very core of the class action mechanism.' "[161]

ConAgra also argues, as it did in its original opposition, that the inclusion of uninjured class members makes the putative classes unascertainable.[162] The court previously found this argument unavailing,[163] and remains unconvinced. Because every putative class member has been exposed to the alleged misrepresentation, the fact that some class members may have not been injured by the "100% Natural" claim does not render the class unascertainable. See *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 455 (S.D.Cal.2014) ("In the instant case, Plaintiffs have alleged a widespread advertising campaign promoting the alleged misrepresentations as well as uniform labeling for each of the Class Products. That the proposed class may include purchasers who did not rely on the misrepresentations and/or were satisfied with the products does not render the class 'overbroad' where Maybelline has failed to demonstrate a lack of exposure as to some class members"); *Rodman v. Safeway, Inc.*, No. 11–CV–03003–JST, 2014 WL 988992, *16 (N.D.Cal. May 10, 2014) ("If Defendant is arguing that, even after a plaintiff establishes all of the Rule 23 factors, a defendant can still defeat certification by pointing to the possibility that certain members of the class will not be able to recover on their claims, the Court does not adopt that view of the 'ascertainability' inquiry. This Court joins others in this district that hold that '[w]hen rejecting class certification based on overbreadth ... the problem lies in the court's ability to ascertain the class, not whether the putative class members have been aggrieved,' " citing *Kurihara v. Best*

*Buy Co., Inc.*, No. 06–CV–01884 MHP, 2007 WL 2501698, *5 (N.D.Cal. Aug. 30, 2007) (in turn citing *Mateo v. M/S Kiso*, 805 F.Supp. 761, 773 (N.D.Cal.1991)) and collecting cases); see also *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1201 (10th Cir.2010) ("That a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification"); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir.2009) (the fact that a proposed class "will often include persons who have not been injured by the defendant's conduct ... does not preclude class certification," but "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant").

For these reasons, and for the reasons articulated in its August 1 order,[164] the court concludes that plaintiffs have proposed sufficiently ascertainable classes. To the extent ConAgra argues that the inclusion of uninjured class members prevents the court from certifying the putative classes, its contentions are more properly considered in analyzing whether plaintiffs have satisfied Rules 23(a)(2) and 23(b)(3).

### (2) Numerosity

■ Before a class can be certified under the Federal Rules of Civil Procedure, the court must determine that it is "so numerous that joinder of all members is impracticable." See FED.R.CIV.PROC. 23(a)(1). "Impracticability does not mean impossibility, [however,] ... only ... difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909,

---

**161.** Order at 39 (quoting *Amchem Prods.*, 521 U.S. at 617, 117 S.Ct. 2231).

**162.** Class Cert. Opp. at 28–29.

**163.** Order at 40–42.

**164.** *Id.* at 36–42.

913–14 (9th Cir.1964) (internal quotation marks omitted). There is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must examine the specific facts of each case to evaluate whether the requirement has been met. See *General Tel. Co. v. EEOC*, 446 U.S. 318, 329–30, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). "As a general rule, [however,] classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D.Cal.1988) (citing 3B J. Moore and J. Kennedy, MOORE's FEDERAL PRACTICE ¶ 23–05[1] (2d ed.1987)). ConAgra acknowledges that millions of consumers purchased Wesson Oil products during the class period.[165] Consequently, plaintiffs have met their burden of demonstrating that the proposed classes are sufficiently numerous.[166]

### (3) Commonality

 Commonality requires "questions of law or fact common to the class." See FED.R.CIV.PROC. 23(a)(2). The commonality requirement is construed liberally, and the existence of some common legal and factual issues is sufficient. *Jordan v. County of Los Angeles*, 669 F.2d 1311, 1320 (9th Cir.1982); accord *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998) ("The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively"); see also, e.g., *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 600 (S.D.N.Y.1989) ("Unlike the 'predominance' requirement of Rule 23(b)(3), Rule 23(a)(2) requires only that

the class movant show that a common question of law or fact exists; the movant need not show, at this stage, that the common question overwhelms the individual questions of law or fact which may be present within the class"). As the Ninth Circuit has noted: "All questions of fact and law need not be common to satisfy the Rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies "within the class."" *Hanlon*, 150 F.3d at 1019.

 That said, the putative class's "claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. Although for purposes of Rule 23(a)(2) even a single common question will do, *id.* at 2556, " '[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* at 2551 (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.REV. 97, 132 (2009)). As the Ninth Circuit recently articulated by way of example, "it is insufficient to merely allege any common question, for example, 'Were Plaintiffs passed over for

---

**165.** Answer to Amended Complaint, ¶ 57.

**166.** ConAgra does not dispute plaintiffs' showing as to this requirement.

promotion?' Instead, they must pose a question that 'will produce a common answer to the crucial question why was I disfavored.' " *Ellis*, 657 F.3d at 981 (quoting *Dukes*, 131 S.Ct. at 2552).

■ As in their original motion for class certification, plaintiffs argue that the commonality requirement is satisfied because all class members were exposed to ConAgra's "100% Natural" label and marketing and their claims thus arise from "a common core of salient facts" and pose a common questions: "whether ConAgra's '100% Natural' marketing and labeling of Wesson Oil products was false, unfair, deceptive, and/or misleading." [167] As the court previously concluded, such a question is sufficient to satisfy commonality.[168] See, e.g., *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 537 (N.D.Cal. 2012) ("[H]ere, variation among class members in their motivation for purchasing the product, the factual circumstances behind their purchase, or the price that they paid does not defeat the relatively 'minimal' showing required to establish commonality"); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 377 (N.D.Cal.2010) (holding that the commonality requirement was satisfied by allegations that the defendant beverage supplier's "packaging and marketing materials [were] unlawful, unfair, deceptive or misleading to a reasonable consumer"). Thus,

the court finds the commonality requirement satisfied.[169]

### (4) Typicality

■ Typicality requires a determination as to whether the named plaintiff's claims are typical of those of the class members she seeks to represent. See FED.R.CIV.PROC. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory").

■ "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon*, 976 F.2d at 508 (citation and internal quotation marks omitted). Typicality, like commonality, is a "permissive standard[ ]." *Hanlon*, 150 F.3d at 1020. Indeed, in practice, "[t]he commonality and typicality requirements

---

**167.** Class Cert. Motion at 7. Plaintiffs also assert that their claims raise additional common questions: (1) whether ConAgra acted knowingly or recklessly; (2) whether plaintiffs and members of the putative classes are entitled to actual, statutory, or other forms of damages; and (3) whether plaintiffs and the class members are entitled to equitable relief, including, but not limited to, injunctive relief and restitution. (*Id.*).

**168.** Order at 44–45.

**169.** In its opposition, ConAgra asserts that "[p]laintiffs have not met their burden of pro-

viding evidence that there is a 'common' question that can resolve in 'one stroke' all of the [p]laintiffs' claims, under each of the states' laws [p]laintiffs cite." (Class Cert. Opp. at 32.) It then identifies a "myriad of individual reliance, causation, materiality, and damages issues" that it contends affect each of plaintiffs' claims. As the court noted in its August 1 order, however, questions of individualized reliance, causation, materiality, and damages are best addressed in conducting a Rule 23(b) predominance inquiry. (See Order at 56–62.).

of Rule 23(a) tend to merge." *Falcon,* 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364. See also *Dukes,* 131 S.Ct. at 2551 n. 5 ("We have previously stated in this context that '[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest,' " citing *Falcon,* 457 U.S. at 158 n. 13, 102 S.Ct. 2364).

■■■■ Typicality may be lacking "if 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.' " *Hanon,* 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.,* 628 F.2d 994, 999 (7th Cir.1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation"). To be typical, a class representative need not prove that she is immune from any possible defense, or that her claim will fail only if every other class member's claim also fails. Instead, she must establish that she is not subject to a defense that is not "typical of the defenses which may be raised against other members of the proposed class." *Id.;* see also *Ellis,* 657 F.3d at 984.

■■■■ The named plaintiffs argue that the typicality requirement is satisfied because their claims " 'arise[ ] from the same course of events, and each class member makes similar legal arguments to prove [ConAgra's] liability.' "[170] They assert that because the named plaintiffs were all exposed to the "100% Natural" claim on Wesson Oil labels, and allege that the claim was a material factor in their decisions to purchase the products, "common evidence [will be presented] based on the same legal theories [ ] to support [the named plaintiffs'] claims and the claims of other [c]lass [m]embers." This suffices, they contend, to satisfy Rule 23's typicality requirement.[171] ConAgra counters with the same arguments it advanced in opposition to plaintiffs' original class certification motion. It contends that plaintiffs' claims are not typical because the evidence demonstrates that the "100% Natural" label was not a significant factor driving purchases of Wesson Oil.[172] ConAgra cites Dr. Hanssens' finding that there is no statistically significant difference between the purchasing decisions of survey respondents shown a "100% Natural" label and those who saw a label without the phrase.[173] It also cites Dr. Hanssens' finding that only 5–6 percent of respondents who saw the "100% Natural" label mentioned "natural" ingredients when describing why they would or would not buy a Wesson Oil product, and identifying the factors that were important to them when purchasing cooking oil.[174] Based on Dr.

---

170. Class Cert. Motion at 7–8.

171. *Id.*

172. Class Cert. Opp. at 29–30.

173. *Id.*

174. *Id.* ConAgra also asserts that the named plaintiffs' lack of standing renders their claims atypical. (*Id.* at 30 n. 17.) As the court

Hanssens' findings, ConAgra asserts that named plaintiffs are atypical of the classes they seek to represent because they allegedly relied on ConAgra's "100% Natural" label in making their purchasing decisions, while "the large majority" of class members did not.[175]

As the court noted in its August 1 order: "Because the typicality requirement focuses on whether the named plaintiffs' claims arise from the same course of conduct as the class members' claims, and whether *the named plaintiffs* are subject to unique defenses, . . . and because it is not an onerous requirement, the court concludes that the fact that some *class members* may not have relied on the '100% Natural' label in purchasing Wesson Oils does not render the named plaintiffs' claims atypical. Stated differently, if the named plaintiffs' claims were subject to the unique defense that they did *not* rely on the '100% Natural' label in purchasing Wesson Oils, then as to any claims that require proof of individualized reliance, there might be a concern about typicality. The situation posited by ConAgra is the converse of that, however. . . . Consequently, the court finds the typicality requirement satisfied." [176]

Because ConAgra sets forth no arguments other than those that the court previously found unpersuasive, and because its contentions concerning "materiality" and the need for individualized proof for reliance and causation are better addressed in assessing whether Rule 23(b)(3)'s predominance requirement is satisfied, the court concludes that named plaintiffs have adequately shown that their claims are typical of the claims of the putative class members they seek to represent.

### (5) Adequacy

 The adequacy of representation requirement set forth in Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiff[ ] and [her] counsel have any conflicts of interest with other class members and (2) will the named plaintiff[ ] and [her] counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020; accord *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir.2003). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Ellis*, 657 F.3d at 985. Individuals are not adequate representatives of a class when "it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs." *Helfand v. Cenco, Inc.*, 80

---

has already rejected ConAgra's standing argument, it need not address this issue.

**175.** *Id.* at 30 ("[S]urvey data here proves that if Plaintiffs really (1) purchased Wesson due to the '100% Natural' claim, and (2) believed that the '100% Natural' claim meant Wesson Oil is 'GMO-free' (as opposed to, e.g., 'free of preservatives'), they are in the distinct minority of Wesson Oil consumers and are not typical of the class. Rule 23(a)(3) is not satisfied"). As the court noted in its prior order, plaintiffs have adduced contradictory evidence indicating that pure and natural claims on product labels are a significant factor in consumer purchasing decisions. (See Order at 47 ("Plaintiffs assert that Dr. Hanssens' findings are contradicted by ConAgra's own documents, which show the materiality of the '100% Natural' claim. Plaintiffs proffer documents detailing the results of ConAgra's marketing research; they contend this research demonstrates that pure and natural claims play a significant role in consumer purchasing decisions. Because the documents were filed under seal, the court does not detail the findings here. It concurs, however, in plaintiffs' description of the documents").)

**176.** Order at 49–50 (emphasis original).

F.R.D. 1, 7 (N.D.Ill.1977). As respects class counsel, adequacy of representation turns on counsel's competence and the absence of conflicts of interest. *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364 ("The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also often tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest"); *Staton,* 327 F.3d at 957 ("To determine whether the representation meets [Rule 23(a)(4)'s] standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" citing *Molski v. Gleich,* 318 F.3d 937, 955 (9th Cir.2003) (in turn quoting *Crawford v. Honig,* 37 F.3d 485, 487 (9th Cir.1995))); *Hanlon,* 150 F.3d at 1020.

ConAgra challenges the adequacy of the named plaintiffs on the same grounds that it challenges the typicality of their claims; it challenges the adequacy of class counsel on the same grounds that it raised in its opposition to plaintiffs' original class certification motion.[177] Specifically, it notes: (1) putative class counsel has "inexplicably forfeited even the possibility of certifying classes in Washington, Wyoming, Massachusetts, and New Jersey, failing to prosecute the action adequately on behalf of the lost state classes"; and (2) class counsel has been dilatory in conducting discovery and failed adequately to present plaintiffs' first motion for class certification.[178] As ConAgra observes,[179] the court considered these arguments and found them unavailing in its order denying plaintiffs' first motion for class certification.[180] Faced with the arguments a second time, the court's conclusions remain unchanged. Accordingly, the court finds that named plaintiffs and class counsel satisfy Rule 23(a)'s adequacy requirement.

### c. Rule 23(b) Requirements

■ Having concluded that Rule 23(a)'s requirements are met, the court turns to Rule 23(b). Plaintiffs seek to certify the proposed classes separately for purposes of injunctive relief and damages under Rules 23(b)(2) and 23(b)(3). In its decision in *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571 (9th Cir.2010) (en banc), rev'd —— U.S. ——, 131 S.Ct. 2541, 180

177. Class Cert. Opp. at 31–32.

178. *Id.*

179. ConAgra states that it raises these arguments "simply [to] preserve[ ] [them] for the record." (*Id.* at 32.).

180. See Order at 51 ("While courts have held that counsel who have delayed in seeking class certification or have not diligently sought discovery are not adequate to represent the interests of the class, see, e.g., *Colby v. J.C. Penney Co.,* 128 F.R.D. 247, 250 (N.D.Ill.1989) (decertifying a class based, *inter alia,* on counsel's lack of diligence in conducting discovery), aff'd on other grounds, 926 F.2d 645 (7th Cir.1991); *Lau v. Standard Oil Co. of California,* 70 F.R.D. 526, 527–28 (N.D.Cal.1975) (three year delay in seeking class certification), the court cannot say that class counsel's problems in this case rise to the level that would support such a finding here, particularly given their background in class action litigation. Nor does the court discern any conflict of interest affecting the representation. Consequently, the court finds that the named plaintiffs and class counsel satisfy the adequacy requirement").

L.Ed.2d 374 (2011), the Ninth Circuit noted that the district court had the option of certifying a Rule 23(b)(2) equitable relief class and a separate Rule 23(b)(3) class for damages if it concluded that it could not certify a single Rule 23(b)(2) class because monetary relief predominated over the equitable relief sought. *Id.* at 620. The Supreme Court later "rejected the 'predominance' test for determining whether monetary damages may be included in a 23(b)(2) certification." *Ellis*, 657 F.3d at 986. Subsequent to the Supreme Court's decision in *Dukes*, however, the Ninth Circuit has suggested on multiple occasions that district courts consider certifying separate Rule 23(b)(2) and 23(b)(3) classes. See, e.g., *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir.2013) ("Plaintiffs concede that class certification for their monetary claims under Rule 23(b)(2) cannot stand in light of *Wal–Mart*. However, the possibility of a Rule 23(b)(2) class seeking injunctive relief remains. Rule 23(b)(2) applies 'when a single injunction or declaratory judgment would provide relief to each member of the class.' ... [S]ee ... *Ellis*, 657 F.3d at 987 (indicating that the court could certify a Rule 23(b)(2) class for injunctive relief and a separate Rule 23(b)(3) class for damages)"); see also *Dukes*, 603 F.3d at 620 (suggesting the court certify a " 'Rule 23(b)(2) class for equitable relief and a separate Rule 23(b)(3) class for damages' "). Consequently, as in the order denying plaintiffs' first motion for class certification,[181] it appears that the court can separately certify an injunctive relief class and, if appropriate, also certify a Rule 23(b)(3) damages class.

### d. Whether Plaintiffs Have Satisfied Rule 23(b)(2)

An injunctive relief class can be certified under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. PROC. 23(b)(2). As a threshold matter, the court must determine whether the named plaintiffs have standing to seek an injunction requiring ConAgra to cease marketing Wesson Oils as "100% Natural." In its August 1 order, the court noted that plaintiffs had failed to proffer any evidence indicating that they intended to purchase Wesson Oil products in the future and thus lacked Article III standing to represent injunctive relief classes:

> "Applying Article III's requirements, the court agrees with Judge Breyer that a plaintiff does not lack standing simply because 'he has learned that a label is misleading and therefore will not be fooled by it again.' Rather, a plaintiff lacks standing if he has not 'express[ed] an intent to purchase the products in the future.' *Jones v. ConAgra Foods, Inc.*, No. C 12–01633 CRB, 2014 WL 2702726, *12 (N.D.Cal. June 13, 2014).... [T]he court concludes that none of the named plaintiffs has standing to sue for injunctive relief. It declines to certify classes under Rule 23(b)(2) as a result."[182]

---

**181.** Order at 52 ("Consequently, and contrary to ConAgra's argument, it does not appear to be the case that the court can certify a Rule 23(b)(2) class only if the monetary relief sought is purely incidental to the injunctive relief. Rather, Ninth Circuit precedent indicates that the court can separately certify an injunctive relief class and if appropriate, also certify a Rule 23(b)(3) damages class. Consequently, the court turns to consideration of the requirements for certification under Rule 23(b)(2)").

**182.** See Order at 55–56.

■ Given this finding, each plaintiff seeking to represent a class entitled to seek injunctive relief under his or her respective state's consumer protection laws has submitted a declaration stating that he or she will or may consider purchasing Wesson Oils in the future.[183] The declarations are nearly uniform, and state that: (1) the named plaintiffs purchased Wesson Oils in part because they were labeled "100% Natural"; (2) they deceived by ConAgra's "100% Natural" label because they believed that "100% Natural" meant the product was GMO-free; (3) they typically attempt to avoid purchasing products with GMO ingredients, but realize that it is extremely difficult to avoid GMO ingredients altogether; and (4) if ConAgra removes the "100% Natural" label, they "might consider" or "will consider" purchasing Wesson Oils in the future, depending on price and the availability of alternate products.[184]

ConAgra contends there is no "clear, admissible evidence that [the named plaintiffs] *w[ill] purchase Wesson Oil in the future*."[185] It asserts that plaintiffs' declarations do not provide "clear, unequivocal evidence that [p]laintiffs w[ill] buy the product again," but merely suggest that they "will *consider* buying it again."[186] Plaintiffs argue that the evidence is not "speculative or illusory; rather, it is condi-

tional: ConAgra must change its conduct before those Plaintiffs would consider buying Wesson Oil again, and ConAgra has given no indication that it will engage in honest labeling in the future without the Court's intervention."[187] The court agrees with ConAgra that plaintiffs have again failed to meet their burden of showing that they have standing to represent an injunctive relief class. Although plaintiffs maintain "[they] have met th[e] standard as to the proposed classes for those states [permitting injunctive relief] under even the strictest interpretation of the law in this Circuit," the court cannot agree.

Plaintiffs contend they have adequately alleged a future intent to purchase Wesson Oil products, citing Judge Breyer's decision in *Jones*, 2014 WL 2702726. There, plaintiffs sued ConAgra for violation of California's Unfair Competition Law, California Business and Professions Code § 17200; misleading advertising in violation of California Business and Professions Code § 17500; violation of California's Consumers Legal Remedies Act; and unjust enrichment. *Id.* at *1. Plaintiffs alleged that ConAgra had mislabeled three products—Hunt's® canned tomatoes, PAM® cooking sprays; and Swiss Miss® hot cocoa; the Hunt's and PAM products were labeled "100% Natural," while the Swiss Miss label stated that the product

---

**183.** See Plaintiffs' Decls., Exh. A (putative California class); *id.*, Exh. B (putative Colorado class); *id.*, Exh. C (putative Florida class); *id.*, Exh. E (putative Nebraska class); *id.*, Exh. F (putative New York class); *id.*, Exh. G (putative Ohio class); *id.*, Exh. H (putative South Dakota class); *id.*, Exh. I (putative Texas class). As the court has noted, plaintiff Pauline Michael, who seeks to represent a class of Illinois consumers, does not state in her supplemental declaration that she will or may consider purchasing Wesson Oils in the future. (See *id.*, Exh. D.).

**184.** See *id.*, Exh. A, ¶¶ 3–9; *id.*, Exh. B, ¶¶ 3–8; *id.*, Exh. C, ¶¶ 3–8; *id.*, Exh. E, ¶¶ 3–7; *id.*,

Exh. F, ¶¶ 3–7; *id.*, Exh. G, ¶¶ 3–8; *id.*, Exh. H, ¶¶ 3–8; *id.*, Exh. I, ¶¶ 3–8. Plaintiff Pauline Michael, the named plaintiff representing the putative Illinois class, does not submit a declaration containing statements regarding her future intent to purchase Wesson Oils. (See generally *id.*, Exh. D.).

**185.** Class Cert. Opp. at 24 (emphasis original).

**186.** *Id.* (emphasis original).

**187.** Class Cert. Reply at 36.

was a "Natural Source of Antioxidants" or that "Natural Antioxidants Are Found in Cocoa." *Id.* at *2. Plaintiffs sought to certify an injunctive relief class under Rule 23(b)(2). *Id.* at *12. Judge Charles Breyer declined to do so, concluding that named plaintiffs lacked Article III standing because they did not "express an intent to purchase the products in the future." *Id.* at *12–13. Judge Breyer noted that while "[c]ourts have rejected the argument that a plaintiff cannot establish standing if he has learned that a label is misleading and therefore will not be fooled by it again," they "do require [that] plaintiffs ... express an intent to purchase the products in the future." *Id.* at *12. He observed:

> "Here, Jones testified that he 'stopped buying' Hunt's products once he found out that they contained the challenged ingredients, and he did not attest to having any intention of buying Hunt's products in the future. While Jones testified that he makes an effort to seek out natural foods in his diet, he also testified that he might actually prefer products not labeled 'natural' depending on price, content, and flavor. He also, after filing the lawsuit, purchased other brands of canned tomatoes that contained citric acid and calcium chloride. Accordingly, Jones could have testified, if true, that he bought the Hunt's products in reliance on the label because he seeks out natural products, but that he might purchase Hunt's products in the future if they were properly labeled. He did not so testify.... Accordingly, the Court finds that Plaintiffs lack standing under Rule 23(b)(2)." *Id.* at *12–13.

Plaintiffs assert that because the named representatives seeking to represent injunctive relief classes have proffered sup-plemental declarations that precisely track the language in *Jones*—i.e., that state "[they] might purchase [Wesson Oil products] in the future if they were properly labeled," they have adduced evidence that shows they have standing to represent an injunctive relief class. While the quoted portion of Judge Breyer's opinion in *Jones* uses the word "might," it elsewhere notes that the plaintiff must show a "real and immediate threat of repeated injury":

> "[C]ourts do require plaintiffs to express an intent to purchase the products in the future. This is somewhat problematic, policywise: if a plaintiff bought a product that claimed to be 'nutritious' but actually contained arsenic, would he have to claim that he intends to buy it again? On the other hand, citric acid is not arsenic, and there is no way around the principle that a plaintiff must establish a 'real and immediate threat of repeated injury' to establish standing for injunctive relief." *Id.* at *12 (citations omitted).

Given that there is "no way around" the threshold showing required to demonstrate Article III standing to assert injunctive relief claims, the court concludes that a statement that a party "will consider" or "might consider" purchasing a product in the future is not sufficiently "concrete" or "real and immediate" to support constitutional standing under either Article III or *Jones*.

Plaintiffs contentions to the contrary are unavailing.[188] While courts have recognized that a plaintiff who has been exposed to a misleading or deceptive label may have Article III standing to represent an injunctive relief class if they intend to purchase the product in the future, see, e.g., *Jou v. Kimberly–Clark Corp.*, No. 3:13–CV–03075, 2013 WL 6491158, *4

---

**188.** Class Cert. Motion at 68–69; Class Cert. Reply at 34–36.

(N.D.Cal. Dec. 10, 2013) ("reject[ing p]laintiffs' contention that it [wa]s unnecessary for them to maintain any interest in purchasing the products in the future"), plaintiffs have not adduced evidence that they "would purchase [Wesson Oils] in the future if the[ products] were truthfully labeled." [189] Rather, they assert only that they will or may *consider* purchasing the products in the future.

Other courts have questioned whether this type of statement demonstrates there is a real and immediate threat of future injury. See, e.g., *Marty v. Anheuser–Busch Companies, LLC*, 43 F.Supp.3d 1333, 1358 (S.D.Fla.2014) ("plaintiffs ... maintain that 'Courts find standing to seek injunctive relief under consumer protection laws where the defendant continues the allegedly deceptive labeling or advertising and the plaintiff may purchase the product in the future.' The permissive word 'may' seems at odds with Supreme Court precedent which requires a real and immediate threat of future injury," citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (holding that the threat must be "real and immediate" as opposed to "conjectural or hypothetical")); *Smith v. Chrysler Financial Co., L.L.C.*, No. Civ.A.00–CV–6003 DMC, 2004 WL 3201002 (D.N.J. Dec. 30, 2004) ("Plaintiffs have failed to establish a real and immediate threat that they will suffer an injury as the result of any actions or policies of Defendant. The injury which Plaintiffs allege, that they *may* want to buy another Chrysler in the future and may be discriminated against by Defendant, is simply too speculative" (emphasis added)). See also *Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 223 (3d Cir.2004) (suggesting, in dicta, that the conclusion that a plaintiff who might default on a lease and might return a leased automobile early and consequently pay an early termination fee had standing was "plainly wrong"); *Freydel v. New York Hosp.*, 242 F.3d 365, 2000 WL 1836755 (2d Cir. Dec. 13, 2000) (Unpub. Disp.) ("While we agree that plaintiff 'may' be referred to NYH in the future, such an indefinite speculation is insufficient to maintain standing to seek injunctive relief"). Cf. *Clapper v. Amnesty International USA*, —— U.S. ——, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013) (to have standing to sue for injunctive relief, a plaintiff must show that the "threatened injury [is] *certainly impending*,'" quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (emphasis added)).

Plaintiffs cite no authority suggesting that allegations they "might" or "will" *consider* purchasing ConAgra's products satisfies Article III, and the court concludes that the weight of authority is to the contrary. Compare *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D.Cal.2012) (concluding that named plaintiffs had shown they had Article III standing to seek classwide injunctive relief because they clearly "stated [an] intent to purchase" the challenged product in the future) with *Werdebaugh v. Blue Diamond Growers*, Case No.: 12–CV–2724–LHK, 2014 WL 2191901, *9 (N.D.Cal. May 23, 2014) ("Here, because Werdebaugh has not alleged, let alone provided evidentiary proof, that he intends or desires to purchase Blue Diamond almond milk products in the future, there is no likelihood of future injury to Plaintiff that is redressable through injunctive relief, and Plaintiff lacks standing to pursue that remedy. As a result, Plaintiff is precluded from seeking injunctive relief on a classwide basis, and the Court declines to certify the proposed class under Rule 23(b)(2)," citing

189. Class Cert. Motion at 69–70.

*Ellis,* 657 F.3d at 979); *Rahman v. Mott's LLP,* No. CV 13–3482 SI, 2014 WL 325241, *10 (N.D.Cal. Jan. 29, 2014) ("to establish standing [for injunctive relief], plaintiff must allege that he intends to purchase the products at issue in the future"); *Jou,* 2013 WL 6491158 at *4 ("Because Plaintiffs fail to identify any allegation in their Complaint that suggests ... they maintain an interest in purchasing the diapers or wipes, or both, in the future, Plaintiffs have not sufficiently alleged standing to pursue injunctive relief").

Consistent with ·Article III's standing requirements, plaintiffs must proffer evidence that there is "a sufficient *likelihood* that [they] will be wronged in a similar way." *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660 (emphasis added). Plaintiffs' equivocal, speculative assertion that they "may consider" or "will consider" purchasing Wesson· Oils in the future if they are not mislabeled does not satisfy this standard. See *Dabish v. Infinitelabs, LLC,* No. 13–CV–2048 BTM (DHB), 2014 WL 4658754, *5 (S.D.Cal. Sept. 17, 2014) ("[t]o establish standing for prospective injunctive relief, [a p]laintiff must demonstrate that 'he has suffered or is threatened with a 'concrete and particularized' legal harm ... coupled with 'a sufficient likelihood that he will again be wronged in a similar way,'' " citing *Bates v. United Parcel Service, Inc.,* 511 F.3d 974, 985 (9th Cir.2007) (in turn citing *Lyons,* 461 U.S. at 111, 103 S.Ct.

1660)); see also *Bates,* 511 F.3d at 985 (holding that a plaintiff must establish a "real and immediate threat of repeated injury" to demonstrate Article III standing).[190]

### e. Rule 23(b)(3)

### (1) Whether Common· Issues Predominate

■ Certifying a class under Rule 23(b)(3) requires "that the questions of law or fact common to the members of the class predominate over any questions af-·fecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. PROC. 23(b)(3); see *Poulos v. Caesars World, Inc.,* 379 F.3d 654, 664 (9th Cir. 2004). The predominance requirement is "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Products,* 521 U.S. at 623–24, 117 S.Ct. 2231. If common questions "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," then "there is clear justification for handling the dispute on a representative rather than on an individual basis," and the predominance test is satisfied. *Hanlon,* 150 F.3d at 1022. " '[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.' "

---

190. In their motion, plaintiffs argue that they need not allege a future intent to purchase Wesson Oils to have Article III standing to represent putative state classes seeking injunctive relief. (Class Cert. Motion at 69–73.) Plaintiffs rely on *Henderson v. Gruma Corp.,* No. CV 10–04173 AHM (AJWx), 2011 WL 1362188 (C.D.Cal. Apr. 11,˙ 2011), and its progeny as support for this argument. (*Id.*) The court addressed this contention at length in its order denying plaintiffs' original motion for class certification. It declined to follow *Henderson,* noting, as Chief Judge Moskowitz

of the Southern District of California reasoned in *Mason v. Nature's Innovation, Inc.,* No. 12–3019, 2013 WL 1969957, *4 (S.D.Cal. May 13, 2013), that "Article III's standing requirements take precedence over enforcement of state consumer protection laws," and concluding that a plaintiff must "express[ ] an intent to purchase the products in the future." (Order at 54–55.) The court remains unpersuaded by *Henderson* and its progeny, and thus finds plaintiffs' argument that they need not demonstrate an intent to purchase Wesson Oils in the future unavailing.

*Zinser,* 253 F.3d at 1190 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at 535–39 (1986)). This is because, *inter alia,* "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." *Id.*

### (a) Reliance and Causation

In its order denying plaintiffs' original motion for class certification, the court concluded that it could not determine whether reliance or causation could "be prove[n] on a classwide basis with respect to each of the claims plaintiffs assert, and each of the classes they propose."[191] It also noted:

> "Even had plaintiffs adequately shown that a classwide inference of reliance and causation is available for all claims and all classes, the court would not be able to find on the present record that they had demonstrated an entitlement to such an inference. Citing California law, the Ninth Circuit has held that if a misrepresentation is not material as to all class members, the issue of reliance 'var[ies] from consumer to consumer,' and no classwide inference arises."[192]

Because plaintiffs had not shown that (1) each putative class's claim could be proved by adducing evidence supporting a classwide inference of reliance and/or causation; and (2) the evidence regarding the materiality of the "100% Natural" label was in conflict, the court concluded that plaintiffs had not sufficiently shown that common questions predominated over individualized ones.[193]

In support of their amended motion for class certification, plaintiffs argue that "the predominant question under each of the consumer protection statutes at issue in this case is whether the '100% Natural' label on Wesson Oils is objectively false, deceptive, misleading, and/ or unfair to *reasonable consumers.*"[194] The threshold question, as the court noted in its August 1 order, is whether each claim sought to be certified under each state requires a showing of reliance and/or causation, and if so, whether such elements may be established on a classwide basis.[195] Accordingly, the court first turns to plaintiffs' showing on this issue.

### (i) Whether a Classwide Inference of Reliance and Causation Is Available for Each Putative Class's State Law Claims

### (1) California

Plaintiffs seek to certify a California class alleging: (1) violations of California's consumer protection statutes; (2) breach of express warranty; and (3) breach of implied warranty.[196]

### (a) Consumer Protection Claims

■ Courts generally consider claims under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL") and Consumers Legal Remedies Act ("CLRA") together. See *Forcellati,* 2014 WL 1410264 at *9 ("For purposes of class certification, the UCL, FAL, and CLRA are materially indistiguishable," citing *De-*

---

191. Order at 57.

192. *Id.* at 58 (citing *Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1022–23 (9th Cir.2011) (in turn citing *In re Vioxx Class Cases,* 180 Cal.App.4th 116, 129, 103 Cal.Rptr.3d 83 (2009))).

193. *Id.* at 58–60.

194. Class. Cert. Reply at 23 (emphasis original).

195. Order at 57–58.

196. Class Cert. Motion at 15–21.

larosa v. Boiron, Inc., 275 F.R.D. 582, 589 n. 3 (C.D.Cal.2011); Bruno v. Quten Research Inst., LLC, 280 F.R.D. 524, 534 (C.D.Cal.2011)). Each statute allows plaintiffs to establish materiality and reliance (i.e., causation and injury) by showing that a reasonable person would have considered the defendant's representation material. Forcellati, 2014 WL 1410264 at *9 (citing Bruno, 280 F.R.D. at 534); see also In re Tobacco II Cases, 46 Cal.4th 298, 327, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009); In re Steroid Hormone Prod. Cases, 181 Cal.App.4th 145, 157, 104 Cal.Rptr.3d 329 (2010).

Thus, a California class suing under the state's consumer protection statutes need not show individualized reliance if it can establish the materiality of ConAgra's "100% Natural" label to a reasonable consumer. See Forcellati, 2014 WL 1410264 at *9 ("As such, whether or not Defendants' claims are misleading is an objective, classwide inquiry for purposes of the UCL, FAL, and the CLRA. It is simply a matter of common sense that consumers who purchased Defendants' products did so in reliance on Defendants' claims that the products provided effective relief from cold and flu symptoms," citing Delarosa, 275 F.R.D. at 586).[197]

### (b) Breach of Express and Implied Warranty Claims

Plaintiffs contend that their California breach of express and implied warranty claims are also susceptible of common proof such that individualized issues do not predominate. The court agrees. California Commercial Code § 2313, which defines express warranty, applies to "transactions in goods." See CAL. COM. CODE § 2102; see also CAL. CIV.CODE § 1791.2(a)(1) (defining an "express warranty" as "[a] written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or to provide compensation if there is a failure in utility or performance"); BLACK's LAW DICTIONARY at 1582 (7th ed.1999) (defining "express warranty" as "[a] warranty created by the overt words or actions of the seller"); 3 B. Witkin, SUMMARY OF CALIFORNIA LAW, §§ 55–56 (9th ed.1990); Richard A. Lord, WILLISTON ON CONTRACTS 4TH § 52.45 (4th ed.2004) ("Under the [Uniform Commercial] Code, an express warranty is usually associated with a contract for the sale of goods, but may be found in connection with other transactions involving goods.... There is a division of opinion

---

197. ConAgra argues that "in the states requiring some evidence of reliance or causation among class members [such as California], class certification is improper where individualized issues of reliance predominate, as they would in this case." (Class Cert. Opp. at 38.) ConAgra cites cases in which courts in this district have refused to certify classes because individualized inquiries concerning reliance and/or causation predominated. See, e.g., Turcios v. Carma Labs., Inc., 296 F.R.D. 638, 646 (C.D.Cal.2014) ("Plaintiff cannot show that all class members suffered the same injury because he cannot show that all class members relied on the alleged misrepresentation"); Hodes v. Van's International Foods, No. CV 09–01530 RGK (FFMx), 2009 WL 2424214, *4 (C.D.Cal. July 23, 2009) ("Courts in the Ninth Circuit and in California have regularly found that where such inquiries predominate over common questions of law or fact, courts may refuse to certify a class action"). Neither case holds, however, that causation and reliance cannot be proved on a classwide basis if there is evidence that the misrepresentation was material. Rather, they address predominance in situations where plaintiffs cannot show that the misrepresentation was material and misleading to a reasonable consumer. Where no such proof is presented, no classwide inference of reliance and causation arises, regardless of its availability under the California consumer protection statutes.

whether the express warranty concepts in the Code are also applicable or may be extended to service agreements").

An express warranty is a term of the parties' contract. See *A.A. Baxter Corp. v. Colt Industries, Inc.*, 10 Cal.App.3d 144, 153, 88 Cal.Rptr. 842 (1970) ("A warranty is as much one of the elements of sale and as much a part of the contract of sale as any other portion of the contract and is not a mere collateral undertaking.... [T]o constitute an express warranty, the statement must be a part of the contract"); WILLISTON, *supra*, § 52.45 (stating that an express warranty is "a term of the parties' contract"); see *Paularena v. Superior Court of San Diego County*, 231 Cal. App.2d 906, 915, 42 Cal.Rptr. 366 (1965) ("The damages which each set of plaintiffs seek[s] through their [breach of warranty] cause[ ] of action are dependent upon their affirmance of the existence of a contract").

▆▆▆▆ To prevail on a breach of express warranty claim under California law, a plaintiff must prove that: "(1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *Allen v. ConAgra Foods, Inc.*, Case No. 13–cv–01279–JST, 2013 WL 4737421, *11 (N.D.Cal. Sept. 3, 2013) (citing *Weinstat v. Dentsply International, Inc.*, 180 Cal.App.4th 1213, 1227, 103 Cal. Rptr.3d 614 (2010)). Proof of reliance on specific promises or representations is not required.[198] *Weinstat*, 180 Cal.App.4th at

**198.** Some California courts have concluded that reliance is an element of an express warranty claim under California law. See *Rodarte v. Philip Morris, Inc.*, No. 03–0353 FMC, 2003 WL 23341208, *7 (C.D.Cal. June 23, 2003) (stating that, to prevail on a breach of express warranty claim, plaintiff must prove that the seller: "(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise or description formed part of the basis of the bargain; (3) the express warranty was breached; and (4) the breach caused injury to the plaintiff," and that plaintiff must allege the "exact terms of the warranty" and that he or she reasonably relied on the warranty, citing *Williams v. Beechnut Nutrition Corp.*, 185 Cal.App.3d 135, 142, 229 Cal.Rptr. 605 (1986)); see also *Nabors v. Google, Inc.*, No. 5:10–CV–03897 EJD (PSG), 2011 WL 3861893, *3 (N.D.Cal. Aug. 30, 2011) ("To plead an action for breach of express warranty under California law, a plaintiff must allege: (1) the exact terms of the warranty; (2) reasonable reliance thereon; and (3) a breach of warranty which proximately caused plaintiff's injury"); *Baltazar v. Apple, Inc.*, No. CV–10–3231–JF, 2011 WL 588209, *2 (N.D.Cal. Feb. 10, 2011) (same); *Kearney v. Hyundai Motor America*, No. SACV09–1298–JST (MLGx), 2010 WL 8251077, *7 (C.D.Cal. Dec. 17, 2010) (same). The court is not persuaded that reliance is an element of a breach of express warranty claim. As an initial matter, the decisions so

holding invariably cite *Williams v. Beechnut Nutrition Corp.*, a Court of Appeal decision that summarily addressed the elements of an express warranty claim, relying on the California Supreme Court's pre-UCC decision in *Burr v. Sherwin Williams Co.*, 42 Cal.2d 682, 268 P.2d 1041 (1954). *Williams*, 185 Cal. App.3d at 142, 229 Cal.Rptr. 605. As the Court of Appeal in *Weinstat* noted:

"Pre–Uniform Commercial Code law governing express warranties required the purchaser to prove reliance on specific promises made by the seller. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 115, 120 Cal.Rptr. 681, 534 P.2d 377, referencing *Grinnell v. Charles Pfizer & Co.* (1969) 274 Cal.App.2d 424, 440, 79 Cal.Rptr. 369.) The Uniform Commercial Code, however, does not require such proof. Instead, the official comment to section 2313 explains that '[i]n actual practice affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement. Rather, any fact which is to take such affirmations, once made, out of the agreement requires clear affirmative proof.' (CAL. U. COM.CODE com., 23A pt. 1, West's Ann. Cal. U. Com.Code (2002 ed.) foll. § 2313, com. 3, p. 296.) The statute thus creates a presumption that the seller's affirmations go to the basis of the bargain."

1227, 103 Cal.Rptr.3d 614 ("The lower court ruling rests on the incorrect legal assumption that a breach of express warranty claim requires proof of prior reliance. While the tort of fraud turns on inducement, as we explain, breach of express warranty arises in the context of contract formation in which reliance plays no role"); see *Brown v. Hain Celestial Group, Inc.*, 913 F.Supp.2d 881, 899–900 (N.D.Cal.2012) ("To prevail on a breach of express warranty claim, Plaintiffs must prove: (1) 'the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached.' Proof of reliance on specific promises is not required"); *Rosales v. FitFlop USA, LLC,* 882 F.Supp.2d 1168, 1178 (S.D.Cal.2012) ("Product advertisements, brochures, or packaging can serve to create part of an express warranty. While this does not require that plaintiff relied on the individual advertisements, it does require that plaintiff was actually exposed to the advertising," *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig.*, 754 F.Supp.2d 1145, 1183 (C.D.Cal.2010)).

Accordingly, courts have found that breach of express warranty claims are appropriate for class treatment where whether defendant misrepresented its product and whether such misrepresentation breached warranties are issues common to members of the putative class. See, e.g., *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 669 (C.D.Cal.2014) ("Here, each of the ele-

ments is subject to common proof. Plaintiffs allege that Defendants represented that the products would be effective at treating various ailments, and such representations on the product packaging formed part of the basis of the bargain. Plaintiffs allege that for the reasons discussed above, Defendants' warranty about the effectiveness of their products was breached"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 505 (S.D.Cal.2013) ("Common issues also exist and predominate on Plaintiffs' claims for quasi-contract and breach of express warranty as to the products labeled 'Nothing Artificial.' Plaintiff Larsen's claims are based on common contentions of deceptive conduct by Defendant in marketing its products. Specifically, this case concerns whether Defendant's products contained artificial ingredients and whether Defendant made material representations to the contrary. Determinations of whether Defendant misrepresented its products and, as a result, whether warranties were breached, are common issues appropriate for class treatment," citing *Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 534–37 (C.D.Cal. 2012)).

 As with California's consumer protection statutes, however, class treatment of breach of express warranty claims is only appropriate if plaintiffs can demonstrate that the alleged misrepresentation would have been material to a reasonable consumer. See *Astiana*, 291 F.R.D. at 509 ("Likewise, Plaintiffs' claims for breach of express warranty and quasi contract due to the 'All Natural' representa-

---

Indeed, the California Court of Appeal in *Keith v. Buchanan* noted that "[i]t is clear from the new language of this code section that the concept of reliance has been purposefully abandoned." 173 Cal.App.3d 13, 23, 220 Cal.Rptr. 392 (1985) (citing *Interco Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 261 (Mo. App.1976); *Winston Industries, Inc. v. Stuy-*

*vesant Insurance Co., Inc.*, 55 Ala.App. 525, 530, 317 So.2d 493 (1975)).

The court agrees with the well-reasoned analysis of the California Court of Appeal in *Weinstat* that, under California Commercial Code § 2313, reliance is not a required element of a plaintiff's *prima facie* case for breach of express warranty.

tions and the presence of those ingredients are insufficient for class treatment. *Because Plaintiffs make an insufficient showing that the 'All Natural' representation is materially misleading, it is fatally unclear whether, from the perspective of the putative class, Defendant breached any express warranty or was unjustly enriched.* The individual views of each class member as to the exact nature of Defendant's warranty would predominate over common issues. Plaintiffs' claims regarding the presence of Defendant's 'All Natural' representations on products containing those ingredients accordingly fail to satisfy the commonality and predominance requirements of Rule 23" (emphasis added)). Thus, while plaintiffs' express warranty claim under California law is susceptible of class treatment, the question remains whether plaintiffs have sufficiently established the materiality of ConAgra's misrepresentation and in this way demonstrated that the predominance requirement satisfied and class treatment is appropriate.[199]

 The California Commercial Code also "implies a warranty of merchantability that goods '[a]re fit for [the] ordinary purposes for which such goods are used.' " *Birdsong v. Apple, Inc.,* 590 F.3d 955, 958 (9th Cir.2009) (quoting CAL. COM.CODE § 2314(2)(c)). "The implied warranty 'provides for a minimum level of quality.' " *Id.* (quoting *Am. Suzuki Motor*

*Corp. v. Superior Court,* 37 Cal.App.4th 1291, 1296, 44 Cal.Rptr.2d 526 (1995)). "A breach of the warranty of merchantability occurs if the product lacks 'even the most basic degree of fitness for ordinary use.' " *Id.* (quoting *Mocek v. Alfa Leisure, Inc.,* 114 Cal.App.4th 402, 406, 7 Cal.Rptr.3d 546 (2003)). Contrary to plaintiffs' assertions,[200] California law requires that a plaintiff asserting a breach of implied warranty claim be in vertical privity with the defendant; the exception to privity available for breach of express warranty claims is not available for breach of implied warranty claims.[201] *Clemens,* 534 F.3d at 1023; *Burr,* 42 Cal.2d at 696, 268 P.2d 1041; see *Allen,* 300 F.R.D. at 669.

 Judge Dolly Gee of this district recently concluded that the predominance requirement was not satisfied with respect to a breach of implied warranty claim that was based on a purported misrepresentation on the product's label because the class members had to show that they were in vertical privity with the defendant. Because they did not purchase the product directly from the defendant, but rather from a retail store, Judge Gee concluded that individual issues predominated over common questions. See *Allen,* 300 F.R.D. at 670 ("Plaintiffs have not adequately demonstrated that common issues of fact and law predominate with respect to this claim, given that each class member will be

---

**199.** Under California law, vertical privity is not required for a breach of express warranty claim where "the purchaser of a product relied on representations made by the manufacturer in labels or advertising material." *Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1023 (9th Cir.2008); *Burr v. Sherwin Williams Co.,* 42 Cal.2d 682, 696, 268 P.2d 1041 (1954).

**200.** Class Cert. Motion at 21; Class Cert. Reply at 27.

**201.** The case law is somewhat ambiguous as to when the exception to vertical privity applies. While the Ninth Circuit in *Clemens* suggested that the exception is available if a consumer relies on a manufacturer's written labels or advertisements, see *Clemens,* 534 F.3d at 1023, the California Supreme Court case it cited for this proposition explicitly held that the vertical privity exception for representations on labels or advertisements "[is] applicable *only* to express warranties." *Burr,* 42 Cal.2d at 696, 268 P.2d 1041 (emphasis added).

required to demonstrate that he or she is in vertical privity with Defendants. Moreover, the allegations in the operative complaint suggest that class members bought the products from retail stores, and thus, they are not in vertical privity with Defendants. In light of the foregoing, the Court concludes that Plaintiffs have not met the predominance requirement with respect to their breach of implied warranty claim"). The court agrees with Judge Gee's reasoning and her interpretation of *Clemens* and *Burr*, and reaches a similar conclusion here. As each member of the putative California class must establish that he or she was in vertical privity with ConAgra to prove his or her implied warranty claim, the court concludes that individual issues predominate over common ones and certification of a class to pursue the claim is not appropriate.

### (c) Conclusion Regarding California Claims

For the reasons stated, the court concludes that plaintiffs' California consumer protection and express warranty claims are susceptible of classwide proof. The court considers *infra* whether plaintiffs have shown that ConAgra's alleged misrepresentation would have been material to a reasonable consumer so as to support a classwide inference of reliance for purposes of plaintiffs' consumer protection claims and a classwide finding of express warranty for purposes of plaintiffs' breach of express warranty claim. The court concludes that individual issues predominate, however, with respect to plaintiffs' California implied warranty claim, and that class certification of that claim is not appropriate.

### (2) Colorado

Plaintiffs representing the putative Colorado class seek to certify four claims: (1)

violation of the Colorado Consumer Protection Act ("CCPA"); (2) breach of express warranty; (3) breach of implied warranty; and (4) common law unjust enrichment.[202]

### (a) Consumer Protection Claim

The CCPA was "enacted to regulate commercial activities and practices, which because of their nature, may prove injurious, offensive, or dangerous to the public." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146 (Colo.2003). More specifically, the CCPA works to deter and punish businesses for consumer fraud. *Id.* The CCPA is liberally construed to serve its broad purpose and scope. *Hall v. Walter*, 969 P.2d 224, 230 (Colo.1998).

■■■ "In order to prove a private cause of action under the CCPA, a plaintiff must show: '(1) [that] the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered ... injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury.' " *HealthONE of Denver, Inc. v. UnitedHealth Group, Inc.*, 805 F.Supp.2d 1115, 1120 (D.Colo.2011) (quoting *Rhino Linings*, 62 P.3d at 146–47). The CCPA applies to the type conduct alleged by plaintiffs in this case—i.e., misleading claims or advertising to consumers. See, e.g., *Dawson v. Litton Loan Servicing, LP*, No. 12–CV–01334–CMA–KMT, 2013 WL 1283848, *4 (D.Colo. Mar. 28, 2013) ("The CCPA prohibits a wide variety of 'deceptive trade practices,' including

**202.** Class Cert. Motion at 21–22.

'mak[ing] false or misleading statements of fact concerning the price of goods' and 'advertis[ing] goods ... with intent not to sell them as advertised'" (citations omitted)); *May Dept. Stores Co. v. State ex rel. Woodard,* 863 P.2d 967, 973–75 (Colo.1993) (concluding that a department store chain's misleading advertisements violated the CCPA).

 ConAgra disputes whether the showing of injury, i.e., damages and causation, is susceptible of classwide proof such that the claim satisfies the predominance requirement.[203] To show causation under the CCPA, plaintiffs must show that ConAgra's challenged practice, i.e., the misleading "100% Natural" claim on its Wesson Oil products, injured putative class members. While proof of individual reliance can be used to establish causation, it need not be used; courts have regularly considered "whether the circumstantial evidence common to the class supports an inference of causation." *Garcia v. Medved Chevrolet, Inc.,* 263 P.3d 92, 99–100 (Colo. 2011); see *Patterson v. BP Am. Prod. Co.,* 240 P.3d 456, 465–67 (Colo.App.2010) ("[P]resuming or inferring reliance is proper when plaintiffs are able to establish material misrepresentations to the class on a common basis.... [W]e conclude that even without a presumption of reliance, named plaintiffs in a class action may demonstrate ignorance or reliance on a classwide basis, using circumstantial evidence that is common to the class" (citations omitted)). The court must, however, consider whether individualized evidence refutes a classwide inference of causation. *Garcia,* 263 P.3d at 99–100.

Plaintiffs maintain there is circumstantial evidence supporting a classwide inference of causation for purposes of the CCPA claim because there is evidence that the "100% Natural" label was material to the putative class.[204] A violation of the CCPA occurs if the conduct has a "capacity or tendency to deceive a reasonable consumer." *Rhino Linings,* 62 P.3d at 148 n. 11 (stating that CCPA plaintiffs must show a reasonable person would have relied on the misrepresentation at issue). If such a showing is made, it suffices to support a classwide inference of reliance and causation. Thus, the court will consider *infra* whether plaintiffs have sufficiently shown that the misrepresentation was material, i.e., that it had the capacity to mislead a reasonable consumer, such that they have satisfied the predominance requirement with respect to their CCPA claim.

#### (b) Breach of Express and Implied Warranty Claims

 To recover for breach of express warranty under Colorado law, a plaintiff must prove that (1) a warranty existed; (2) the defendant breached the warranty; (3) the breach proximately caused the losses claimed as damages; and (4) timely notice of the breach was given to defendant. *Fiberglass Component Production, Inc. v. Reichhold Chemicals, Inc.,* 983 F.Supp. 948, 953 (D.Colo.1997) (citing *Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187 (Colo. 1984); COLO. JURY INSTR.—Civ.3d 14:6 (1990)). "An implied warranty of merchantability exists in all contracts for sales of goods unless disclaimed." *Id.* at 957–58; see also COLO. JURY INSTR.—Civ. 14:10 (2014). In cases such as this, where plaintiffs allege that the same conduct breached an express and an implied warranty of merchantability, courts analyze the claims together. See *Haffner v. Stryker Corporation,* No. 14–CV–00186–RBJ, 2014 WL 4821107, *6 (D.Colo. Sept. 29, 2014) ("Under Colorado law, an express warranty

---

**203.** Class Cert. Opp. at 37–38.

**204.** Class Cert. Motion at 23.

includes any affirmation of fact, promise, or description of the product by the seller of the goods. Colorado further imposes an implied warranty of merchantability, effectively a guarantee that a product is fit for the ordinary purposes for which it is used. I agree with Stryker's assertion that in this case the breach of warranty claims are essentially identical. Accordingly, they can be discussed together.... In both cases, Mr. Haffner contends that the warranties were breached because the Knee System 'had dangerous propensities when put to its intended use and would cause severe injuries to the user' ").

■ Reliance is not a required element of a Colorado warranty claim, see. *Lutz Farms v. Asgrow Seed Co.*, 948 F.2d 638, 645 (10th Cir.1991), nor is a showing of privity required, *Hansen v. Mercy Hospital, Denver*, 40 Colo.App. 17, 18, 570 P.2d 1309 (1977) ("lack of privity no longer presents an obstacle to recovery for breach of implied warranty," citing Colo. Rev.Stat. Ann. § 4–2–318 ("A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty")).

■ Causation, however, *is* a required element. See *Reichhold Chemicals*, 983 F.Supp. at 953 ("To recover for breach of express warranty, a plaintiff must prove that: 1) a warranty existed; 2) the defendant breached the warranty; 3) *the breach proximately caused the losses claimed as damages;* and 4) timely notice of the breach was given to defendant," citing *Palmer v. A.H. Robins Co., Inc.*, 684 P.2d 187 (Colo.1984); Colo. Jury Instr.—Civ. 14:6). Causation is also a required element for a breach of implied warranty

claim under Colorado law. See Colo. Jury Instr.—Civ. 14:10 (2014) (noting that to recover on a claim of breach of implied warranty of merchantability, a plaintiff must establish by a preponderance of the evidence, *inter alia*, "[t]his breach of warranty caused the plaintiff (injuries) (damages) (losses)"). At the hearing, plaintiffs argued that their Colorado warranty claims are susceptible of classwide proof because they will be able to show through hedonic regression and conjoint analysis that the "100% Natural" label on bottles of Wesson cooking oil proximately caused their damages; specifically, they assert they will be able to show that there was a price premium associated with the label that led class members to pay more for each bottle of Wesson Oils they purchased. Plaintiffs contend that payment of the price premium was proximately caused by ConAgra's purported breach of a warranty that Wesson Oils contained no GMOs. They seek to recover the price premium as damages.

The court is persuaded by plaintiffs' argument and agrees that, under Colorado law, causation is susceptible of classwide proof where, as here, plaintiffs may be able to prove that defendant's warranty caused each class member to pay more than he or she otherwise would have paid for the product. Thus, if plaintiffs are able to propose a methodology to calculate the price premium attributable to use of the "100% Natural" label to suggest that Wesson Oils contain no GMO ingredients, the court concludes they will be able to demonstrate causation on a classwide basis. The court considers *infra* whether plaintiffs have proposed a viable damages methodology.[205]

---

**205.** The court's tentative ruling declined to certify Colorado express warranty and implied warranty classes because plaintiffs had failed to address how proximate causation could be proved on a classwide basis, and because they cited no authority suggesting

### (c) Unjust Enrichment Claim

 Unjust enrichment is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another. *Salzman v. Bachrach,* 996 P.2d 1263, 1265 (Colo.2000). Unjust enrichment is based on principles commonly associated with restitution. *DCB Constr. Co. v. Central City Dev. Co.,* 965 P.2d 115, 119 (Colo.1998). "When restitution is the primary basis of a claim, as opposed to a remedy for bargains gone awry, it invokes what has been called a 'contract implied in law.'" *Id.* (citing Joseph M. Perillo, *Restitution in a Contractual Context,* 73 Col. L.Rev. 1208, 1212–13 (1973)). It is thus an equitable remedy and does not depend on the existence of either an oral or written contract. See *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n,* 649 P.2d 1093, 1097 (Colo.1982).

 To state an unjust enrichment claim under Colorado law, plaintiff must show that "(1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008) (citing *Salzman,* 996 P.2d at 1266–67). Colorado courts have recognized that unjust enrichment "does not require a promise or privity between the parties." *Salzman,* 996 P.2d at 1265.

 Plaintiffs argue that a Colorado unjust enrichment claim does not require proof of "causation, materiality, [or] reliance," and thus that a class should be certified.[206] While causation, materiality, and reliance are not explicit elements of an unjust enrichment claim under Colorado law, it is clear that plaintiffs must show that ConAgra "received a benefit" from putative class members "under circumstances that would make it unjust for [ConAgra] to retain the benefit without commensurate compensation." *Lewis,* 189 P.3d at 1141. This "highly fact-intensive inquiry," *Dudding v. Norton Frickey & Associates,* 11 P.3d 441, 445 (Colo.2000), requires that the trial court "'make extensive factual findings to determine whether a party has been unjustly enriched.'" *Redd Iron, Inc. v. International Sales and Services Corp.,* 200 P.3d 1133, 1136 (Colo. App.2008) (citing *Lewis,* 189 P.3d at 1140).

Given the highly factual nature of this question, the court is concerned that individualized inquiries will be required concerning the motivations and purchasing decisions of each class member, notwithstanding the fact that ConAgra made a uniform representation, i.e., that Wesson Oils were "100% Natural." Plaintiffs cite no authority for the proposition that a Colorado unjust enrichment class should be certified, or that, under Colorado law, the court can draw a common inference that the purchase transactions into which class members entered with ConAgra were unjust, obviating the need for individualized inquiries. The court thus concludes that plaintiffs have failed to demonstrate that common questions predominate over individualized inquiries with respect to their unjust enrichment claim, and that certification of a Colorado unjust enrichment class is appropriate.[207]

---

that it could. After consideration of the arguments plaintiffs' counsel made at the hearing, the court concludes the better view is that proximate causation can be proved on a class-wide basis where, as here, plaintiffs propose to demonstrate that putative class members paid a price premium for each bottle of cooking oil due to defendant's purported breach of express and implied warranties.

**206.** Class Cert. Motion at 25.

**207.** The cases that plaintiffs cite in their motion do ·not persuade the court otherwise. (Class Cert. Motion at 25.) In *Jackson v.*

### (d) Conclusion Regarding Colorado Claims

For the reasons stated, the court concludes that plaintiffs have demonstrated that their Colorado consumer protection claim is susceptible of classwide proof con-

*Unocal Corp.*, 262 P.3d 874, 877, 890 (Colo. 2011), the Colorado Supreme Court reversed the Colorado Court of Appeals' decertification of a class alleging nuisance, negligence, trespass, respondeat superior, and unjust enrichment claims. The Court did not substantively analyze certification of an unjust enrichment class, however. *Id.* Moreover, the nature of the claims asserted in *Jackson* are factually distinct from those alleged in this case; this underscores why individualized inquiries did not predominate in *Jackson*, but are likely to predominate here. There, the putative class's claims were each premised on common property defects created by easements granted to an oil company for use of a pipeline and alleged asbestos contamination caused by removal of the pipeline. *Id.* at 877–78. Here, by contrast, the case involves individualized purchasing decisions made by thousands of consumers over a several year period. The individualized nature of the purchasing decisions and the meaning each class member ascribed to the "100% Natural" claim on Wesson Oils presents a completely different type of question than that at issue in *Jackson*. Here, the materiality of the "100% Natural" label and a class member's reliance on it will determine whether it would be unjust for ConAgra to retain any price premium generated by the label.

Similarly inapposite is *Francis v. Mead Johnson & Co.*, No. 1:10–CV–00701–JLK, 2010 WL 3733023, *1 (D.Colo. Sept. 16, 2010). There, the court was not evaluating certification of a class, but a motion to strike class allegations. *Francis*, 2010 WL 3733023 at *1. The court's observation that it might not be "impossible" for plaintiffs to certify the proposed classes, despite their inability to prove that some class members had been injured, does not assist in determining whether plaintiffs have made an adequate showing justifying certification of their unjust enrichment class. Nor does it suggest that the "unjust" prong of a Colorado unjust enrichment claim can be proved on a classwide basis, nor indicate what must be established for a classwide inference of injustice to arise.

The court notes additionally that it would be inappropriate to certify a Colorado unjust enrichment class for the independent reason that the claim is based on the same wrongful conduct for which the class seeks to recover under the CCPA. The unjust enrichment claim also seeks the same recovery as the CCPA claim, i.e., the price premium paid on each bottle of Wesson Oil purchased. Under Colorado law, if the remedy sought on an unjust enrichment claim is available at law through prosecution of a CCPA claim, the unjust enrichment claim must be dismissed. *Harris Group v. Robinson*, 209 P.3d 1188, 1205–06 (Colo.App.2009) (holding that unjust enrichment is an equitable remedy that is not available where there is "a plain, speedy, and adequate remedy at law"). In *Francis*, a case on which plaintiffs rely, the court ultimately dismissed the unjust enrichment claim because it was duplicative of plaintiffs' CCPA claim. See *Francis v. Mead Johnson & Co.*, No. 1:10–CV–00701–JLK, 2010 WL 5313540, *9 (D.Colo. Dec. 17, 2010) ("Although Plaintiff has adequately pled the elements of her unjust enrichment claim, it must be dismissed because the CCPA provides an adequate legal remedy. In her unjust enrichment claim, Plaintiff seeks recovery for the same wrongful conduct as in her CCPA claims. Most importantly, Plaintiff seeks the exact same damages for these two claims. Furthermore, because the success of Plaintiff's unjust enrichment claim depends directly upon the success of her CCPA claims, alternative pleading is superfluous"). Compare *Edwards v. ZeniMax Media, Inc.*, No. 12–CV–00411–WYD–KLM, 2013 WL 5420933, *10 (D.Colo. Sept. 27, 2013) (concluding that an unjust enrichment claim should not be dismissed when "the 'equitable remedy' sought by [plaintiff's] unjust enrichment claim appears to be separate from any available remedy at law under the CCPA claim," citing *Colorado Foundation, Inc. v. Am. Cynamid Co.*, 216 F.Supp.2d 1188, 1200 (D.Colo.2002); *Robinson*, 209 P.3d at 1205–06). Because plaintiffs seek the same recovery on both their CCPA and unjust enrichment claims and because injunctive relief is not available as noted *supra*, the court concludes that the Colorado class's unjust enrichment claim would fail because plaintiffs possess an adequate remedy at law. For this reason as well, the court declines to certify an unjust enrichment class.

cerning the materiality of ConAgra's representation. The court also concludes that the proximate cause element of the Colorado breach of express warranty and breach of implied warranty claims is susceptible of classwide proof. By contrast, the court concludes that individualized inquiries are likely to predominate with respect to the Colorado class's unjust enrichment claim.

### (3) Florida

Plaintiffs representing the putative Florida class seek to certify two claims: (1) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); and (2) unjust enrichment.[208]

### (a) Consumer Protection Statutes

■■■ The FDUTPA is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Siever v. BWGaskets, Inc.*, 669 F.Supp.2d 1286, 1292 (M.D.Fla.2009) (quoting FLA. STAT. § 501.204(1)). A claim under the FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages. *Id.* Conduct that is deceptive or unfair for purposes of the FDUTPA is defined, *inter alia,* by "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices." *Id.* (quoting FLA. STAT. § 501.203(3)(c)); *Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.,* 657 F.Supp.2d 1279, 1290 (M.D.Fla.2009). An unfair practice under the FDUTPA is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So.2d 489, 499

(Fla.App.2001) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n,* 540 F.2d 287, 293 (7th Cir.1976)).

■■■ Claims under the FDUTPA are governed by a "reasonable consumer" standard, obviating the need for proof of individual reliance by putative class members. See, e.g., *Office of the Attorney Gen. v. Wyndham Int'l, Inc.,* 869 So.2d 592, 598 (Fla.App.2004) ("When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.... [U]nlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue"); *Davis v. Powertel, Inc.,* 776 So.2d 971, 974 (Fla. App.2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue"). If numerous individualized inquiries are required to determine the reaction of a "reasonable consumer" to the challenged conduct, however, the predominance requirement for class certification cannot be satisfied; stated differently, while reliance may be proved on a classwide basis, a classwide inference of reliance is inappropriate if plaintiffs cannot establish that the conduct would be material to a reasonable person. See, e.g., *In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices,* 715 F.Supp.2d 1265, 1282–83 (S.D.Fla.2010) ("In this case, ... the reasonableness conclusion depends on numerous individualized inquiries that would fly in the face of the requirement that individual issues not predominate over those common to the class"). Thus, plaintiffs must show that ConAgra's allegedly

208. *Id.* at 26–30.

misleading representation was "likely to mislead a reasonable consumer acting reasonably under the circumstances, i.e., the plaintiff's circumstances." *Id.* at 1282 (citing *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 777 N.Y.S.2d 50 (2004)); *Fitzpatrick v. General Mills, Inc.*, 263 F.R.D. 687, 697 (S.D.Fla.2010) ("[B]ecause each plaintiff seeking damages under the FDUTPA is only required to prove that [defendant's] conduct would deceive an objective reasonable consumer, and not that the deceptive act motivated their particular purchase decision ... the putative class members would rely on the same pool of evidence to prove their claims"). The court considers *infra* whether plaintiffs have shown that the "100% Natural" statement was material and thus likely to mislead a reasonable consumer.

### (b) Unjust Enrichment

■ The essential elements that must be shown to prove unjust enrichment under Florida law are a benefit conferred on the defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for it to retain the benefit without paying the value thereof. *Swindell v. Crowson*, 712 So.2d 1162, 1163 (Fla. App.1998) (citing *Ruck Brothers Brick v. Kellogg & Kimsey*, 668 So.2d 205 (Fla.App. 1995); *Rite–Way Painting & Plastering v. Tetor*, 582 So.2d 15 (Fla.App.1991)); see also *Florida Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n. 4 (Fla.2004); *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla.App.2006). Florida courts have concluded that privity is not a required element of an unjust enrichment claim. See *MacMorris v. Wyeth, Inc.*, No. 2:04–CV–596–FTM–29DNF, 2005 WL 1528626, *4 (M.D.Fla. June 27, 2005) (observing that

"indirect purchasers have been allowed to bring an unjust enrichment claim against a manufacturer").

■ Plaintiffs argue that predominance is satisfied because "[c]ourts have found that common questions predominate for Florida unjust enrichment claims where defendant's conduct was the same as to all class members." [209] Plaintiffs are correct that some Florida courts have certified unjust enrichment classes where the defendant's business practices were the same as to all class members and defendant failed to disclose the same material information to the class. See, e.g., *In re Checking Account Overdraft Litigation*, 286 F.R.D. 645, 657–58 (S.D.Fla.2012) ("Unjust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit received from class members was just or not. That situation exists in this case. Based on the evidence presented, class-wide proof is available to show that Comerica deliberately concealed from all customers important information about its overdraft policy—including the existence and amount of customers' overdraft Matrix limits—factors which bear on the justness of Comerica's retention of excess overdraft fees it collected as a result"); *James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecommunications, Inc.*, 275 F.R.D. 638, 647 (M.D.Fla.2011) ("Although unjust enrichment ordinarily requires individualized inquiries, this is not an ordinary case.... BellSouth's conduct was the same with regard to each class member in all relevant respects. The issue of whether it is equitable for BellSouth to retain the full amount of its bills when such amounts exceeded what BellSouth could recover in an action at law thus appears to be subject

---

**209.** Class Cert. Motion at 29–30.

to common proof. BellSouth has failed to explain why it would be equitable for it to retain the amounts collected from some of the putative class members, but inequitable to retain the amounts collected from others").

As the *BellSouth Telecommunications* court recognized, however, Florida courts frequently conclude that unjust enrichment classes cannot be certified because "unjust enrichment claims 'typically require individualized inquiries into the equities.'" *BellSouth Telecommunications*, 275 F.R.D. at 647. See *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) ("Due to the necessity of [an] inquiry into the individualized equities attendant to each class member, ... common questions will rarely, if ever, predominate an unjust enrichment claim"). The *In re Checking Account Overdraft Litigation* court concluded that plaintiffs in that case did not assert a "typical" unjust enrichment claim because, unlike *Vega*, where employees had varying levels of knowledge and understanding about a commission policy that was uniformly applied, the bank customer plaintiffs were uniformly impacted by a common scheme whose "true nature" they never learned; there was thus no question of the customers having different levels of knowledge or different reactions to the practice. See *In re Checking Account Overdraft Litigation*, 286 F.R.D. at 658. Similarly, *BellSouth Telecommu-*

*nications* was not a "typical" unjust enrichment case because the same billing policy applied to all putative class members, and defendants adduced no evidence that class members knew of the practice. See *BellSouth Telecommunications*, 275 F.R.D. at 647.

Despite the fact that ConAgra's alleged misconduct was common to all class members, cases in which plaintiffs assert that they were misled by a representation in advertising or on a product label and that they purchased a product they otherwise would not have are the type that require individualized inquiries similar to those discussed by the *Vega* court. Where individualized inquiries concerning the reasons class members purchased a product are required, Florida courts find that those inquiries predominate over common questions, and that class certification is inappropriate.[210] *Green v. McNeil Nutritionals, LLC*, No. 2004–0379–CA, 2005 WL 3388158, *1 (Fla.Cir.Ct. Nov. 16, 2005), is particularly instructive on this point.

In *Green*, plaintiffs filed a putative class action against McNeil alleging violations of the FDUTPA and unjust enrichment; they asserted that McNeil's use of a "SUGAR" label of Splenda® packets was "unfair, false, and misleading." *Id.* at *1. Plaintiffs moved to certify an unjust enrichment class under Florida law and the court denied the motion, concluding that individualized inquiries concerning each class mem-

---

**210.** These deceptive labeling cases are distinguishable from *In re Checking Account Overdraft Litigation* and *BellSouth Telecommunications*. In those cases, as noted, the courts concluded that unjust enrichment classes could be certified because defendants' business practice affected each putative class member in the same way, and individual class members had no way to learn of the practice or its "true nature" so as to formulate an individualized reaction to it, see *In re Checking Account Overdraft Litigation*, 286 F.R.D. at 658; *BellSouth Telecommunications*, 275

F.R.D. at 647. By contrast, as the cases cited *infra* indicate, unjust enrichment claims premised on representations in product advertising or labeling often involve situations in which individual class members have varying levels of knowledge regarding the nature of the product and/or the defendant's allegedly misleading conduct, and also understand the representations in different ways. Neither consideration was implicated in *In re Checking Account Overdraft Litigation* or *BellSouth Telecommunications*.

ber's reasons for purchasing Splenda® would be required. It stated:

"Under Rule 1.220(b)(2), Green must show that McNeil 'acted or refused to act on grounds generally applicable to all members of the class.' FLA.R.CIV.P. 1.220(b)(2). However, where 'factual differences amongst the class members' will 'translate into significant legal differences' class certification is not appropriate. *Chase Manhatten [Manhattan ] Mortgage Corp. v. Porcher,* 898 So.2d 153, 159 (Fla. 4th DCA 2005). See also *Gilman v. John Hancock Variable Life Ins. Co.,* No. 02–00051 AB, 2003 WL 23191098, at *5 (Fla.Cir.Ct. Oct. 20, 2003) (denying certification under (b)(2) when claims would 'require individualized determination as to whether damages exist and, if so, the amount of damages each individual class member sustained'). . . . In the unjust enrichment count, each member would have to show evidence as to why the purchase was made to determine whether equity warrants the return of the purchase price. Unjust enrichment may not be appropriate if a consumer did not rely on the alleged deceptive acts. It would be unjust to compensate a consumer under this equitable theory if the consumer purchased the product without relying on the alleged deceptive practices. Under such facts any unjust enrichment of McNeil would not be at the expense of that individual class member. See *Avis Rent A Car Systems, Inc. v. Heilman,* 876 So.2d 1111 (Ala.2003) (denying class certification on an unjust enrichment claim holding unjust enrichment requires an individualized inquiry into the subjective 'state of mind' of each class plaintiff)." *Id.* at *9.

The court finds the reasoning of the *Green* court persuasive, and concludes that individualized inquiries concerning the reasons each class member purchased Wesson Oils will be required in order to determine whether ConAgra's retention of the purported price premium would be "unjust" or otherwise inequitable. In contrast to *Bell-South Telecommunications,* it is not "difficult to conceive of . . . significant equitable differences between class members." *BellSouth Telecommunications,* 275 F.R.D. at 647. Indeed, as the class is currently defined, it includes all consumers who purchased Wesson Oils during the class period—whether or not they relied on the "100% Natural" label and regardless of the meaning they ascribed to the term. Even if plaintiffs can prove that the "100% Natural" was false, it does not necessarily follow that ConAgra's retention of the full purchase price would be inequitable with respect to a consumer who did not notice or did not rely on the "100% Natural" claim. Plaintiffs cite no authority suggesting that the need for individualized inquiries described in *Green* can be obviated by submitting classwide proof of the materiality of the representation. Accordingly, the court concludes that even though ConAgra made a common representation, individualized inquiries concerning the equities of individual class members' transactions will be required such that common questions do not predominate with respect to plaintiffs' unjust enrichment claim.

### (c) Conclusion Regarding Florida Claims

For the reasons stated, the court concludes that the Florida class's FDUTPA claim may be susceptible of class treatment if plaintiffs can establish that ConAgra's "100% Natural" claim was both common to all members of the class and material, i.e., that it led class members to purchase the Wesson Oils believing that they contained no GMOs. As noted, however, the court concludes that the Florida class's unjust enrichment claim will require individualized inquiries concerning

the equities of each class member's purchase transactions. It thus finds that plaintiffs have failed to satisfy the predominance requirement as to that claim.[211]

#### (4) Illinois

Plaintiffs seek to certify an Illinois class to assert claims for violation of the Illinois Consumer Fraud Deceptive Business Practices Act ("ICFA") and unjust enrichment.[212]

#### (a) Consumer Protection Claim

 An ICFA claim requires: "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception." *De Bouse v. Bayer*, 235 Ill.2d 544, 550, 337 Ill.Dec. 186, 922 N.E.2d 309 (2009) (citing *Zekman v. Direct American Marketers, Inc.*, 182 Ill.2d 359, 373, 231 Ill.Dec. 80, 695 N.E.2d 853 (1998)). The last two elements of the claim require a showing that the allegedly deceptive act "proximately caused any damages" suffered by the plaintiff. *De Bouse*, 235 Ill.2d at 550, 337 Ill.Dec. 186, 922 N.E.2d 309 (citing *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 149, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002)). To be actionable under the ICFA, a representation must be "material"; this is established by applying a reasonable person standard. See *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 505, 221 Ill.Dec. 389, 675 N.E.2d 584 (1996) (an omission or misrepresentation is material if it "concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase"); see also *Cirone–Shadow v. Union Nissan of Waukegan*, 955 F.Supp. 938, 944 (N.D.Ill.1997) ("The standard for materiality under the ICFA is an objective standard").

 Plaintiffs maintain that common issues predominate over individualized inquiries with respect to the ICFA claim because "individual reliance is not an ICFA element," and the materiality of a misrepresentation is judged by whether a reasonable person would have been deceived by the defendant's conduct.[213] Plaintiffs are correct that the reliance and materiality inquiries do not preclude certification of the class on predominance grounds. See *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 576 (7th Cir.2001) ("[T]he Illinois Supreme Court has repeatedly held that, unlike a claim for common law fraud, reliance is not required to establish a consumer fraud claim," citing *Connick*, 174 Ill.2d at 499, 221 Ill.Dec. 389, 675 N.E.2d 584; *Martin v. Heinold Commodities*, 163 Ill.2d 33, 76, 205 Ill.Dec. 443, 643 N.E.2d 734 (1994); *Siegel v. Levy Organization Development Co., Inc.*, 153 Ill.2d 534, 542, 180 Ill.Dec. 300, 607 N.E.2d 194 (1992)); see also *Connick*, 174 Ill.2d at 499, 221 Ill.Dec. 389, 675 N.E.2d 584 ("Plaintiff's reliance is not an element of statutory consumer fraud," citing *Harkala v. Wildwood Realty, Inc.*, 200 Ill.App.3d 447, 453, 146 Ill.Dec. 232, 558 N.E.2d 195 (1990)); *Martin*, 163 Ill.2d at 76, 205 Ill.Dec. 443, 643 N.E.2d 734 ("[The ICFA] does not require actual reliance"); *Siegel*, 153 Ill.2d at 542, 180 Ill.Dec. 300, 607 N.E.2d 194 ("On its face, it appears

**211.** ConAgra argues that because of privity requirements, a Florida breach of warranty claim is not susceptible of classwide proof because individualized inquiries regarding privity predominate over common questions. (Class Cert. Opp. at 39–40.) Plaintiffs, however, do not seek to certify a warranty claim on behalf of the putative Florida class. (Class Cert. Motion at 26–30.)

**212.** Class Cert. Motion at 30–33.

**213.** Class Cert. Motion at 30–31.

that all a plaintiff need prove to establish a violation of the [ICFA] is: (1) a deceptive act or practice, (2) intent on the defendants' part that plaintiff rely on the deception, and (3) that the deception in the course of conduct involving trade or commerce. *Significantly, the Act does not require actual reliance*" (emphasis added)).

The same is not true of proximate causation, however. As noted, an ICFA plaintiff must show that defendant's deception proximately caused his or her damage. See *Clark v. Experian Information Solutions, Inc.,* 256 Fed.Appx. 818, 821 (7th Cir.2007) (Unpub. Disp.) ("We concluded that 'a private cause of action under the ICFA requires a showing of proximate causation,'" citing *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 514–15 (7th Cir.2006) (in turn citing 815 ILL. COMP. STAT. 505/10a); *Oliveira v. Amoco Oil Co.,* 201 Ill.2d 134, 149, 267 Ill.Dec. 14, 776 N.E.2d 151 (2002) ("Unlike an action brought by the Attorney General under [815 Ill. Comp. Stat. 505/2], which does not require that 'any person has in fact been misled, deceived or damaged[,]' … a private cause of action brought under section [505/10a(a) ] requires proof of 'actual damage' … [and] proof that the damage occurred 'as a result of' the deceptive act or practice.' As noted previously, this language imposes a proximate causation requirement [and] proof that the damage occurred 'as a result of' the deceptive act or practice")).

"To be sure, individual issues will almost always be present in consumer fraud actions." *Langendorf v. Skinnygirl Cocktails, LLC,* 306 F.R.D. 574, 583, 2014 WL 5487670, *6 (N.D.Ill. Oct. 30, 2014). As the Seventh Circuit recently noted, however, it is legally erroneous to hold that individual issues necessarily predominate in [all] cases requiring individual subjective inquiries into causality. *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 759 (7th Cir. 2014); see also *Pella Corp. v. Saltzman,* 606 F.3d 391, 393 (7th Cir.2010) ("While consumer fraud class actions present problems that courts must carefully consider before granting certification, there is not and should not be a rule that they never can be certified").

In cases like this one where the representation being challenged was made to all putative class members, Illinois courts have concluded that causation is susceptible of classwide proof and that individualized inquiries concerning causation do not predominate if plaintiffs are able to adduce sufficient evidence that the representation was material. See, e.g., *In re Synthroid Marketing Litigation,* 188 F.R.D. 287, 292–93 (N.D.Ill.1999) ("The defendants argue that class certification under Rule 23(b)(3) is precluded because individualized issues relating to causation and damages predominate over the common issues in this lawsuit. First, defendants argue that certification is precluded because plaintiffs cannot demonstrate liability and causation with class-wide proof. According to defendants, causation depends upon individualized inquiries into decisions of consumers, physicians, and pharmacists to purchase, prescribe and dispense Synthroid as well as a careful investigation of the individual facts surrounding each [plaintiff's] knowledge and policies with respect to Synthroid. The plaintiffs, however, allege a pattern of standardized conduct by the defendants, consisting mainly of a fraudulent scheme to conceal scientific information regarding the bioequivalency of Synthroid and other levothyroxine drugs. These allegations involve a common course of conduct that leads to injury of all the class members," citing *Toney v. Rosewood Care Center, Inc. of Joliet,* No. 98 C 0693, 1999 WL 199249, *9 (N.D.Ill. Mar. 31, 1999) (in turn citing *McDonald v. Prudential Ins. Co. of America,* No. 95 C

5186, 1999 WL 102796, *2 (N.D.Ill. Feb. 19, 1999))); *Garner v. Healy*, 184 F.R.D. 598, 602 (N.D.Ill.1999) ("In *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330 (N.D.Ill. 1997), Chief Judge Aspen grappled with the identical distinction raised by Plaintiffs in this case and noted that [w]hen the fraud was perpetrated in a uniform manner against every member of the class, such as when all plaintiffs received virtually identical written materials from the defendants, courts typically hold that individual reliance questions do not predominate. This court concurs with Judge Aspens reasoning in *Rohlfing*, and sees no reason why individual reliance questions should predominate over the alleged misrepresentations or scheme to defraud in this case. So far as the issue of proximate cause is concerned, the Court is of a similar mind. To establish proximate cause, Plaintiffs must demonstrate that their purchases occurred after the allegedly fraudulent statements were made, and that the alleged fraud directly or indirectly injured Plaintiffs. This will invariably turn on the nature or character of the material misrepresentation. In other words, if Plaintiffs paid money for a wax, but instead received a worthless non-wax product, then issues of proximate cause would be relatively simple to resolve on a classwide basis"); *Tylka v. Gerber Products Co.*, 178 F.R.D. 493, 499 (N.D.Ill.1998) (concluding, in an ICFA case challenging, *inter alia*, Gerber's representation on its label that its products were pure and natural, that individualized issues concerning proximate causation did not predominate, and noting that "[b]ecause proximate cause under the ICFA is inextricably tied to the character of the material misrepresentation, ... individualized proof of causation cannot be an impediment to class certification if materiality is not" (citations omitted)); see also *Suchanek*, 764 F.3d at 760 (reversing the district court's denial of class certification, remanding for further consideration and observing, although not deciding whether common issues predominated over individualized inquiries, that if the class prevailed on the common issue[, i.e., that the representation was material because the packaging was likely to mislead a reasonable consumer], it would be a straightforward matter for each purchaser to present her evidence on reliance and causation). Here, it is undisputed that ConAgra made the same alleged misrepresentation on each bottle of Wesson Oils purchased by class members during the class period. The court thus concludes that, if plaintiffs can demonstrate that ConAgra's "100% Natural" claim was material, i.e., that it led class members to purchase the Wesson Oils believing they contained no GMOs, they will be able to prove proximate cause on a classwide basis as well.[214]

---

**214.** The court is aware that other courts in the Seventh Circuit have reached the opposite conclusion as to whether individualized issues concerning proximate cause predominate where class claims are based on an alleged misrepresentation. See, e.g., *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 748 (7th Cir.2008) (concluding that common issues did not predominate where each class member's claim turned on the extent to which she relied on and was damaged by an alleged deception); *Langendorf*, 306 F.R.D. at 583–84, 2014 WL 5487670 at *6–7 (concluding that common issues did not predominate where plaintiff "offer[ed] no evidence" concerning what percentage of the proposed class was likely deceived by "all natural" representations in defendant's marketing); *In re Sears, Roebuck & Co. Tools Marketing and Sales Practices Litigation*, Nos. 05 C 4742, 05 C 2623, 2007 WL 4287511, *9 (N.D.Ill. Dec. 4, 2007) (concluding that common issues concerning deception and causation did not predominate over individualized factual inquiries). These cases are distinguishable, however, and do not persuade the court that individualized inquiries concerning causation

will necessarily be required or predominate over common questions.

In *Thorogood,* the Seventh Circuit directed the district court to decertify an ICFA class challenging Sears's representation that its dryers had a "stainless steel drum.". *Thorogood,* 547 F.3d at 748. Thorogood alleged the representation ˴was misleading because the dryer drum was not 100% stainless steel. · The court faulted the district court for presuming that "the other half million buyers, apart from Thorogood, shared his understanding of Sears's representations and paid a premium [based on that understanding]." *Id.* Specifically, the court questioned whether *any other class member* understood "stainless steel drum" in the same manner as plaintiff. *Id.* at 747 ("The plaintiff claims to believe that when a dryer is labeled or advertised as having a stainless steel drum, this implies, without more, that the drum is 100 percent stainless steel because otherwise it might rust and cause rust stains in the clothes dried in the dryer. Do the other 500,000 members of the class believe this? Does *anyone* believe this besides Mr. Thorogood? It is not as if Sears advertised the dryers as eliminating a problem of rust stains by having a stainless steel drum. There is no suggestion of that. It is not as if rust stains were a common concern of owners of clothes dryers. There is no suggestion of that either, and it certainly is not common knowledge" (emphasis original)). As plaintiffs proffered no evidence concerning consumers' interpretation of Sears's representation, and thus no evidence indicating that the representation was material to a reasonable consumer, the Seventh Circuit concluded that individualized issues were likely to predominate.

Similarly, in *Langendorf,* a Northern District of Illinois court concluded that individualized issues concerning proximate cause predominated over common questions and precluded certification of an ICFA class. *Langendorf,* 306 F.R.D. at 583–84, 2014 WL 5487670 at *6–7. Critical to this conclusion was the fact that Langendorf had adduced no evidence concerning the materiality of defendant's purportedly misleading "all natural" claim on its product labels:

"Langendorf argues that it is irrelevant why each class member purchased the product, because 'the simple fact is that Plaintiff and the Class did not get what they paid for, i.e. 'All Natural' or 'Blue Agave.'' But 'what they paid for' is precisely the question, and it is an individual one. That common is-

sues predominate over individual ones is a requirement for class certification, and Langendorf has the burden of demonstrating it by a preponderance of the evidence— attorney assertions do not suffice. Next, Langendorf argues that 'the fact that a defendant may be able to defeat the showing of causation as to a few individual class members does not transform the common question into a multitude of individual ones; plaintiffs satisfy their burden of showing causation as to each by showing materiality as to all.' But even if that were a correct statement of the law (for these claims, in this Circuit), Langendorf has produced no evidence to show that causation will be defeated only as to 'a few' class members; in other words, she has not demonstrated the materiality of the 'all natural' text. As defendants point out, such a showing could have been attempted through survey evidence. Langendorf submitted no evidence, survey or otherwise, to show what portion of purchasers likely relied on the 'all natural' text, or the degree to which the label 'all natural' had a tendency to influence the decision to purchase the product. She has therefore failed to carry her burden to show that common issues predominate." *Id.* at 582–83, 2014 WL 5487670 at *5.

As can be seen, *Thorogood* and *Langendorf* do not stand for the proposition that causation cannot be proven on a classwide basis. They merely reflect the fact that, under the specific circumstances of those cases, plaintiff did not carry his or her burden of proving that the purported misrepresentation was material to consumers, i.e., that consumers understood the representation in the same way, and purchased the product as a result of that understanding. Here, in contrast to both *Thorogood* and ·*Langendorf,* plaintiffs have proffered evidence concerning the materiality of ConAgra's "100% Natural" claim, which the court considers *infra* to determine if it is sufficient to demonstrate the materiality of the misrepresentation.

In re Sears, 2007 WL 4287511 at *9, is also distinguishable. There, the court concluded that individualized issues were likely to predominate over common questions with respect to plaintiff's ICFA and unjust enrichment claims, noting, inter alia, that "each plaintiff will have been exposed to a different representation or mix of representations," and that "each class member's motivation for buying Craftsman products would be highly individualized." Id. In contrast here, it is

### (b) Unjust Enrichment Claim

To state an unjust enrichment claim under Illinois law, a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violated fundamental principles of justice, equity, and good conscience. See *Drury v. County of McLean*, 89 Ill.2d 417, 425–26, 60 Ill.Dec. 624, 433 N.E.2d 666 (1982); *Kenneke v. First National Bank*, 65 Ill. App.3d 10, 12, 21 Ill.Dec. 945, 382 N.E.2d 309 (1978). As is true of unjust enrichment claims in other states, privity is not required. *Muehlbauer v. General Motors Corp.*, 431 F.Supp.2d 847, 853 (N.D.Ill. 2006) (noting that the focus of unjust enrichment is not privity, but rather "the defendant's retention of benefits").

In cases where plaintiffs plead ICFA and unjust enrichment claims based on the same deceptive and/or fraudulent conduct, Illinois courts apply the same predominance analysis to both claims. See *Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D.Ill.2005) (concluding that "[t]he same analysis applies to Oshana's unjust enrichment claim" as to her ICFA claim because "Oshana allege[d] class members were 'tricked' by Coca-Cola's marketing scheme into purchasing fountain diet Coke that they would not have otherwise purchased"); see also *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 462 (N.D.Ill.2013) (analyzing predominance jointly with respect to plaintiffs' ICFA, intentional representation, and unjust enrichment claims); *Clark v. Experian Information, Inc.*, 233 F.R.D. 508, 511–12 (N.D.Ill.2005) (same).

Indeed, the Seventh Circuit has recognized that where, as here, an unjust enrichment claim is based on the same alleged wrongdoing that forms the basis for an ICFA claim, the "unjust enrichment claim will stand or fall with the related [ICFA] claim." *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir.2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim" (citations omitted)); see *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir.2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well").

As discussed, to prove ConAgra's liability under the ICFA, plaintiffs must show that its allegedly misleading "100% Natural" label proximately caused their damage. To make such a showing on a class-wide basis, moreover, plaintiffs must demonstrate that "100% Natural" claim was material to a reasonable consumer. Because the court has concluded that common issues will predominate over individualized inquiries if plaintiffs make a sufficient showing of materiality, and because plaintiffs unjust enrichment claim

---

undisputed that each class member was exposed to the same representation, which appeared on each bottle of Wesson Oils sold during the class period. Regarding the In re Sears court's observation that "highly individualized" inquiries concerning class members' motivations for purchasing Craftsman tools would be necessary, plaintiffs here have proffered some evidence demonstrating that class members understood that the "100% Natural" claim meant Wesson Oils contained no GMOs and that they purchased the product as a result. Because under Illinois law, causation can be proved on a classwide basis if a uniform, material misrepresentation has been made, the court considers infra whether the evidence plaintiffs have adduced could suffice to prove materiality and hence causation.

based on the same allegedly wrongful conduct "stands or falls" with the ICFA claim, *Cleary,* 656 F.3d at 517, the court concludes that plaintiffs' unjust enrichment claim under Illinois law is similarly amenable to class treatment if plaintiffs can sufficiently demonstrate that ConAgra's "100% Natural" label was material to a reasonable consumer.

### (c) Conclusion Regarding Illinois Claims

For the reasons stated, the court concludes that the putative Illinois class's ICFA and unjust enrichment claims are susceptible of classwide proof if plaintiffs can establish that ConAgra's "100% Natural" claim was material.

### (5) Indiana

Plaintiffs seek to certify a putative Indiana class to assert breach of express warranty, breach of implied warranty, and unjust enrichment claims.[215]

### (a) Unjust Enrichment Claim

■■■ There are three elements of an unjust enrichment claim under Indiana law: (1) a benefit conferred upon another at the express or implied request of the other party; (2) allowing the other party to retain the benefit without restitution would be unjust; and (3) plaintiff expected payment. *Kelly v. Levandoski,* 825 N.E.2d 850, 861 (Ind.App.2005). Stated differently, "a plaintiff must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust. One who labors without an expectation of payment cannot recover in quasi-contract." *Bayh v. Sonnenburg,* 573 N.E.2d 398, 408 (Ind.1991); see *Meridian Financial Advisors, Ltd. v. Pence,* 763 F.Supp.2d 1046, 1065 (S.D.Ind.2011) ("To recover under a theory of unjust enrich-

ment, 'a party must show that a measurable benefit has been conferred on a party under such circumstances that retention of the benefit without payment would be unjust.' ... In other words, unjust enrichment recovery is possible only where disgorgement of the benefit received by the defendant is possible.... In addition, Indiana law only permits recovery under the equitable principle of unjust enrichment when no adequate remedy at law exists").

■■■ The court concludes that the Indiana plaintiffs' unjust enrichment claim satisfies the predominance requirement. Indiana courts considering unjust enrichment claims asserted on behalf of a class have found them appropriate for certification if the defendant's allegedly deceptive or fraudulent conduct is common to all class members. See *ConAgra, Inc. v. Farrington,* 635 N.E.2d 1137, 1143 (Ind. App.1994) (concluding that the predominance requirement was satisfied where plaintiffs showed that defendant made misleading and/or fraudulent statements to which all class members were exposed); see also *Wal–Mart Stores, Inc. v. Bailey,* 808 N.E.2d 1198, 1207 (Ind.App.2004) (noting, in remanding to the trial court, that "it may ultimately be necessary that the class action be maintained for certain issues, such as whether Wal–Mart was unjustly enriched or whether certain elements of unjust enrichment were met"). As in *Farrington,* plaintiffs here assert that ConAgra engaged in deceptive conduct by labeling Wesson Oils "100% Natural." ConAgra's conduct was indisputably uniform with respect to all members of the putative class. The court therefore concludes that plaintiffs have shown that common questions predominate over individualized inquiries with respect to their

---

**215.** Class Cert. Motion at 33–35.

Indiana unjust enrichment claim and that the claim is susceptible of class treatment and proof.

### (b) Express and Implied Warranty Claims

■ "In order to prevail on a cause of action based on breach of [express] warranty [under Indiana law], the plaintiff must provide 'evidence showing not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained.'" *U.S. Automatic Sprinkler Co. v. Reliable Automatic Sprinkler Co.,* 719 F.Supp.2d 1020, 1027 (S.D.Ind.2010).

■ The court concludes that plaintiffs have not made a sufficient showing that common issues predominate over individualized inquiries with respect to their breach of express warranty claim. In Indiana, a plaintiff suing for breach of an express warranty must be in privity with the defendant. See *Atkinson v. P & G–Clairol, Inc.,* 813 F.Supp.2d 1021, 1026 (N.D.Ind.2011) ("[V]ertical privity is required for claims of breach of express warranty.... *Pizel v. Monaco Coach Corp.,* 364 F.Supp.2d 790, 793 (N.D.Ind. 2005) (stating that the holding in [*Hyundai Motor America, Inc. v.*] *Goodin,* [822 N.E.2d 947 (Ind.2005),] was limited to abolishing the vertical privity requirement for claims of breach of the implied warranty of merchantability) ..."); *Davidson v. John Deere & Co.,* 644 F.Supp. 707, 713 (N.D.Ind.1986) (finding that plaintiff did not have a claim for breach of express warranty because "[p]rivity has not been abrogated as a requirement in contract actions for breach of warranty"); see also *Thunander v. Uponor, Inc.,* 887 F.Supp.2d 850, 865 (D.Minn.2012) ("In Indiana, vertical privity must be shown in order to sue for breach of an express warranty. Verti-

cal privity exists only between immediate links in the chain of distribution. A buyer in the same chain who did not purchase directly from a seller is 'remote' to that seller," citing *Atkinson,* 813 F.Supp.2d at 1026; IND. CODE ANN. § 26–1–2–318).

■ The Indiana Court of Appeals, however, has recognized an "exception" to the privity requirement for breach of express warranty claims against a manufacturer that are based on representations in advertisements and/or on a product label. In *Prairie Production, Inc. v. Agchem Division–Pennwalt Corp.,* 514 N.E.2d 1299 (Ind.App.1987), the court held that where a manufacturer has made representations to a buyer in the chain of distribution in advertisements or on product labels, and the buyer relied on those representations, the buyer could assert a breach of express warranty claim notwithstanding the lack of privity between plaintiff and defendant. *Id.* at 1303–04; see also *Ryden v. Tomberlin Auto. Group,* No. 1:11–CV–1215–RLY–DML, 2012 WL 4470266, *2 (S.D.Ind. Sept. 27, 2012) ("In *Prairie Production,* the Indiana Court of Appeals relied on the New York case of *Randy Knitwear, Inc. v. Am. Cyanamid Co.,* 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399 (N.Y.1962), and held that where a manufacturer had made representations to a buyer in the chain [of] distribution through advertisements and product labels, and the buyer in fact relied upon those representations, the buyer could maintain a claim for breach of an express warranty"). To invoke this "exception," *Ryden,* 2012 WL 4470266 at *2 ("[Courts] do not treat the case as a general repudiation of privity, but as an exception to it"), however, the representation must have become part of the basis of the bargain, *Prairie Production,* 514 N.E.2d at 1304 ("[T]he seller's representation rises to the level of an express warranty only if it becomes part of the basis of

the bargain"). Stated differently, express warranty claims falling within the *Prairie Production/Randy Knitwear* privity exception must satisfy "the conditions of representation and reliance." [216] *Ryden*, 2012 WL 4470266 at *2 ("The cases that have followed [*Prairie Production* and] *Randy Knitwear* only allow express warranty claims where the conditions of representation and reliance are met").

Plaintiffs do not address either the privity requirement for breach of express warranty claims or the *Prairie Production* privity exception. They neither argue nor cite authority for the proposition that there will be no need for individualized inquiries concerning each class member's purchase of Wesson Oils to determine if the privity requirement has been satisfied if the exception does not apply. They also proffer no evidence suggesting that the proof of reliance that is required to invoke the *Prairie Production* exception is susceptible of classwide proof. Specifically, they cite no authority indicating that a classwide inference of reliance arises under Indiana law if they prove that the label was material to a reasonable consumer. The court's own survey of Indiana cases does not suggest that privity and reliance can be proved on a classwide, rather than an individual, basis. Thus, the court concludes that individualized inquiries will predominate over common questions respecting the putative Indiana class's breach of express warranty claim, and thus

denies plaintiffs' motion to certify a class asserting that claim.

▮ "Under Indiana law, an action based on breach of the implied warranty of merchantability 'requires evidence showing not only the existence of the warranty but also that the warranty was broken and that the breach was the proximate cause of the loss.'" *Hughes v. Chattem, Inc.*, 818 F.Supp.2d 1112, 1120 (S.D.Ind.2011) (quoting *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind.App.2009)). Indiana courts have held that a plaintiff need not prove vertical privity with the defendant to recover for breach of the implied warranty of merchantability. See *Hoopes v. Gulf Stream Coach, Inc.*, No. 1:10–CV–365, 2014 WL 4829623, *10 (N.D.Ind. Sept. 29, 2014) ("The Indiana Supreme Court held that 'Indiana law does not require vertical privity between a consumer and a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of [the] implied warranty of merchantability'" (citations omitted)); *Lautzenhiser v. Coloplast A/S*, No. 4:11–CV–86–RLY–WGH, 2012 WL 4530804, *5 (S.D.Ind. Sept. 29, 2012) ("The warranty of merchantability attaches automatically if the seller is a vendor of the goods in question.... Unlike the warranty of fitness for a particular purpose, vertical privity is not required"); *Goodin*, 822 N.E.2d at 959 ("[W]e conclude that Indiana law does not require vertical privi-

---

**216.** Plaintiffs cite the Indiana Court of Appeals' opinion in *Essex Group, Inc. v. Nill*, 594 N.E.2d 503 (Ind.App.1992), for the proposition that "reliance is not required on a warranty claim." (Class Cert. Motion at 35.) In *Essex Group*, the court considered the *prima facie* elements of a breach of warranty claim under Indiana law and observed that "reliance is not an element...." *Essex Group*, 594 N.E.2d at 506–07. *Prairie Production* did not alter the *prima facie* elements of a breach of express warranty claim, however; instead, it

created an exception to the privity requirement that is one of those elements. To invoke the exception, a plaintiff must establish his or her reliance on a representation made by the manufacturer. While proof of reliance is not generally required to prove a breach of warranty claim, therefore, it *is required* in situations such as this where plaintiffs do not allege that they are in privity with the manufacturer, and seek to take advantage of the *Prairie Production* exception.

ty between a consumer and a manufacturer as a condition to a claim by the consumer against the manufacturer for breach of the manufacturer's implied warranty of merchantability").

■ A plaintiff asserting a claim for breach of the implied warranty of merchantability must still prove that the breach was a proximate cause of his or her loss, however. See *Irmscher Suppliers, Inc.*, 909 N.E.2d at 1048; *Frantz v. Cantrell,* 711 N.E.2d 856, 860 (Ind.App.1999) (" 'Any action based on breach of warranty requires evidence showing not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained,' " citing *Richards v. Goerg Boat and Motors, Inc.,* 179 Ind.App. 102, 108–09, 384 N.E.2d 1084 (1979)).

■ Plaintiffs argue that, as with their Colorado warranty claims, their Indiana implied warranty claim is susceptible of classwide proof because they will be able to demonstrate through their damages methodology that the allegedly misleading "100% Natural" label proximately caused their damages, i.e., they will be able to show that a price premium attributable to the label resulted in Indiana class members paying more for each bottle of Wesson Oils than they otherwise would have. Plaintiffs contend that payment of the price premium was proximately caused by ConAgra's purported breach of a warranty that Wesson Oils contained no GMOs. They seek to recover the price premium as damages.

The court is persuaded and agrees that, under Indiana law, causation is susceptible of classwide proof where, as here, plaintiffs may be able to prove that defendant's warranty caused each class member to pay more than he or she otherwise would have

paid for the product. Thus, if plaintiffs are able to propose a methodology to calculate the price premium associated with use of the "100% Natural" label to suggest that Wesson Oils contain no GMO ingredients, the court concludes they will be able demonstrate causation on a classwide basis. The court considers *infra* whether plaintiffs have proposed a viable damages methodology.

### (c) Conclusion Regarding Indiana Claims

For the reasons stated, the court concludes that common questions predominate over individualized issues as respects plaintiffs' Indiana unjust enrichment and implied warranty claims. The same is not true of the Indiana class's breach of express warranty claim, however. The court concludes that these claims are not susceptible of classwide proof and that the predominance requirement is not satisfied with respect to them.

### (6) Nebraska

Plaintiffs seek to certify a Nebraska class to assert breach of express and implied warranty claims, as well as a claim for unjust enrichment.[217]

### (a) Unjust Enrichment

■ Nebraska recognizes the doctrine of unjust enrichment only when the parties do not have an express contract. See *Washa v. Miller,* 249 Neb. 941, 950, 546 N.W.2d 813 (1996) (noting that the doctrine cannot "rescue a party from the consequences of a bad bargain"). To recover on an unjust enrichment claim, a plaintiff must prove that defendant "received and retained [benefits] under such circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor."

---

**217.** Class Cert. Motion at 35–38.

*Hoffman v. Reinke Mfg. Co.*, 227 Neb. 66, 69, 416 N.W.2d 216 (1987).

Plaintiffs argue that they have satisfied the predominance requirement with respect to their Nebraska unjust enrichment claim because the elements of the claim are susceptible of common proof.[218] They cite *Cortez v. Nebraska Beef, Inc.*, 266 F.R.D. 275 (D.Neb.2010), a district court case in which the court certified a class alleging various state law claims related to wage and hour violations under Nebraska law; one of the claims was unjust enrichment. *Id.* at 280–81. The court certified the class, concluding that common questions predominated over individual issues because all class member employees had been exposed to "non-unique employee training sessions and other non-unique representations [that formed] the basis of the oral contracts at issue." *Id.* at 293. So too here, the putative class has been exposed to non-unique representations by ConAgra on its bottles of Wesson Oils. Under Nebraska law, this common fact predominates over "differences in individual experiences." *Id.* Thus, the court concludes that individualized issues will not predominate over issues subject to common proof, i.e., ConAgra's representations to the putative class, with respect plaintiffs' unjust enrichment claim under Nebraska law.

### (b) Express and Implied Warranty Claims

Under Nebraska law, "[t]o maintain a warranty action, several factors must be proved: (1) The plaintiff must prove the defendant made a warranty, express or implied, under §§ 2–313, 2–314, or 2–315; (2) the plaintiff must prove the goods did not comply with the warranty, i.e., the goods were defective at the time of the sale; (3) the plaintiff must prove the injury was caused, proximately and in fact, by the defective nature of the goods; and (4) the plaintiff must prove damages." *Divis v. Clarklift of Nebraska, Inc.*, 256 Neb. 384, 393, 590 N.W.2d 696 (1999) (citing *Murphy v. Spelts–Schultz Lumber Co.*, 240 Neb. 275, 481 N.W.2d 422 (1992); *Delgado v. Inryco, Inc.*, 230 Neb. 662, 433 N.W.2d 179 (1988); *England v. Leithoff*, 212 Neb. 462, 323 N.W.2d 98 (1982); *Geiger v. Sweeney*, 201 Neb. 175, 266 N.W.2d 895 (1978)).

Plaintiffs assert in their breach of express warranty claim under Neb.Rev. Stat. U.C.C. § 2–313, arguing that the "100% Natural" label on Wesson Oils was a factual affirmation by ConAgra concerning the quality and characteristics of the products; the court agrees that this type of claim on a label can serve as the basis for an express warranty claim under Nebraska law. See NEB.REV.STAT. U.C.C. § 2–313 ("Express warranties by the seller are created as follows: ... (a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; (b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description"); see also *Peterson v. North American Plant Breeders,* 218 Neb. 258, 262–63, 354 N.W.2d 625 (1984) ("The existence of an express warranty depends upon the particular circumstances in which the language is used and read.... A catalog description or advertisement may create an express warranty in appropriate circumstances.... The trier of fact must determine whether the circumstances necessary to create an express warranty are present in a given case.... The test is

**218.** *Id.* at 36.

'whether the seller assumes to assert a fact of which the buyer is ignorant, or whether he merely states an opinion or expresses a judgment about a thing as to which they may each be expected to have an opinion and exercise a judgment,'" citing *Overstreet v. Norden Laboratories, Inc.*, 669 F.2d 1286, 1290–91 (6th Cir. 1982)). Compare *Sherman v. Sunsong America, Inc.*, 485 F.Supp.2d 1070, 1088 (D.Neb.2007) ("In this case, the Plaintiffs argue that the label on the Product—specifically, the words 'Misuse may result in injury or fire'—creates an express warranty that if all of the instructions on the Product's label are followed, injury will not result. Although well taken, I do not believe that there was an express warranty made as contemplated by Nebraska law because I do not find that 'misuse may result in injury' is an express affirmation that 'proper use will not result in injury.' In other words, there was no affirmative statement made to serve as the basis for an express warranty claim. Consequently, the seventh cause of action, based on breach of an express warranty, will be dismissed as to Winco and Shiu Fung").

■ Although plaintiffs have sufficiently alleged an affirmative representation that could constitute an express warranty under Nebraska law, they must also show that they relied on the representation to prevail. See *Hillcrest Country Club v. N.D. Judds Co.*, 236 Neb. 233, 241, 461 N.W.2d 55 (1990) ("[S]ince an express warranty must have been 'made part of the basis of the bargain,' it is essential that the plaintiffs prove reliance upon the warranty,'" citing *Wendt v. Beardmore Suburban Chevrolet*, 219 Neb. 775, 780, 366 N.W.2d 424 (1985)). Plaintiffs argue they can satisfy the reliance requirement on a classwide basis by showing the "materiality of the '100% Natural' claim to reasonable

consumers."[219] They proffer no authority supporting this assertion, however. Absent authority to the contrary, the court concludes that a plaintiff must prove actual reliance under Nebraska law to maintain a breach of express warranty claim, and that such reliance must be proved on an individual basis. See *Hillcrest Country Club*, 236 Neb. at 241, 461 N.W.2d 55 ("It is essential that plaintiffs prove reliance upon the warranty"); see also *In re General Motors Corp. Dex–Cool Products Liability Litigation*, 241 F.R.D. 305, 320–21 (S.D.Ill. 2007) (observing that a breach of express warranty claim under Nebraska law, as well under the laws of several other states, requires a showing of specific reliance, and rejecting plaintiffs' suggestion that the court could "employ[ ] a classwide presumption of reliance" because "states that require proof of actual reliance in order to maintain a claim for breach of express warranty under the UCC," like Nebraska, do not presume "a buyer's reliance on a seller's affirmations of fact or promises relating to goods"). The court thus concludes that individualized inquiries will be required to prove plaintiffs' express warranty claim under Nebraska law, and that these will predominate over common questions.

■ To prove a breach of the implied warranty of merchantability under Nebraska law, there must be proof that there was a deviation from the standard of merchantability at the time of sale and that the deviation caused plaintiff's injury. *Mennonite Deaconess Home and Hospital, Inc. v. Gates Engineering Co., Inc.*, 219 Neb. 303, 314, 363 N.W.2d 155 (1985) (citing *O'Keefe Elevator v. Second Ave. Properties*, 216 Neb. 170, 343 N.W.2d 54 (1984)). Under Nebraska law, goods are defective, i.e., not merchantable, if they do

**219.** Class Cert. Motion at 37.

not "conform to the promises or affirmations of fact made on the container or label." See NEB. REV. STAT.U.C.C. § 2–314 ("Goods to be merchantable must be at least such as . . . conform to the promises of fact made on the container or label if any"). Nebraska courts have recognized that, unlike a breach of express warranty claim, a cause of action for breach of the implied warranty of merchantability does not require proof of reliance by plaintiffs. *El Fredo Pizza, Inc. v. Roto–Flex Oven Co.*, 199 Neb. 697, 702, 261 N.W.2d 358 (1978) ("In order for goods to be merchantable under section 2–314, they must be at least such as are fit for the ordinary purpose for which such goods are used. Under this implied warranty, no reliance upon the seller need be shown").

It is nonetheless necessary that a plaintiff show the defective nature of the goods, i.e., the merchant's "deviation from the standard of merchantability at the time of sale," and that such deviation was the proximate cause of his or her injury. See *In re Saturn L–Series Timing Chain Products Liability Litigation*, MDL No. 1920, 2008 WL 4866604, *10 (D.Neb. Nov. 7, 2008) ("In Nebraska, 'to establish a breach of the implied warranty of merchantability, there must be proof that there was a deviation from the standard of merchantability at the time of sale and that such deviation caused the plaintiff's injury both proximately and in fact' "); *Sherman v. Sunsong America, Inc.*, 485 F.Supp.2d 1070, 1086–87 (D.Neb.2007) ("The Plaintiffs' Second Amended Complaint includes a claim for breach of an implied warranty of merchantability. In order to recover damages for breach of an implied warranty of merchantability, the Nebraska Supreme Court has held that 'there must be proof that there was a deviation from the standard of merchanta-

bility at the time of sale and that such deviation caused the plaintiff's injury both proximately and in fact,' " citing *Delgado v. Inryco, Inc.*, 230 Neb. 662, 666–67, 433 N.W.2d 179 (1988)).

■ While plaintiffs contend that the implied warranty class can be certified because reliance and privity are not required elements of an implied warranty claim,[220] they must also demonstrate that proximate cause can be proven on a classwide basis. Plaintiffs have adequately made this showing for class certification purposes. As with the Colorado and Indiana breach of warranty claims, plaintiffs contend they will be able to prove causation on a classwide basis by showing that each class member paid more for each bottle of Wesson Oils purchased as a result of the allegedly misleading "100% Natural" label. If their damages methodology provides proof of the price premium associated with use of the label to suggest that the product contained no GMOs, a question the court addresses *infra*, the court will conclude that the breach of implied warranty class satisfies Rule 23's predominance requirement.

#### (c) Conclusion Regarding Nebraska Claims

For the reasons stated, the court concludes that common questions predominate over individualized inquiries with respect to the Nebraska class's unjust enrichment and breach of implied warranty claims. The class's breach of express warranty claim, however, will require individualized inquiries concerning each class member's reliance on the warranty such that class treatment of the claim is not appropriate.

#### (7) New York

Plaintiffs seek to certify a New York class to assert claims for violation of the

---

**220.** Class Cert. Motion at 37–38.

New York Consumer Protection Act ("GBL"), breach of express warranty, and unjust enrichment.[221]

### (a) Consumer Protection Claim

■ New York General Business Law ("GBL") § 349 creates a private cause of action for any person injured by "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. GEN. BUS. LAW § 349. To state a claim under § 349, a plaintiff must allege that: (1) the challenged act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) plaintiff was injured as a result. *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir.2009); *Bosch v. LaMattina*, 901 F.Supp.2d 394, 406 (E.D.N.Y.2012). To be consumer-oriented, conduct must have a "broad impact on consumers at large." *U.W. Marx, Inc. v. Bonded Concrete, Inc.*, 7 A.D.3d 856, 776 N.Y.S.2d 617, 619 (2004).

■ ConAgra argues that individualized issues concerning reliance predominate over the common issues raised by plaintiffs' GBL claim. The New York Court of Appeals recently clarified, however, that proof of reliance and scienter are not elements of a GBL claim. See *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941–41, 944 N.Y.S.2d 452, 967 N.E.2d 675 (2012). Rather, "each [GBL] claim includes the requirement that a reasonable consumer could have been misled by defendants' conduct." *Ackerman v. Coca–Cola Co.*, No. CV–09–0395 JG (RML), 2010 WL 2925955, *15 (E.D.N.Y. July 21, 2010). As a result, individualized issues concerning reliance and scienter do not preclude classwide proof of plaintiffs' GBL claim. Plaintiffs must, however, show materiality to demonstrate that common questions predominate over individualized

issues. The court considers below whether plaintiffs have adduced sufficient evidence that the "100% Natural" claim was material such that it is appropriate to certify the class because plaintiffs may be able to prove that "a reasonable consumer could have been misled" by the label claim. *Ackerman*, 2010 WL 2925955 at *15; see also *Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 78–79 (E.D.N.Y.2011) ("Whether acts or practices are deceptive is determined using an objective test. Representations or omissions are considered deceptive when they are 'likely to mislead a reasonable consumer acting reasonably under the circumstances,'" citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)).

### (b) Express Warranty Claim

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." *Avola v. La.-Pac. Corp.*, 991 F.Supp.2d 381, 391 (E.D.N.Y.2013) (quoting N.Y. U.C.C. § 2–313(1)(a)); accord *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F.Supp.2d 585, 604 (S.D.N.Y. 2010) (describing an express warranty as an affirmation of fact or promise that naturally tends to induce the buyer to purchase and upon which buyer relies to his detriment).

■ To state a breach of express warranty claim under New York law, a plaintiff must allege (1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on the warranty as a basis for the contract with the immediate

seller, (3) a breach of the warranty, and (4) injury to the buyer caused by the breach. *Avola,* 991 F.Supp.2d at 391 (citing *CBS Inc. v. Ziff–Davis Publ'g Co.,* 75 N.Y.2d 496, 502–04, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990)); accord *Liberty Media Corp. v. Vivendi Universal, S.A.,* Nos. 02 Civ. 5571(RJH), 03 Civ. 2175(RJH), 2004 WL 876050, *10 (S.D.N.Y. Apr. 21, 2004) (plaintiffs must allege "the existence of an express warranty, reliance on that warranty as part of the agreement between the parties, and that the warranties were false or misleading when made, proximately causing plaintiff's loss," citing *Rogath v. Siebenmann,* 129 F.3d 261, 264 (2d Cir.1997); *CBS Inc.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997).

A buyer may assert an express warranty claim against a manufacturer from which he did not purchase a product directly, since an express warranty can "include specific representations made by a manufacturer in its sales brochures or advertisements regarding a product upon which a purchaser relies." *Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.,* 51 A.D.3d 1114, 1116, 858 N.Y.S.2d 405 (2008) (citing *Randy Knitwear, Inc.,* 11 N.Y.2d at 14, 226 N.Y.S.2d 363, 181 N.E.2d 399 (no privity requirement where a manufacturer makes express representations to induce reliance by remote purchasers)); accord *Daniels v. Forest River, Inc.,* No. 07–4227, 2013 WL 3713464, *3 (N.Y.Sup. Ct. June 28, 2013). A plaintiff alleging breach of express warranty must "set forth the terms of the warranty upon which he relied," however. *Parker v. Raymond Corp.,* 87 A.D.3d 1115, 1117, 930 N.Y.S.2d 27 (App.Div.2011).

New York law requires "no more than reliance on the express warranty as being a part of the bargain between the parties." *CBS, Inc.,* 75 N.Y.2d at 503, 554 N.Y.S.2d 449, 553 N.E.2d 997. Stated differently, "[t]he critical question is not whether the buyer believed in the truth of the warranted information, but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth].'" *Id.* (alterations original). While plaintiffs need not prove that they believed the truth of the warranted information, they must establish, via classwide proof, that the representation was "material and actionable" before certification of a New York express warranty class is appropriate. See *Weinberg v. Hertz Corp.,* 116 A.D.2d 1, 7, 499 N.Y.S.2d 693 (N.Y.App.Div.1986) ("[O]nce it has been determined that the representations alleged are material and actionable ... the issue of reliance may be presumed, subject to such proof as is required on the trial"). Accordingly, plaintiffs must adduce sufficient evidence that the representation was material on a classwide basis to support certification of an express warranty class. The court examines below whether they have done so.

### (c) Unjust Enrichment Claim

To state an unjust enrichment claim under New York law, a plaintiff must plead that (1) the defendant was enriched (2) at the plaintiff's expense and (3) the circumstances were such that equity and good conscience require that the defendant make restitution. *Hughes v. Ester C Co.,* 930 F.Supp.2d 439, 471 (E.D.N.Y.2013); accord *Corsello v. Verizon N.Y., Inc.,* 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177 (2012) ("The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which 'in equity and good conscience' should be paid to the plaintiff"). Unjust enrichment is available as a cause of action "only in unusual situations whe[re], though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equi-

table obligation running from the defendant to the plaintiff." *Corsello*, 18 N.Y.3d at 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177. Under New York law, "[i]t does not matter whether the benefit is directly or indirectly conveyed [to the defendant]." *Manufacturers Hanover Trust Co. v. Chem. Bank*, 160 A.D.2d 113, 117, 559 N.Y.S.2d 704 (N.Y.App.Div.1990). Privity, moreover, is not required for an unjust enrichment claim. See *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516, 950 N.Y.S.2d 333, 973 N.E.2d 743 (2012) ("a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment, [but] there must exist a relationship or connection between the parties that is not too attenuated").

■■■ Plaintiffs have not adequately shown that common questions predominate with respect to their New York unjust enrichment claim. New York courts regularly conclude that unjust enrichment classes cannot be certified because individualized inquiries as to whether "equity and good conscience require restitution" are not susceptible of classwide proof. See, e.g., *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 75–76 (S.D.N.Y.2013) ("Plaintiff's attempt to certify a class as to his unjust enrichment claim fails, in part, because the elements of the cause of action are not susceptible to classwide proof. Specifically, plaintiff cannot prove through common evidence that equity and good conscience require restitution. An 'indispensable ingredient' of the equity and good conscience requirement is the existence of 'an injustice as between the two parties involved.' In this case, plaintiff cannot demonstrate through classwide evidence that it was unjust for XM to collect fees from all of the customers whose service was renewed.... Plaintiff's inability to prove the elements of his claim through common evidence, in and of itself, defeats Rule 23(b)(3)'s predominance requirement," citing *In re Jetblue Airways Corp. Privacy Litig.*, 379 F.Supp.2d 299, 330 (E.D.N.Y.2005)); *Dungan v. Academy at Ivy Ridge*, 249 F.R.D. 413, 427 (N.D.N.Y. 2008) (holding that the predominance requirement was not satisfied where individual inquiries would be necessary to determine whether equity and good conscience required restitution).

As in these cases, individualized inquiries will be required here to determine whether it would be "unjust" for ConAgra to retain the price paid by each class member for Wesson Oils during the class period. As noted in connection with the court's analysis of the Illinois class's unjust enrichment claim, a class member's ability to recover for unjust enrichment under New York law will turn on individual questions concerning proximate causation, deception and conferral of a benefit. Accordingly, the court concludes that plaintiffs have not shown that common questions predominate with respect to their New York unjust enrichment claim.[222]

**222.** Plaintiffs' attempt to certify an unjust enrichment class fails for the independent reason that the claim is duplicative of plaintiffs' GBL claim. Under New York law, as noted, "unjust enrichment is not a catchall cause of action to be used when others fail." Rather, "it is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello*, 18 N.Y.3d at 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177. Where, as here, an unjust enrichment claim merely duplicates a conventional contract or tort claim, courts routinely conclude that plaintiffs have an adequate remedy at law and find that an independent cause of action for unjust enrichment will not lie. See *id.* at 790–91, 944 N.Y.S.2d 732, 967 N.E.2d 1177 ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort

### (d) Conclusion Regarding New York Claims

For the reasons stated, the court concludes that the GBL and express warranty claims of the putative New York class may be susceptible of classwide proof. The court cannot determine if certification of such classes is appropriate, however, until it evaluates whether plaintiffs have adduced sufficient evidence indicating that they may be able to prove the materiality of ConAgra's representations on a classwide basis. As respects the putative class's unjust enrichment claim under New York law, the court concludes that individualized issues predominate and that a class cannot be certified.

### (8) Ohio

 Plaintiffs seek certification of an Ohio class alleging violation of the Ohio Consumer Sales Practices Act ("OCSPA").[223] Under Ohio law, a class action for violation of the OCSPA can be maintained to redress a "deceptive act [that] has the likelihood of inducing a state of mind in the consumer that is not in accord with the facts. Courts ... apply a reasonableness standard in determining whether an act amounts to deceptive, unconscionable, or unfair conduct." *Shumaker v. Hamilton Chevrolet, Inc.*, 184 Ohio App.3d 326, 920 N.E.2d 1023, 1030–31 (2009). A classwide inference of reliance is permitted where defendant's fraud-

ulent or deceptive conduct is common to all consumers. See *Washington v. Spitzer Mgmt. Inc.*, No. 81612, 2003 WL 1759617, *6 (Ohio App. Apr. 3, 2003) (Unpub. Disp.) ("If a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis. In such cases, 'reliance ... may be sufficiently established by inference or presumption,'" citing *Hamilton v. Ohio Savings Bank*, 82 Ohio St.3d 67, 84, 694 N.E.2d 442 (1998)); *Amato v. General Motors Corp.*, 11 Ohio App.3d 124, 127–28, 463 N.E.2d 625 (1982) ("The second assignment [of error] has much in common with the first. There is an interdependency. For exposure without reliance would necessarily block recovery. The problem is how is reliance to be proven.... '[I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class. Defendants may, of course, introduce evidence in rebuttal.' ... [I]t is held here and now that proof of reliance may be sufficiently established by inference or presumption from circumstantial evidence to warrant submission to a jury without direct testimony from each member of the class. Accordingly, the second assignment of error lacks merit," quoting *Vasquez v. Superior Court of San Joaquin County*, 4 Cal.3d 800, 814–15, 94 Cal.Rptr. 796, 484

---

claim," citing *Samiento v. World Yacht, Inc.*, 10 N.Y.3d 70, 81, 854 N.Y.S.2d 83, 883 N.E.2d 990 (2008); *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 382, 388–89, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987); *Town of Wallkill v. Rosenstein*, 40 A.D.3d 972, 974, 837 N.Y.S.2d 212 (2007)); see also *id.* at 791, 944 N.Y.S.2d 732, 967 N.E.2d 1177 ("Here, plaintiffs allege that Verizon committed actionable wrongs, by trespassing on or taking their property, and by deceiving them into thinking they were not entitled to compensation. To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust

enrichment claim cannot remedy the defects. The unjust enrichment claim should be dismissed"); *Samiento*, 10 N.Y.3d at 81, 854 N.Y.S.2d 83, 883 N.E.2d 990 ("As to plaintiffs' third cause of action for unjust enrichment, this action does not lie as plaintiffs have an adequate remedy at law and therefore the claim was likewise properly dismissed"). The court therefore declines to certify a New York unjust enrichment class for this reason as well.

**223.** Class Cert. Motion at 43–47.

P.2d 964 (1971)). As plaintiffs note, Ohio courts "allow[ ] an inference of reliance where there was uniform nondisclosure of a material fact, satisfying predominance." [224] .Materiality under the OCSPA is measured by assessing whether an omitted or misrepresented fact would likely have been "material to a consumer's decision" to purchase the product involved. See, e.g., *In re Porsche Cars North America, Inc.*, 880 F.Supp.2d 801, 871 (S.D.Ohio 2012) ("Omissions are actionable under the OCSPA if they 'concern a matter that *is or is likely to be material to a consumer's decision to purchase the product or service involved*,' " citing *Temple v. Fleetwood Enterprises, Inc.*, 133 Fed.Appx. 254, 265 (6th Cir.2005) (Unpub. Disp.) (in turn citing *Richards v. Beechmont Volvo*, 127 Ohio App.3d 188, 190, 711 N.E.2d 1088 (1998)) (emphasis added)); *Lump v. Best Door and Window, Inc.*, Nos. 8–01–09, 8–01–10, 2002 WL 462863, *12 (Ohio App. Mar. 27, 2002) (Unpub. Disp.) (reversing the entry of summary judgment on an OCSPA claim based on misrepresentations by defendant after concluding that plaintiff had adduced sufficient evidence to establish that "[the] representations or omissions [ ] were material and of a nature likely to misled consumers acting reasonably under the circumstances"). Accordingly, to determine whether common questions predominate over individual issues with respect to plaintiffs' OCSPA claim, the court must consider whether plaintiffs have adduced sufficient evidence showing that they may be able to prove ConAgra's use of the "100% Natural" label misrepresented a material fact to reasonable consumers.

### (9) Oregon

Plaintiffs seek certification of an Oregon class asserting claims for violation of the Oregon Unfair Trade Practices Act ("OUTPA") and unjust enrichment.[225]

### (a) Consumer Protection Claim

"Private plaintiffs may bring OUTPA actions under ORS 646.638(1), which provides, in part:

'[A]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608, may bring an individual action in an appropriate court to recover actual damages or statutory damages of $200, whichever is greater. The court or the jury, as the case may be, may award punitive damages and the court may provide the equitable relief the court considers necessary or proper.' " *Pearson v. Philip Morris, Inc.*, 257 Or.App. 106, 116–17, 306 P.3d 665 (2013).

To prevail in an action for damages under § 646.638(1), a plaintiff must establish that he or she suffered an ascertainable loss as a result of an unlawful trade practice by the defendant. *Id.* "In other words, the plaintiff must prove an unlawful trade practice, causation, and damages." *Id.* (citing *Feitler v. The Animation Celection, Inc.*, 170 Or.App. 702, 708, 13 P.3d 1044 (2000)).

The causation/reliance element of an OUTPA claim is susceptible of classwide proof. See *Strawn v. Farmers Ins. Co. of Oregon*, 350 Or. 336, 358–59, 258 P.3d 1199 (2011) ("To prevail in a class action for fraud, the class plaintiff must prove reliance on the part of all class members. Direct evidence of reliance by each of the individual class members is not

---

**224.** *Id.* at 46 (citing *Cope v. Metropolitan Life Ins. Co.*, 82 Ohio St.3d 426, 696 N.E.2d 1001, 1008 (1998)).

**225.** *Id.* at 47–50.

always necessary, however. Rather, reliance can, in an appropriate case, be inferred from circumstantial evidence. For that inference to arise in this context, the same misrepresentation must have been without material variation to the members of the class. In addition, the misrepresentation must be of a nature that the class members logically would have had a common understanding of the misrepresentation, and naturally would have relied on it to the same degree and in the same way"); see also *id.* at 356–57, 258 P.3d 1199 ("And although *Newman [v. Tualatin Development Co., Inc.,* 287 Or. 47, 597 P.2d 800 (1979),] did not declare when reliance can be determined through common, rather than individualized evidence, it at least suggested an answer—*viz.,* when the same misrepresentation was made to all individual class members and was sufficiently material or central to the plaintiff's and the defendant's dealings that the individual class members naturally would have relied on the misrepresentation. Such a standard for inferring classwide reliance from evidence common to the class accords with what we consider to be the better-considered authority in other jurisdictions").

 Plaintiffs argue that reliance is susceptible of classwide proof because ConAgra made the same alleged misrepresentation—the "100% Natural" claim—to all class members, and it was material.[226] The court agrees that reliance can be proven on a classwide basis if plaintiffs can demonstrate that the representation was material. Whether they have adduced sufficient evidence indicating that they can do so, such that it is appropriate to certify a class, is a question the court considers *infra.*

### (b) Unjust Enrichment

 "It is well-settled [under Oregon law] that, to establish unjust enrichment, a plaintiff must establish that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant was aware that it had received a benefit; and (3) under the circumstances, it would be unjust for the defendant to retain the benefit without paying for it." *Winters v. County of Clatsop,* 210 Or.App. 417, 421, 150 P.3d 1104 (2007) (citing *Volt Services Group v. Adecco Employment Services,* 178 Or.App. 121, 133, 35 P.3d 329 (2001), rev. den. 333 Or. 567, 42 P.3d 1246 (2002)); see *Phelps v. 3PD, Inc.,* 261 F.R.D. 548, 562 (D.Or.2009) ("On the unjust enrichment/quantum meruit claim, plaintiffs have to show (1) a benefit conferred by the plaintiffs; (2) awareness by the recipient that a benefit has been received; and (3) under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it," citing *Summer Oaks Ltd. P'ship v. McGinley,* 183 Or.App. 645, 654, 55 P.3d 1100 (2002); *L.H. Morris Elec., Inc. v. Hyundai Semiconductor Am., Inc.,* 203 Or.App. 54, 66, 125 P.3d 1 (2005)). To state a claim, plaintiff need not show that he or she was in privity with the defendant. See *Rosenblum v. First State Bank of Elgin,* 283 Or. 123, 128–29, 581 P.2d 515 (1978) ("[P]rivity of the contractual type need not exist between the parties," citing *Smith v. Rubel,* 140 Or. 422, 427–28, 13 P.2d 1078 (1932)).

 The court concludes that individualized inquiries will not predominate over common issues with respect to the Oregon unjust enrichment claim. Oregon courts have certified unjust enrichment claims where members of a putative class were subjected to "uniform treatment" by the defendant. See, e.g., *Phelps,* 261 F.R.D. at 563 ("[T]he evidence will be common because of defendant's uniform treatment

---

**226.** *Id.* at 47–49.

of [the putative class members]. All of the [putative class members'] contracts will be adjudged in the same fashion on this issue. Thus, common issues predominate in the unjust enrichment/quantum meruit claim"); see also *Sobel v. Hertz Corp.*, 291 F.R.D. 525, 543 (D.Nev.2013) (citing *Phelps* with approval in interpreting a substantially similar unjust enrichment claim under Nevada law, and concluding that Rule 23(b)'s predominance requirement was satisfied because "[a]ny putative class members who were overcharged ... would be in exactly the same position" given defendant's common treatment of the putative class). Because the putative class was subject to uniform treatment by ConAgra, i.e., ConAgra's allegedly misleading statements were on each bottle of Wesson Oil purchased by a class member during the class period, the court concludes that common questions predominate under Oregon law and that plaintiffs have satisfied Rule 23(b)'s predominance requirement with respect to their Oregon unjust enrichment claim.

### (c) Conclusion Regarding Oregon Claims

For the reasons stated, the court concludes that plaintiffs' Oregon consumer protection claim may be susceptible of classwide proof if plaintiffs can show that class members would logically have understood the "100% Natural" label to mean no use of genetically modified organisms and naturally have relied on it in the same way. If plaintiffs are able to adduce sufficient evidence of this, common questions will likely also predominate with respect to the Oregon class's unjust enrichment claim.

### (10) South Dakota

Plaintiffs also seek certification of a South Dakota class to assert claims for violation of the South Dakota Deceptive Trade Practices and Consumer Protection Law ("SDDTPL") and unjust enrichment.[227]

### (a) Consumer Protection Claim

■■■ A claim for damages under the SDDTPL requires "proof of an intentional misrepresentation or concealment of a fact on which [the] plaintiff relied and that caused an injury to plaintiff." *Northwestern Public Service, a Div. of Northwestern Corp. v. Union Carbide Corp.*, 236 F.Supp.2d 966, 973–74 (D.S.D.2002).

■■■ Plaintiffs argue they will be able to prove reliance by the South Dakota class on a classwide basis by adducing circumstantial evidence of the materiality of ConAgra's "100% Natural" claim and its adverse impact on all class members.[228] As support, they cite the South Dakota Supreme Court's decision in *Thurman v. CUNA Mut. Ins. Society*, 836 N.W.2d 611 (S.D.2013).[229] There, the court concluded that the trial court had erred in denying plaintiffs' motion for certification of a class pleading claims, *inter alia*, for violation of the SDDTPL. *Id.* at 615, 623. Specifically, it held that the trial court erred in concluding that individualized inquiries concerning a statute of limitations defense predominated over common questions. *Id.* at 620–21. The Court reasoned:

"The common questions need not be dispositive of the entire action. In other words, 'predominate' should not be automatically equated with 'determinative.' Therefore, when one or more of the central issues in the action are common to the class and can be said to predomi-

---

**227.** *Id.* at 50–52.

**228.** Class Cert. Motion at 50–51.

**229.** *Id.*

nate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* at 620 (citing 7AA Wright & Miller's Federal Practice and Procedure—Civil 1778 (3d ed.)).

Plaintiffs contend that, as in *Thurman,* individualized inquiries concerning class members' damages or ConAgra's affirmative defenses will not predominate because they will be able to demonstrate classwide reliance by adducing evidence of the materiality of ConAgra's claim.[230]

Plaintiffs proffer no authority indicating that reliance or causation can be proved on a classwide basis, however. ConAgra, for its part, cites no authority at all. The court itself has surveyed South Dakota law, and can find nothing directly addressing the issue. It nonetheless concludes that reliance and causation can be proved on a classwide basis by showing that the "100% Natural" claim was material. In reaching this conclusion, the court is guided by the broad, remedial purpose of the SDDTPL, which is designed to provide relief to victims of deceptive trade practices, see *Moss v. Guttormson,* 551 N.W.2d 14, 17 (S.D. 1996) (noting that the SDDTPL "assists consumers seeking relief as victims of deceptive trade practices" and contains "broad statutory language [that] [encompasses] more than only consumers"); see also *Rainbow Play Systems, Inc. v. Backyard Adventure, Inc.,* No. CIV 06–4166, 2009 WL 3150984, *7 (D.S.D. Sept. 28, 2009) (same). It is also guided by the South Dakota Supreme Court's suggestion in *Thurman* that "class certification 'is favored by courts in questionable cases.'" *Thurman,* 836 N.W.2d at 618 (citing *Beck v. City of Rapid City,* 650 N.W.2d 520, 525

(S.D.2002)). Accordingly, the court concludes that plaintiffs' SDDTPL claim is susceptible of classwide proof if plaintiffs are able to prove materiality, an issue it considers *infra.*

### (b) Unjust Enrichment

Under South Dakota law, "[u]njust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.'" *Hofeldt v. Mehling,* 658 N.W.2d 783, 788 (S.D.2003) (quoting *Parker v. Western Dakota Insurors, Inc.,* 605 N.W.2d 181, 192 (S.D.2000)); accord *Miller v. Jacobsen,* 714 N.W.2d 69, 81 (S.D.2006); *Juttelstad v. Juttelstad,* 587 N.W.2d 447, 451 (S.D.1998); see *Sporleder v. Van Liere,* 569 N.W.2d 8, 12 (S.D.1997); *Randall Stanley Architects, Inc. v. All Saints Community Corp.,* 555 N.W.2d 802, 805 (S.D.1996). When a plaintiff proves unjust enrichment, "the law implies a contract obligating the beneficiary to compensate the benefactor for the value of the benefit conferred." *Hofeldt,* 658 N.W.2d at 788; accord *Mack v. Mack,* 613 N.W.2d 64, 69 (S.D.2000).

To prove unjust enrichment, three elements must be shown: (1) a benefit was received; (2) the recipient was cognizant of that benefit; and (3) the retention of the benefit without reimbursement would unjustly enrich the recipient. *Hofeldt,* 658 N.W.2d at 788; *Action Mechanical, Inc. v. Deadwood Historic Preservation Comm'n,* 652 N.W.2d 742, 750 (S.D.2002); *Mack,* 613 N.W.2d at 69; *Parker,* 605 N.W.2d at 192; *Juttelstad,* 587 N.W.2d at 451; *Bollinger v. Eldredge,* 524 N.W.2d 118, 122–23 (S.D.1994). Privity is not required. *Anderson v. Dunn,* 68 S.D. 479, 4 N.W.2d 810, 812 (1942).

**230.** *Id.*

■■■ At least one district court has certified an unjust enrichment class under South Dakota law. In *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605 (D.S.D.2004), plaintiffs filed a putative class action alleging claims for violations of the Packers and Stockyards Act ("PSA"), 7 U.S.C. §§ 181–229, and unjust enrichment. *Id.* at 607–08. Considering plaintiffs' motion for class certification, the court concluded that plaintiffs' PSA and unjust enrichment claims raised common questions, particularly given that defendants' conduct toward all class members was uniform and there was no "practical difference" between "a practice that is 'unfair' and a practice that results in 'unjust enrichment.'" *Id.* at 612–13. The court also concluded that common questions as to whether defendants' actions were "unfair" and resulted in "unjust enrichment" predominated over individualized inquiries such that a South Dakota unjust enrichment class should be certified. *Id.* at 617–18.

The court finds *Schumacher* instructive. Like the plaintiffs in *Schumacher*, ConAgra's conduct toward each member of the plaintiff class was uniform, purportedly "unfair," and allegedly resulted in ConAgra's "unjust enrichment." *Schumacher* indicates that whether a defendant's actions resulted in unjust enrichment is a question susceptible of classwide proof, and that common questions predominate over individualized inquiries when each plaintiff was exposed to the same allegedly wrongful conduct. Because plaintiffs here were exposed to the same allegedly deceptive representation that Wesson Oils were "100% Natural," the court concludes that common issues predominate over individualized inquiries and that the South Dakota unjust enrichment class satisfies Rule 23(b)'s predominance requirement.

## (c) Conclusion Regarding South Dakota Claims

For the reasons stated, the court concludes that plaintiffs may be able to show on a classwide basis that the "100% Natural" label had a common meaning that was material to members of the putative class. The court considers *infra* whether plaintiffs have made a sufficiently adequate showing that certification of a class is appropriate. The court also concludes that common issues predominate over individualized inquiries with respect to plaintiffs' South Dakota unjust enrichment claim, and that Rule 23(b)'s predominance requirement is therefore satisfied.

### (11) Texas

Plaintiffs seek certification of a Texas class asserting claims for violation of the Texas Deceptive Trade Practices–Consumer Protection Act ("TDTPA") and unjust enrichment.[231]

#### (a) Consumer Protection Claim

To prove a claim under the TDTPA, a plaintiff must establish that defendant violated the specific prohibitions of Texas Business and Commercial Code Annotated §§ 17.46 and 17.50; one of these is using deceptive representations in connection with goods or services. The Texas Supreme Court has held that a plaintiff can prove a "false, misleading, or deceptive act" as defined in the TDTPA by demonstrating "an act or series of acts which has the capacity or tendency to deceive an average or ordinary person, even though that person may have been ignorant, unthinking, or credulous." *Spradling v. Williams*, 566 S.W.2d 561, 562–64 (Tex. 1978).

■■■ While the TDTPA requires a showing that defendant's misrepresenta-

---

231. *Id.* at 52–54.

tion was a cause in fact of plaintiff's injury, the Texas Supreme Court has held that reliance and causation can be proved on a classwide basis when appropriate. See *Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex.2003) ("This does not mean, of course, that reliance or other elements of their causes of action cannot be proved classwide with evidence generally applicable to all class members; classwide proof is possible when classwide evidence exists"). Thus, the court concludes that plaintiffs' TDTPA claim is susceptible of classwide proof if common evidence exists regarding class members' reliance on the purported "100% Natural" misrepresentation. Plaintiffs assert such proof is available, citing evidence they have adduced concerning the materiality of the "100% Natural" label;[232] the court considers the sufficiency of that evidence *infra.*

### (b) Unjust Enrichment

 Under Texas law, unjust enrichment occurs when a defendant wrongfully secures a benefit or passively receives a benefit that it would be "unconscionable" for it to retain. See *Tex. Integrated Conveyor Sys. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 367 (Tex.App. 2009). Privity between plaintiff and defendant is not required. See *Miekow v. Faykus,* 297 S.W.2d 260, 264 (Tex.Civ.App. 1956) ("For a quasi contract neither promise nor privity, real or imagined, is necessary").

 Plaintiffs assert they can use common proof to prevail on their Texas unjust enrichment claim because ConAgra received a benefit, in the form of increased revenue from the higher price it was able to charge as a result of its false "100% Natural" claim.[233] The court cannot agree that common questions would predominate over individualized inquiries with respect to the Texas unjust enrichment claim. The Texas Supreme Court has held that, even in situations where the benefit received, i.e., the price paid by class members to the defendant, is uniform, "individual differences between each class member's experience" will necessitate individualized inquiries to "determine in whose favor the equities weigh in resolving [class members'] claims." *Best Buy Co. v. Barrera,* 248 S.W.3d 160, 163–64 (Tex.2007) ("We recognize that the claim Barrera asserts involves issues that are common to the class; presumably, the restocking fee was uniformly calculated and applied when consumers returned the specified items. But just as in *Stonebridge,* there are 'inescapably individual differences between each class member's experience ... that could determine in whose favor the equities weigh in resolving their claims.' We conclude that Barrera failed to prove at the outset that individual issues governing a class claim for 'money had and received' can be considered in a fair, manageable, and time-efficient manner on a class-wide basis, and thus failed to satisfy [the] predominance requirement," citing *Stonebridge Life Insurance Co. v. Pitts,* 236 S.W.3d 201, 206 (Tex.2007) (in turn citing *Sw. Ref. Co. v. Bernal,* 22 S.W.3d 425, 435–36 (Tex. 2000))).

Here, individualized inquiries will be required to determine whether ConAgra's conduct was "unconscionable" vis-á-vis each individual class member such that it would be unjust for it to retain the benefit it received from that individual. Plaintiffs proffer no authority indicating that it is possible to dispense with such inquiries through the presentation of classwide

---

**232.** *Id.* at 53.

**233.** Class Cert. Motion at 54.

proof. Accordingly, the court concludes that the Texas unjust enrichment class does not satisfy Rule 23(b)'s predominance requirement.

### (c) Conclusion Regarding Texas Claims

For the reasons stated, the court concludes that plaintiffs' Texas consumer protection claim may be susceptible of classwide proof if plaintiffs can show the materiality of ConAgra's representation on a classwide basis. The court considers *infra* whether they have adduced sufficient evidence of an ability to do so that certification is warranted. As respects plaintiffs' claim for unjust enrichment under Texas law, the court concludes that individualized inquiries will predominate over common issues and declines to certify the class.

### (ii) Whether Plaintiffs Have Established that Materiality Can Be Proved on a Classwide Basis

▮▮▮▮ Plaintiffs assert they have submitted substantial evidence demonstrating that the materiality of ConAgra's misrepresentation can be established by common survey proof. Plaintiffs proffer various third party surveys to support their contention that the "100% Natural" label is material to Wesson Oil buyers.[234] Specifically, they rely on a report by the Consumer Reports National Research Center, which surveyed a nationally representative sample of consumers and found that 59% look for a "natural" claim when shopping for packaged or processed foods, such as Wesson Oils.[235] Plaintiffs also cite a 2010 survey in which 65% of respondents were "somewhat interested" or "very interested" in purchasing natural products and a substantial majority of consumers attested that it was worth paying more for "natural" products.[236]

Plaintiffs also rely on portions of ConAgra's market research as support for their contention that a classwide inference that the "100% Natural" label on Wesson Oils is material.[237] The marketing research purportedly show that consumers exposed to a "100% Natural" or "Natural" claim on ConAgra product labels generally consider the representation a significant factor in their purchasing decisions.[238] Plaintiffs argue that the materiality of the "100% Natural" claim can also be inferred from ConAgra's internal strategy documents, which identify a "100% Natural" claim as a favorable product attribute in the view of consumers.[239] None of the three surveys plaintiffs cite directly links consumers' understanding of the "100% Natural" label to the specific issue raised in this case—i.e., whether consumers believe the label means the product contains no genetically modified organisms or GMO ingredients. Nonetheless, the surveys tend to show that, however they interpret it, consumers find the "100% Natural" claim material to their purchasing decisions.

Plaintiffs contend the survey data also adequately shows that the "100% Natural" label causes consumers to believe that Wesson Oils do not contain genetically modified organisms. They cite survey findings that consumers believe "natural"

---

**234.** Class Cert. Motion at 9–10.

**235.** See Declaration of David Azar ("Azar Decl."), Exh. 31.

**236.** *Id.*, Exh. 32 at 15, 44.

**237.** See Class Cert. Motion at 11–12. Because this evidence has been filed under seal,

the court does not detail the findings or conclusions it contains.

**238.** See, e.g., Azar Decl., Exhs. 3, 8, 12, 25, 36.

**239.** *Id.*, Exhs. 24, 28.

means, among other things, no GMOs.[240] The Consumer Reports survey, published in June 2014, found that 64% of respondents believed that a "natural" claim on food products meant that the product contained "no GMOs" or "genetically modified ingredients."[241] Plaintiffs also reference two studies by the Hartman Group that found, *inter alia*, that a majority of consumers understood "natural" to mean an "absence of genetically modified foods,"[242] and that "[c]onsumers perceive [GMO] foods as inherently unnatural and worry about adverse health effects" from such foods.[243] Finally, plaintiffs cite a Health-Focus International study, which concluded that a substantial majority of consumers associate a "natural" claim with the absence of GMOs.[244]

As respects ConAgra products specifically, plaintiffs adduce evidence that the company received consumer complaints about the "100% Natural" label on Wesson Oils after discovering that they contained GMOs.[245]

The court concludes that plaintiffs have made a sufficient showing for purposes of class certification that the "100% Natural" claim is material and that consumers generally understand it, *inter alia*, as a representation that Wesson Oils do not contain GMOs. Plaintiffs need not prove at this stage that *every* ConAgra customer would find the "100% Natural" claim material or would believe that it meant the products contained no GMOs. Rather, they need

only demonstrate that a reasonable consumer would understand it in that way and find it material. Courts, moreover, have found a representation material when significantly smaller percentages of consumers than those reflected in the surveys here viewed it in that light. See, e.g., *Oshana v. Coca–Cola Co.*, No. 04 C 3596, 2005 WL 1661999, *9 (N.D.Ill. July 13, 2005) ("Coca–Cola provides no authority that a misrepresentation is immaterial if only 24% of consumers would behave differently.... [T]here is sufficient evidence to raise a genuine issue of fact as to whether the alleged misrepresentations are material to a reasonable consumer").

ConAgra counters that plaintiffs have failed to adduce sufficient evidence of the materiality of the "100% Natural" claim to the putative class or reasonable consumers and therefore that individualized inquiries will predominate over common questions.[246] It notes that the court concluded that plaintiffs had not satisfied the predominance requirement in their original motion for class certification because they had not produced reliable evidence that "the 100% Natural label on Wesson Oils [was] material to all class members and [ ]that consumers generally believe ... the label means the product contains no genetically modified organisms or GMO ingredients."[247] At the time the court decided the original motion, however, several of the third party surveys that have now been proffered were not in evidence be-

---

**240.** Class Cert. Motion at 13; see, e.g., Azar Decl., Exh. 31 (64% of respondents understood "natural" to mean, among other things, "no GMOs"); *id.*, Exh. 33 (61% of consumers understood "natural" to include the "absence of genetically modified goods").

**241.** See Azar Decl., Exh. 31.

**242.** *Id.*, Exh. 33.

**243.** *Id.*, Exh. 47.

**244.** *Id.*, Exh. 34.

**245.** *Id.*, Exh. 5. Plaintiffs also rely on the Kozup Survey, which purportedly shows that ConAgra consumers associate a "100% Natural" claim with the absence of GMOs. Because the court has concluded that the Kozup Survey is inadmissible, it disregards it.

**246.** Class Cert. Opp. at 41–43.

**247.** *Id.* at 43.

cause plaintiffs failed to submit them with their moving papers.[248] Plaintiffs properly submitted the third party surveys in support of their amended motion, and as noted, they provide substantial support for plaintiffs' contention that the "100% Natural" claim is material to consumers, and is understood, *inter alia*, as an indication that the products do not contain GMOs.

ConAgra next asserts that plaintiffs cannot establish the materiality of the "100% Natural" claim because the FDA has refused to designate genetically engineered foods and food ingredients non-natural and has concluded that the presence of GMOs is not a "material fact" that must be disclosed under FDA regulations.[249] The relevant question, however, is whether a reasonable consumer would have understood the term in that manner and found it material to his or her purchasing decision. It is not how the FDA views genetically engineered foods.

ConAgra contends that the named plaintiffs' supplemental declarations significantly undercut their assertion that they considered the "100% Natural" label on Wesson Oils material to their purchasing decision because they believed it meant the products contained no GMOs.[250] It cites specifically plaintiffs' statement that they "might" be interested in purchasing Wesson Oils containing GMOs in the future.[251] While these statements could support an inference that plaintiffs' belief Wesson Oils did not contain GMOs was not material to *their* purchasing decision, the court does not believe that the named plaintiffs' declarations are sufficient to demonstrate that the claim would not be material to a *reasonable consumer*, partic-

ularly in light of the survey evidence plaintiffs have adduced.

ConAgra also relies on *Jones*. It contends that as in that case, the "100% Natural" claim is susceptible of numerous interpretations and thus materiality cannot be established on a classwide basis.[252] The court is not persuaded. In *Jones*, the court denied plaintiffs' motion for class certification on the grounds, *inter alia*, that plaintiffs had failed to adduce evidence of the impact of the challenged label statements on consumers. See *Jones*, 2014 WL 2702726 at *16 ("While the Court has no trouble believing that the '100% natural' claim is material to some customers, Caswell's testimony does not demonstrate that it is necessarily 'material to reasonable consumers.' This court held in *Badella v. Deniro Mktg., LLC*, No. 10–3908, 2011 WL 5358400, *9 (N.D.Cal. Nov. 4, 2011), that '[m]ateriality is an objective standard, but still, Plaintiffs will need to point to some type of common proof, particularly given Defendant's arguments that people join Amateur Match for many different reasons and for many different purposes.' Here, although only two challenged label statements are at issue, there are numerous reasons a customer might buy Hunt's tomatoes and there is a lack of evidence demonstrating the impact of the challenged label statements. Accordingly, Plaintiffs lack common proof of materiality," citing *Astiana*, 291 F.R.D. at 508). Unlike Jones, plaintiffs here have adduced evidence of the "impact of the challenged label statements," i.e., the "100% Natural" claim, on consumers. They have also proffered sufficient evidence that reasonable consumers associate the claim, inter alia,

---

**248.** See Order at 59 n. 131 (rejecting plaintiffs' request to take judicial notice of third party surveys and refusing to consider the contents of the surveys).

**249.** Class Cert. Opp. at 45–46.

**250.** Class Cert. Opp. at 47–49.

**251.** See Plaintiffs' Decls., Exhs. A–I.

**252.** Class Cert. Opp. at 50–52.

with the fact that the products contain no GMOs. The court thus finds *Jones* distinguishable.[253]

Because plaintiffs have adduced sufficient evidence that the "100% Natural" label is material to a reasonable consumer and that the consumer would understand it to mean, *inter alia*, that a product labeled in this fashion contains no GMOs, the court concludes that materiality can be proved on a classwide basis.[254]

### (b) Damages

Rule 23(b)(3) is satisfied only if plaintiffs can show that "damages are capable

---

253. ConAgra also cites *Allen v. Hyland's, Inc.*, 300 F.R.D. 643 (C.D.Cal.2014), and *Astiana*, 291 F.R.D. 493, for the proposition that a classwide inference of reliance cannot arise where there are "differing understandings of the word 'natural' and variations in the importance consumers place on the 'natural' label." (Class Cert. Opp. at 49–52.) These cases are also distinguishable. In *Allen*, the court declined to certify classes alleging that a "100% Natural" label was misleading because "[p]laintiffs [ ] ha[d] not demonstrated that 'natural' has a fixed meaning, nor ha[d] they introduced evidence that 'a significant portion of the general consuming public or of targeted consumers' would rely on the 'natural' label." *Allen*, 300 F.R.D. at 668. Likewise, the *Astiana* court, citing the Ninth Circuit's opinion in *Stearns*, concluded that an inference of reliance did not arise because "[p]laintiffs fail[ed] to sufficiently show that 'All Natural' has any kind of uniform definition among class members, that a sufficient portion of class members would have relied to their detriment on the representation, or that [d]efendant's representation of 'All Natural' in light of the presence of the challenged ingredients would be considered to be a material falsehood by class members." *Astiana*, 291 F.R.D. at 508.

Unlike *Allen* and *Astiana*, plaintiffs have adduced evidence in this case of the "impact of the challenged label statements" on consumers, and have proffered sufficient evidence showing that a reasonable consumer would conclude the "100% Natural" label meant Wesson Oil products contained no GMOs.

254. At the hearing, ConAgra argued that the Ninth Circuit's opinion in *Stearns* and subsequent district court decisions applying *Stearns* preclude a finding here that plaintiffs' evidence gives rise to an inference of reliance for purposes of their California consumer protection claims. ConAgra contends that *Stearns* stands for the proposition that an inference of reliance cannot arise "unless a misrepresentation is understood the same way by all members of the proposed class." (Class Cert. Opp. at 49.)

In *Stearns*, the Ninth Circuit reviewed a district court's denial of a motion for class certification. *Stearns*, 655 F.3d at 1016–18. Plaintiffs sought to certify classes asserting claims under California's consumer protection statutes based on defendant's purportedly deceptive website. *Id.* Ticketmaster and a business partner, Entertainment Publications, LLC ("EPI") operated separate websites; EPI's website offered an online coupon program called Entertainment Rewards. *Id.* at 1017. Entertainment Rewards allowed members, for a monthly membership fee, to download printable coupons that they could use to obtain discounts at various retail establishments. *Id.* EPI's website was linked to Ticketmaster's website, such that when a customer made a purchase on Ticketmaster, he or she was shown an ad on the confirmation page offering a "$25 Cash Back Award." *Id.* If customers clicked on the ad, they were taken to EPI's website, where they were enrolled in the Entertainment Rewards program if they entered their email address or clicked a "Sign Me Up" or "Yes" button. *Id.* Once enrolled, Ticketmaster transferred the customer's credit card information to EPI and the customer was charged a monthly membership fee for the Entertainment Rewards program. *Id.* at 1017–18. Plaintiffs sought to certify classes alleging claims under California's consumer protection statutes; the district court declined to certify UCL and CLRA classes, concluding that individualized proof of reliance and causation would be required to prove each claim. *Id.* at 1020–23.

The Ninth Circuit concluded that the district court had erroneously declined to certify a UCL class because a classwide inference of reliance arises under the UCL unless "there [is] no cohesion among the members [of the class] because they were exposed to quite disparate information from various representations of the defendant." *Id.* at 1020. It

held, by contrast, that the district court had properly declined to certify a CLRA on the basis that reliance would require individualized inquiries. *Id.* at 1022. The court observed that, unlike the UCL, the CLRA requires that each class member have suffered actual injury as a result of the unlawful practice. Nonetheless, it stated, causation can be established on a classwide basis by showing the materiality of the defendant's representation, because if material misrepresentations were made to an entire class "an inference of reliance arises as to the class." *Id.* (citing *Vioxx*, 180 Cal.App.4th at 129, 103 Cal. Rptr.3d 83). The court cautioned that if the representation or omission was "not material as to all class members," then "the issue of reliance 'would vary from consumer to consumer,' " and a class should not be certified. *Id.* at 1022–23. In the case before it, the court reasoned that, although the websites were "materially deficient," i.e., materially misleading, as to some class members, there was no evidence they were "materially deficient as to the entire class" because there were "myriad reasons that someone who was not misled and intentionally signed up might have chosen not to take advantage of the available product by actually printing a coupon or obtaining a rebate for some period." *Id.* at 1024. Because the class encompassed anyone enrolled in Entertainment Rewards who did not print a coupon or apply for a cashback award, and because there were multiple reasons other than being deceived that a class member might have signed up for the Entertainment Rewards program, but not have taken advantage of its discounts, the court concluded that the district court had not abused its discretion in denying plaintiffs' certification motion. *Id.*

ConAgra contends that under *Stearns*, a classwide inference of reliance cannot arise if there is the possibility that some members of a putative class suffered no injury. The court cannot agree. The California Court of Appeal's opinion in *Vioxx*—a case on which the Ninth Circuit relied in *Stearns*—is instructive in this regard. The *Vioxx* court discussed the CLRA's causation requirement and how causation can be proved on a classwide basis:

"The language of the CLRA allows recovery when a consumer 'suffers damage as a result of' the unlawful practice. This provision 'requires that plaintiffs in a CLRA action show not only that a defendant's conduct was deceptive but that the deception caused them harm.' Causation, on a class-wide basis, may be established by materiality. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class. This is so because a representation is considered material if it induced the consumer to alter his position to his detriment." *Vioxx*, 180 Cal.App.4th at 129, 103 Cal.Rptr.3d 83 (citing *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1292, 119 Cal. Rptr.2d 190 (2002); *Caro v. Procter & Gamble Co.*, 18 Cal.App.4th 644, 668, 22 Cal.Rptr.2d 419 (1993)).

Critically, the *Vioxx* court noted that the fact "[t]hat the defendant can establish a lack of causation as to a handful of class members does not necessarily render the issue of causation an individual, rather than a common, one." *Id.* This is because "plaintiffs may satisfy their burden of showing causation as to each by showing materiality as to all." *Id.*

Under California law, "a misrepresentation or omission is material 'if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.' " *Stearns*, 655 F.3d at 1022 (citing *In re Steroid Hormone Prod. Cases*, 181 Cal.App.4th 145, 157, 104 Cal.Rptr.3d 329 (2010)). In *Stearns*, the court concluded that the form and content of the Ticketmaster and EPI websites were not materially deficient as to all class members. *Id.* at 1024. The court, however, did not discuss the evidence adduced by plaintiffs that supported the district court's finding of non-materiality. Here, plaintiffs have adduced substantial evidence that a "100% Natural" claim on a food product is material to consumers; the industry studies and surveys they proffer indicate that a majority of consumers consider the claim material to their purchasing decision, and that consumers of Wesson Oils understand that "100% Natural" means, *inter alia*, that Wesson Oils do not contain GMOs. Nothing in *Stearns* suggests that similar evidence proffered in that case would not have sufficed to show materiality for certification purposes. More fundamentally, as the Ninth Circuit was applying the abuse of discretion standard of review, it is far from clear that it would have concluded that the district court had abused its discretion had it certified the class. *Id.* ("As it is, we cannot say that on the record before it the district court abused its discretion when it failed to certify the proposed CLRA class").

of measurement on a classwide basis." *Comcast*, 133 S.Ct. at 1433. The Supreme Court in *Comcast* held that plaintiffs' method of proving damages must be tied to their theory of liability. See *id.* ("If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure *only those damages attributable to that theory.* If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)" (emphasis added)).

 The court previously rejected plaintiffs' damages methodology, noting that Weir's hedonic regression analysis "calculate[d only] the price premium attributable to ConAgra's use of the term '100% Natural,' " rather than the portion of that premium attributable to plaintiffs' theory of liability—i.e., that ConAgra's "100% Natural" label on Wesson Oils caused putative class members to believe the products contained no genetically modified organisms or GMO ingredients.[255] The court reasoned:

Following *Stearns,* district courts in this circuit have concluded that an inference of classwide reliance can arise under California law if plaintiffs adduce evidence that a uniform misrepresentation was material. The court's decision in *Werdebaugh* is particularly instructive. There, plaintiff sought certification of a CLRA class challenging Blue Diamond's "All Natural" claims on its products. *Werdebaugh,* 2014 WL 2191901 at *1. Werdebaugh argued that the representation was deceptive because of a single ingredient the products contained—potassium citrate. *Id.* at *2. Blue Diamond asserted that plaintiff had not shown commonality or predominance; specifically, it urged that she was "not entitled to a presumption of reliance because what is material varies from consumer to consumer" and because "All Natural" has no common definition. *Id.* at *12–13. The court disagreed, concluding that Werdebaugh had satisfied the commonality and predominance requirements with respect to her "All Natural" claim. *Id.* at *14, *18–20. It noted that "[w]hether Blue Diamond's label statements constitute material misrepresentations [did] not depend on the subject motivations of individual purchasers, and [that] the particular mix of motivations that compelled each class member to purchase the products in the first place [was] irrelevant." *Id.* at *12. Because the case concerned "misrepresentations common to the class," rather than "individualized representations to class members," the court concluded that there a presumption of could arise with respect to the entire class if Werde-

baugh proffered adequate evidence to show that the representations were material to a reasonable person. It thus found that common questions, rather than individualized issues, would predominate if the class were certified. *Id.* at *12–14, *18–20.

Here, as in *Werdebaugh,* ConAgra uniformly made a single representation to all class members—that Wesson Oils were "100% Natural." Plaintiffs have adduced evidence that the claim was material to class members and to a reasonable consumer. The evidence in the record is sufficient to support a finding that the "100% Natural" claim was a material misrepresentation. If such a finding were made, an inference of reliance would arise. Consequently, the court finds that plaintiffs have met their burden of showing that individualized issues of reliance will not predominate over common questions. See, e.g., *Lilly v. Jamba Juice Company*, No. 13–CV–02998–JST, 2014 WL 4652283, *8 (N.D.Cal. Sept. 18, 2014) (concluding that common questions predominated over individualized issues regarding reliance); *Werdebaugh,* 2014 WL 2191901 at *12–14, *18–20 (same), class decertified on other grounds, 2014 WL 7148923 (N.D.Cal. Dec. 15, 2014); *Brazil v. Dole Packaged Foods, LLC,* No. 12–CV–01831–LHK, 2014 WL 2466559, *7–9, *11–12 (N.D.Cal. May 30, 2014), class decertified on other grounds, 2014 WL 5794873, *1 (N.D.Cal. Nov. 6, 2014) (same).

**255.** Order at 61–62.

"Weir proposes to calculate the price premium attributable to ConAgra's use of the term '100% Natural.' He concedes, however, that '100% Natural' and 'non-GMO' are not equivalent. Specifically, he testified at his deposition that he did not believe the terms were equivalent 'because non-GMO is extremely specific about one thing and I—my understanding of the general claim of 'All Natural' is that it has many implications.' This is confirmed by the studies Benbrook cites, which list multiple possible characteristics that consumers associate with a 'natural' label. Plaintiffs' specific theory of liability in this case is that the '100% Natural' label misled consumers and caused them to believe that Wesson Oils contained no genetically modified organisms or GMO ingredients. Under *Comcast*, therefore, Weir must be able to isolate the price premium associated with misleading consumers in that particular fashion. It does not appear from his declaration and deposition testimony that he intends to do so. Rather, it appears he intends merely to calculate the price premium attributable to use of the term '100% Natural' and all of the meanings consumers ascribe to it. This does not suffice under *Comcast*. See *Vaccarino v. Midland Nat. Life Ins. Co.*, No. 2:11–cv–05858–CAS (MANx), 2014 WL 572365, *7 (C.D.Cal. Feb. 3, 2014) ('In *Comcast*, the plaintiffs advanced four separate theories of antitrust violation, which collectively resulted in subscribers overpaying for cable TV service. The district court only accepted one of these four theories as susceptible of classwide proof. The plaintiffs' method of computing damages, however, did not segregate out the harm caused by each of the four theories of antitrust violation proffered by the plaintiffs. The Supreme Court found that this damages model did not satisfy the requirements of Rule 23(b)(3) because it conflated all four theories of antitrust violation without differentiating between the harms caused by each theory' (citations omitted))."

Weir again fails to provide an acceptable damages methodology that isolates and quantifies damages associated with plaintiffs' specific theory of liability—that they were misled to believe that Wesson Oils contained no GMOs or GMO ingredients because of the "100% Natural" label. As he did in support of plaintiffs' original motion for class certification, Weir focuses solely on the "price premium" attributable to the "100% Natural" label; he makes no efforts to segregate the price premium attributable to a consumer's understanding that "100% Natural" means the cooking oils contain no genetically modified organisms.[256] Thus, although Weir has provided

---

**256.** See Am. Weir Decl., ¶ 7 ("Thus, it is my opinion that, if Plaintiffs are correct as to their theory of liability—that it was a violation of the law for ConAgra to have placed the '100% Natural' claim on the label of each bottle of Wesson Oil—then the total (i.e., Classwide) economic harm suffered by Plaintiffs and all other members of the proposed Class is the amount of additional money they paid for Wesson Oil because of the presence of the '100% Natural' claim on the label of every bottle of Wesson Oil they purchased"); *id.*, ¶ 8 ("In my opinion, the individual meaning any one consumer ascribes to the term '100% Natural' is irrelevant to this analysis because their individual subjective belief does not alter the market price of Wesson Oil nor does their individual subjective belief alter the amount they paid for Wesson Oil at retail. Regardless of whether an individual consumer believed '100% Natural' meant GMO-free, preservative free, nothing artificial, or a combination of these attributes, or even nothing at all, that individual consumer still paid more for Wesson Oil because of the presence of the '100% Natural' claim on the label because it is the market as a whole, and not the individual consumer, that determines the retail price of Wesson Oil—and the mar-

more details concerning his methodology and conducted a preliminary regression analysis, his analysis does not satisfy *Comcast* because it does not isolate the price premium attributable to consumers' belief that ConAgra's products did not contain GMOs. See *Vaccarino*, 2014 WL 572365 at *7.

While Weir's proposed hedonic regression alone does not satisfy *Comcast*, the court concludes that his hedonic regression and Howlett's conjoint analysis in combination meet *Comcast's* requirements for class certification purposes. Howlett proposes to use consumer surveys to segregate the percentage of the price premium specifically attributable to a customer's belief that "100% Natural" means "no GMOs." She proposes to take the total price premium calculated by Weir and multiply it by the percentage derived from her conjoint analysis. Such a calculation would necessarily produce a damage figure attributable *solely to ConAgra's alleged misconduct*—i.e., misleading consumers to believe that Wesson Oils contain no GMOs by placing a "100% Natural" label on the products.

At the hearing, ConAgra disputed this, arguing that Howlett's conjoint analysis was not sufficiently reliable to produce a

viable damages model capable of satisfying *Comcast*. ConAgra emphasized the criticisms raised by Ugone in his declaration in opposition to plaintiffs' motion. Ugone contends there are three major "drawbacks that [ ] render [Howlett's conjoint analysis] inappropriate for use in the two-step hybrid method." [257] He maintains that the conjoint analysis is not sufficiently reliable to provide a viable damages model because: (1) Howlett's proposed analysis measures only the "relative importance" of certain product features, and this does not correlate to the price premium paid; (2) Howlett's proposed analysis involves collecting future data concerning consumer impressions, which renders it "incapable of evaluating the importance of the claimed 'GMO–Free' interpretation during the past portions of the putative Class period(s)"; and (3) Howlett's proposed analysis over-emphasizes certain product attributes and thus "may yield a conclusion that the 'GMO–Free' interpretation is material when it was not." [258]

Plaintiffs addressed Ugone's first criticism at the hearing, arguing that Ugone's assertion that the "relative importance" of product features does not correlate with a price premium misapprehends conjoint

---

ket as a whole places a premium on natural products. Individual Class Members have no control over the price of Wesson Oil, or the price premium resulting from the '100% Natural' claim. Individual reasons consumers may have for purchasing Wesson Oil do not alter this price premium, nor do they alter the injury arising from paying that premium because the price, and resulting price premium are set by the market. Thus, individual interpretation of the claim is not relevant for the determination of class-wide damages. The '100% Natural' label is a binary 'yes or no question'—the label either says it or it does not. Calculating a but-for price premium does not depend on interpretation of the label"); *id.*, ¶ 20 ("The presence of the '100% Natural' label claim is a binary 'yes or no question'— the label either says '100% Natural' or it does

not. As such, we are dealing with a simple but-for question: What did the Class pay for Wesson Oil with the '100% Natural' Claim (i.e., the actual, historical sales data), and what would they have paid had the Claim not been made (the but-for, hypothetical price had ConAgra not violated the law). Calculating a but-for price premium does not depend on an individual interpretation of the Claim because there is no middle ground. If the market price for Wesson Oils was higher as a result of the '100% Natural' claim, then ALL consumers will have paid a higher price than if the claim had not been made").

257. Reply Ugone Decl., ¶ 11.

258. *Id.*

analysis and merely attacks the premise behind conjoint analysis. As noted, Ugone contends that Howlett's conjoint analysis—which measures consumer perceptions of the "relative values associated with the various components of a 'Natural' claim"—cannot be used to measure the portion of the price premium associated with the claim that is attributable to an understanding that "100% Natural" is equivalent to "GMO–Free."[259] He maintains that because Howlett does not account for certain "supply" factors "that might influence prices (and therefore price premiums)," e.g., "features and prices of other products," "costs of production and distribution," and "practical pricing considerations," consumer opinions concerning the value of the attribute "are not the same as the price of (or the price premium associated with) that product or feature."[260] Because Howlett did not account for these factors, Ugone asserts "there may be no nexus between [ ] some consumers' perception of the 'relative importance' of a particular attribute of '100% Natural' and [ ] a manufacturer's or retailer's ability to charge an actual price premium on that specific attribute ... [,] and thus the attribute's 'relative importance' will likely have little, if any, correlation with an actual price premium."[261] Weir disputes this; he asserts Ugone fails to recognize that Weir's hedonic regression takes supply factors and other market forces in account in calculating the *actual price premium* attributable to the "100% Natural" label. As a consequence, he contends, there is no need for Howlett's conjoint analysis to consider the factors.[262]

Based on the present record, the court cannot find that Ugone's criticism renders Howlett's proposed conjoint analysis unreliable or demonstrates that the hybrid damages model plaintiffs propose does not satisfy *Comcast*. Marketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences.[263] The contribution of an attribute to overall product preference, i.e., the "relative importance" of a particular attribute, is the attribute's "partworth."[264] Partworth estimates can be used to assess how consumers value the elements of a specific product variable.[265] Howlett suggests that the price premium calculated by Weir can be multiplied by the value of the partworth associated with a "GMO-free" interpretation of "100% Natural" to determine the price premium attributable to that attribute.[266] Despite ConAgra's arguments to the contrary, other district courts have concluded that translating a partworth, i.e., the "relative importance" of a particular attribute, into a price premium satisfies *Comcast*. See, e.g., *Guido v. L'Oreal, USA, Inc.,* Nos. 2:11–CV–01067 CAS (JCx), 2:11–CV–05465 CAS (JCx), 2014 WL 6603730, *1 (C.D.Cal. July 24, 2014); *Khoday v. Symantec Corp.,* No. 11–180 (JRT/TNL), 2014 WL 1281600, *1 (D.Minn. Mar. 13, 2014).

In *Guido,* Judge Christina A. Snyder granted plaintiffs' motion for class certification, concluding that their proposed damages model, a conjoint analysis that

259. *Id.,* ¶ 100.

260. *Id.,* ¶¶ 101–02.

261. *Id.,* ¶ 102.

262. Reply Weir Decl., ¶ 64.

263. Am. Howlett Decl., ¶ 95.

264. *Id.*

265. *Id.,* ¶¶ 136–39.

266. *Id.,* ¶ 139.

calculated the price premium attributable to a flammability warning on defendant's hair products, complied with *Comcast* and satisfied Rule 23's predominance requirement. *Guido*, 2014 WL 6603730 at *10–14. Plaintiffs' expert, Dr. Misra, proposed use of conjoint analysis to "estimate[ ] how much consumers value the perceived risk of flammability[ ] versus the other features" of the product, and to use this estimate to calculate "the portion of the [product's] market price attributable to the lack of a flammability warning." *Id.* at *5. Dr. Misra proposed to conduct this analysis using surveys that required "consumers to choose between [products] that differed in price, brand, and the presence of a flammability warning." *Id.* He then proposed to use regression to generate "a function that captures the value of the product as a function of various product features," i.e., the feature's partworth. *Id.* Finally, he opined that the partworth—i.e., the percentage/ "relative importance" of the particular attribute—could be used to estimate the price premium attributable to the presence or lack of a flammability warning. *Id.* ("This function [the partworth], in turn, will estimate the portion of the Serum's market price attributable to the lack of a flammability warning [i.e., the price premium]"). Judge Snyder found that this proposed analysis satisfied *Comcast;* specifically, she concluded that common issues concerning damages predominated over individualized issues because Dr. Misra's conjoint analysis could be used to predict the "value of the product without a flammability warning." Consequently, she certified a class. *Id.* at *11.

Similarly, in *Khoday*, the court found that a damages model that employed conjoint analysis to estimate the "relative value of [ ] product feature[s] and thus the price premium consumers paid for a par-

ticular feature," satisfied *Comcast*. *Khoday*, 2014 WL 1281600 at *10–11, 32–33. There too, the conjoint analysis proposed involved comparison of the relative importance (i.e., partworth) of different product features to isolate the price premium attributable to a particular feature. *Id.*

This case is similar to *Guido* and *Khoday*, as plaintiffs propose a damages model that uses conjoint analysis to "predict the 'value of the [Wesson Oil products]' " without ConAgra's representation that the oils were "100% Natural" and thus contained no GMOs or GMO-ingredients. As in those cases, Howlett proposes to use the "relative importance," or partworth, of the GMO-free feature to estimate the price premium attributable to this interpretation of "100% Natural." Specifically, the total price premium Weir calculated will be multiplied by the partworth of the GMO-free feature. The court agrees with the *Guido* and *Khoday* courts that this methodology is capable of calculating damages attributable to plaintiffs' specific theory of liability on a classwide basis, notwithstanding the fact that it employs the "relative importance" of product attributes to consumers to calculate the relevant price premium. Conjoint analysis is regularly used in litigation to translate the "relative importance" of a product feature into a price premium paid by consumers.[267] The assertedly imperfect correlation between the relative importance of a product feature to consumers and the price premium attributable to that feature about which ConAgra complains has not been an obstacle to certification of classes in other cases, and the court cannot conclude, at this stage, that Howlett will be unable to calculate the price premium attributable to a "GMO-free" interpretation of the "100% Natural" label. To the extent ConAgra faults How-

---

**267.** Am. Howlett Decl., ¶ 95.

lett for failing to consider supply factors in measuring the "relative importance" of product attributes to consumers, and using a specific attribute's relative importance to calculate the price premium attributable to it, as Weir notes, and as the court discusses elsewhere in this order, the proposed hedonic regression accounts for the supply and market factors Ugone identifies.[268] For all of these reasons, the court finds Ugone's first criticism of Howlett's proposed conjoint analysis unpersuasive.

The court also finds Ugone's remaining criticisms unavailing. He asserts that Howlett's conjoint analysis is deficient because, although it purports to calculate the importance of a "GMO–Free" interpretation of Wesson Oils' "100% Natural" label in the past, i.e., during the class period, it will be based on yet-to-be-collected survey data.[269] Ugone states that "[s]urvey methodologies such as conjoint analysis generally measure the value of features of the product at the point in time of the survey and cannot easily determine the value of features in the past." [270] The fact that Howlett intends to use future surveys to determine the "relative importance" of a "GMO–Free" interpretation of the "100% Natural" label does not make her methodology unreliable or fail to satisfy *Comcast*. *Any* use of conjoint analysis for litigation purposes will have the same "shortcoming" Ugone identifies. Indeed, Weir confirms in his reply declaration that using current research results to draw inferences about past consumer behavior is a regular practice in litigation.[271] Courts have found conjoint analysis to be sufficiently reliable to satisfy *Comcast* in situations like this one where plaintiffs must isolate a price premium attributable to a particular product feature based on the use of "future data," and apply that price premium to the product's historical market price. See, e.g., *Guido*, 2014 WL 6603730 at *14 (concluding that plaintiffs' proposed conjoint analysis satisfied *Comcast* and Rule 23(b)(3)'s predominance requirement where the analysis was to be based on future survey data and the product's historical price). Accordingly, Howlett's proposed use of future survey data does not make her methodology unsound or unable to satisfy *Comcast*. Moreover, there is no basis in the present record to question Howlett's assumption that the value attributable to a "GMO–Free" interpretation of "100% Natural" can be applied across the class period.[272] Indeed, the *Guido* court permitted plaintiffs to calculate one consumer value for a flammability warning on a product and apply it equally to purchases made over the a six year period. *Guido*, 2014 WL 6603730 at *2, *14.

Ugone's final criticism is that Howlett's "[c]onjoint analysis necessarily draws attention to features used in the survey exercise" and thus "runs the risk of assigning a larger value to the 'GMO–Free' aspect than that which would actu-

---

**268.** Reply Weir Decl., ¶ 64.

**269.** Ugone Decl., ¶ 11.

**270.** *Id.*, ¶ 103.

**271.** See Reply Weir Decl., ¶ 71 ("It is commonplace to use current research results to make inferences about past consumer behavior as evidenced by the large number of cases that have been used in litigation. For example, Bird and Steckel (Steckel being an affiliated expert at the same firm as Defendant's expert Dr. Ugone) highlight a large number of surveys used in litigation that apply results over a historical time period").

**272.** See Reply Weir Decl., ¶ 72 ("Thus far, I have seen no evidence that would suggest that the proposed conjoint survey would not provide accurate insights about the class [over the class period], especially given the screening requirements that will ensure that respondents are actual cooking oil consumers").

ally be observed in the marketplace." [273] The fact that Howlett will select certain product attributes for inclusion in the proposed surveys to the exclusion of others does not render her analysis unreliable or indicate that it cannot satisfy *Comcast.* As already noted, Howlett has explained why she chose certain product attributes and not others, and why she did not identify more than six. More fundamentally, the court is not persuaded that the survey will necessarily focus consumers on the "GMO–Free" interpretation to the exclusion of other interpretations included in the survey. First, as Weir observes in his reply declaration, the survey treats "GMO–Free" the same way it does every other attribute, and notes that Howlett has taken steps to ensure that respondents' attention is not drawn to the "GMO–Free" attribute.[274]

ConAgra also contends that the attributes Howlett has selected will confine a respondent's choices and cause the respondent to select "GMO–Free" or another attribute he or she might not consider in purchasing a Wesson Oil product. Howlett has adequately explained why she limited the attributes to six. She asserts that her proposed analysis has several safeguards that will confirm the validity of a respondent's attribute choices and ensure that each attribute selected reflects a sig-

nificant meaning the consumer ascribes to "100% Natural." She explains that she will conduct focus groups and a serious of pilot tests to confirm that "the six chosen attributes are the most significant meanings that Wesson purchasers ascribe to the '100% Natural' claim." [275] The focus groups and pilot tests will help to ensure that the variables tested are attributes consumers and survey respondents consider in making their purchasing decisions. Howlett notes that the focus groups and pilot tests will also help to ensure that there is no material overlap between the attributes selected; if such an overlap is observed, i.e., if consumers believe that two separate attributes have the same meaning, the attributes can be adjusted.[276] Howlett states that the conjoint analysis will produce statistical measures that she can use to determine whether the tested variables are valid and reliable, i.e., whether they correspond to the attributes consumers actually consider when purchasing.[277] By evaluating these statistical measures, Howlett reports, she will be able to determine "how well the selected attributes actually account for the decisions of the respondents." [278] Thus, contrary to Ugone's assertion, it appears the conjoint analysis will be able to measure those attributes that actually account for purchasing decisions, and provide an accurate estimation of the importance of the

---

**273.** Ugone Decl., ¶ 105.

**274.** See Reply Weir Decl., ¶¶ 74–75 ("[E]very possible effort has been taken to ensure that the GMO-free sub-attribute—the attribute of interest in this litigation—has no 'attention drawn' to it. Importantly, the proposed conjoint [analysis] does not treat the GMO-free interpretation of the 'Natural' claim any differently than any of the other six attributes being included in the survey. The GMO-free attribute will not be highlighted, bolded, italicized, or presented in any different light from the other corresponding interpretations. The overt inclusion of attributes is the gold standard of conjoint analysis. Moreover, the sur-

vey instructions and prompts only raises the issue of the '100% Natural' label. Nothing in the proposed survey passes any judgment on GMO-free. The survey could not be more neutral as to the characterization of GMO-free, vis-a-vis all of the included attributes").

**275.** Am. Howlett Decl., ¶ 118.

**276.** *Id.*

**277.** *Id.,* ¶¶ 119–21.

**278.** *Id.,* ¶ 119.

"GMO–Free" interpretation of the "100% Natural" claim.[279]

To the extent Ugone suggests the number of attributes Howlett proposes to use will "draw [undue] attention" to a few attributes, the court concludes that this, too, does not preclude certification of a Rule 23(b)(3) class. Howlett explains her underlying rationale for only selecting six attributes.[280] Furthermore, she explains that the survey can be modified to include different or additional attributes if warranted such that the survey will be an "adequate [ ] fit" with consumer interpretations of "100% Natural." [281] Stated differently, Howlett can modify that the survey model if her belief that consumers ascribe only six meanings to the "100% Natural" claim proves to be incorrect. This adequately addresses Ugone's objection. Indeed, other courts have concluded that objections that conjoint analysis does not include sufficient variables does not preclude. certification at this stage. See, e.g., *Khoday*, 2014 WL 1281600 at *33

("Defendants' expert takes issue with the precise model prepared by Gaskin—in that it measures only the value of the automatic injection and not, for example, the possible value of having the download insurance automatically 'remember' what type of software was originally purchased, and therefore also disputes the estimated value found by Gaskin of between $0.05 and $0.16 for each purchase of download insurance. But disputes about the precision of the particular model developed by Gaskin do not indicate that damages will not be measurable on a classwide basis. In other words, Plaintiffs have presented a method that allows for a determination of the actual value to consumers of the download insurance products. Defendants do not dispute that the conjoint analysis will be capable of measuring damages on a classwide basis.... *They argue only that Gaskin's model may need to include several more variables in order to be a completely accurate measure of damages. Such a*

**279.** See also Reply Weir Decl., ¶¶ 58–60 ("Accepting, *arguendo*, that the proposed study has not included a relevant sub-attribute interpretation of the '100% Natural' label claim, there are numerous checks and balances to identify such a situation, and to correct for it. First, the Howlett Declaration makes abundantly clear that prior to fielding the conjoint analysis, Plaintiffs would conduct numerous focus group studies to confirm the selection of attributes to be included in the study. If an additional attribute is identified in these focus groups, it can easily be added to the conjoint survey. Second, as the Howlett Declaration also specifies, the conjoint study will be pretested before the final full study is deployed. This pretest will give plaintiffs an additional opportunity to gauge the survey design. Should the pretest identify any issues surrounding the included attributes, they can be addressed before the final survey is deployed. Finally, conjoint analysis, like many economic techniques, produces a number of metrics that can be used to measure the reliability of the survey results including if there appears to be any misspecification of the included

attributes. Common, objective, metrics such as the R-squared, F-statistic, T-statistic, and confidence level will give the Court ample information to gauge the reliability of the survey results. Defendant's own expert has discussed the use of these objective metrics").

**280.** Am. Howlett Decl., ¶ 117 ("Based on more than twenty years of work and study in the fields of marketing research and food labeling, it is my opinion that consumers in general do not place high importance on more than six independent meanings of claims made on food labels (and often fewer). Therefore, I anticipate that [any] meaning of 'natural' not included in the six selected attributes would ... represent an insignificant factor in the beliefs of Wesson Oils consumers overall").

**281.** *Id.*, ¶ 121 ("If pretest CBC results do not show an adequate model fit at a 95% level of significance, different attributes can be included and/or the number of attributes can be increased until the level is reached").

*dispute does not prevent the Court from certifying the class at this stage of litigation,*" citing *Vaccarino v. Midland Nat. Life Ins. Co.,* 2013 WL 3200500 at *14 (C.D.Cal. June 17, 2013) ("[P]laintiffs must . . . offer a method that tethers their theory of liability to a methodology for determining the damages suffered by the class"); *Chavez v. Blue Sky Natural Beverage Co.,* 268 F.R.D. 365, 379 (N.D.Cal. 2010) (explaining that plaintiffs need only identify a proposed method for evaluating class damages) (emphasis added)).

For all of these reasons, Ugone's criticisms of Howlett's proposed conjoint analysis are unavailing and concludes that her proposed conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages. Accordingly, the court concludes that this hybrid damages methodology, which takes into account both Weir's hedonic regression and Howlett's conjoint analysis, satisfies *Comcast.*

ConAgra next argues that, even if a viable damages methodology has been proposed, individualized inquiries will be necessary and will predominate due to variations in the "number, price, size, location, discount or promotion, and time period" of each class member's purchase(s) of Wesson Oils.[282] It notes that Wesson Oils are sold by retailers, who set the price of the product, and thus that the price paid will have varied among consumers. At this stage, the court is not persuaded that this precludes class certification. The damages

methodology plaintiffs have proposed allows Weir to perform refined regressions that focus solely on Wesson Oils and competitor products in specific retail channels and geographic areas.[283] Given this fact, it appears Weir's hedonic regression analysis, coupled with historical pricing data, will be able to account for the price variations that ConAgra asserts require individualized inquiries. The cases it cites are not to the contrary.

In *Algarin v. Maybelline, LLC,* 300 F.R.D. 444, 459–61 (S.D.Cal.2014), the court rejected the price premium methodology plaintiffs proposed for calculating damages because they proffered nothing more than speculation that a price premium existed. Here, by contrast, Weir has conducted a preliminary hedonic regression that indicates there is a price premium associated with the "100% Natural" label on Wesson Oils. The *Algarin* court also concluded that it was inappropriate to use a price premium methodology because of variability in the retail price of the class products and competing products; it noted that plaintiffs had failed to suggest a viable means of accounting for such variations. *Algarin,* 300 F.R.D. at 460–61. Weir, by contrast, proposes a methodology that can be refined to account for variations in retail prices among retailers, and across time periods, and geographic areas. He also asserts he can take into account promotional prices and other attributes. Weir opines that the various attributes

---

282. Class Cert. Opp. at 53–54.

283. See, e.g., Am. Weir Decl., ¶ 39 (describing a data set that can be used in the regression analysis and noting that "[t]he data includes dollar sales, unit sales, units sold, and the average price per unit (on both promoted and non-promoted basis). The data can be further broken down as coming from particular geographic locations (i.e., Los Angeles, Chica-

go, etc.), particular retailers (i.e., Publix, Ralley's, etc.), or particular groups of retailers (i.e., Food, Drug, or Mass Merchandiser retailers). The data from this spreadsheet, after being properly formatted, can be used as an input into a hedonic regression analysis (or as the basis for a conjoint analysis) to determine more geographically, temporally, or promoted product group specific price premiums").

that are considered in the analysis can be controlled to produce an accurate and reliable price premium solely attributable to the "100% Natural" claim.[284]

ConAgra also relies on *Astiana*. There, the court denied certification on predominance grounds because plaintiff had not proffered expert testimony that the market price of Ben & Jerry's ice cream labeled "all natural" was higher than the market price of the ice cream without that label. Nor did she proffer evidence that a consumer would be willing to pay a premium for "all natural" ice cream. *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10–4387 PJH, 2014 WL 60097, *12–13 (N.D.Cal. Jan. 7, 2014). The court also noted that "[e]stablishing a higher price for a comparable product would be difficult because prices in the retail market differ and are affected by the nature and location of the outlet in which they are sold." *Id.* As noted, plaintiffs here have adduced evidence in the form of Weir's preliminary hedonic regression analysis that a price premium exists; they have also proffered a viable damages methodology that can account for the variables the *Astiana* court found predominated over common questions.[285]

Because plaintiffs have proposed a viable damages model that can isolate a price premium attributable to consumers' understanding that "100% Natural" means that Wesson Oils do not contain GMOs, and that can manipulate historical pricing data to account for variations in retail price, the court concludes that they have shown that individual damages issues do not predominate over common questions.

---

**284.** *Id.*, ¶¶ 75–87.

**285.** ConAgra also contends that individual inquiries regarding the price paid by each consumer for Wesson Oil products and the quantity of bottles purchased will predominate over common questions such that a class should not be certified. (Class Cert. Opp. at 53–54.) The court cannot agree. The Ninth Circuit has noted that "the amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie, et al. v. Barrack, et al.*, 524 F.2d 891, 905 (9th Cir.1975); see *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 670 (C.D.Cal.2009) ("[W]ith regard to Dannon's arguments that consumers purchased the Products at different prices, which would affect the amount of their damages, the Ninth Circuit has explicitly held that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment'"). In *Wiener,* the court rejected defendant's contention that individualized issues regarding the varying prices paid by consumers were sufficient to defeat class certification. It noted that "although [there] are problems inherent in calculating damages for a class action based on consumer products sold at varying prices," it believed "a workable method of calculating damages for the proposed class could be achieved." *Wiener,* 255 F.R.D. at 670–71.

Specifically, the court noted that individualized inquiries would not predominate over common questions concerning actual damages on several of plaintiffs' claims because "the[] actual damages for the[] claims c[ould] be calculated by subtracting the value of the products without the claimed health benefits, a uniform value to be determined based on the evidence presented at trial, from the price that the particular class member is able to prove he or she paid"; such a calculation, the court concluded, was not "individualized and unique as to each class member." *Id.* Similarly, as respects restitutionary relief, the court noted it had "very broad discretion to determine an appropriate ... award as long as it is supported by the evidence and is consistent with the purpose of restoring [to] the plaintiff the amount that the defendant wrongfully acquired." *Id.* The court agrees with the *Wiener* court that, at this stage, ConAgra has not shown that individualized inquiries will predominate over common questions. As noted, plaintiffs have proffered a damages methodology that can account for many of the variables ConAgra identifies; as a consequence, a "workable method of calculating damages for the proposed class [can] be achieved."

### (c) Conclusion Regarding Predominance

For the reasons stated, the court concludes that plaintiffs have shown that common questions predominate over individualized inquiries. It therefore finds that certification of the putative classes under Rule 23(b)(3) is appropriate.

### (2) Superiority

 The second requirement imposed by Rule 23(b)(3) is that a class action be superior to other methods of resolving class members' claims. "Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D.Cal.2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D.Cal.2004)).

 "Where damages suffered by each putative class member are not large, th[e first] factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190. Given the low average price of a bottle of Wesson Oil,[286] the price premium attributable to consumers' belief that "100% Natural" means the product contains no genetically modified organisms or GMO-ingredients will be quite small. Thus, even if an individual purchased Wesson Oils on a regular basis during the class period, the damages he or she could recover in an individual suit would not be sufficient to induce the class member to commence an action. The funds required to marshal the type of evidence, including expert testimony, that is necessary to pursue such a claim against a well-represented corporate defendant would discourage individual class members from filing suit when the expected return is so small. See *Amchem Products*, 521 U.S. at 617, 117 S.Ct. 2231 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights").

The second factor likewise favors a finding that class certification is a superior means of litigating these claims. The only litigation raising the claims of which the court is aware are the cases presently pending before it. With respect to the third factor, these cases were either voluntarily transferred to this jurisdiction by the parties or transferred here by the Panel on Multidistrict Litigation. Given the small recovery that any individual plaintiff can expect, moreover, concentrating the litigation in a single forum is appropriate. Thus, the third factor also favors a finding of superiority.

In addressing the fourth factor, ConAgra raises concerns about the manageability of the action given that plaintiffs seek certification of eleven state classes. The claims, ConAgra asserts, "invok[e] a spectrum of common law and statutory principles, [and have] widely varying remedies." As a consequence, it contends, a class action is not "superior" and will fail to "simplify any questions regarding manageability."[287] Plaintiffs counter that a class action is superior because: (1) they propose that the court certify eleven separate classes, alleviating choice of law concerns; (2) while they require proof of

---

**286.** See Ugone Decl., ¶ 58.

**287.** Class Cert. Opp. at 58–60.

different elements, the various state consumer protection laws all "fall into consistent patterns;" and (3) the warranty claims are all based on the same statutory text. The court agrees with plaintiffs.

The court considered the various state law claims in analyzing predominance, and found that several raise common questions. Under the various consumer protection statutes, plaintiffs must show, for example, that ConAgra's conduct is deceptive and misleads reasonable consumers and/or class members. See, e.g., *Elias v. Hewlett–Packard Co.*, 903 F.Supp.2d 843, 854 (N.D.Cal.2012) ("[T]he standard for [the CLRA, FAC, and UCL] is the 'reasonable consumer' test, which requires a plaintiff to show that members of the public are likely to be deceived by the business practice or advertising at issue" (citations omitted)); *Ackerman v. Coca–Cola Co.*, No. CV 09–0395(JG), 2010 WL 2925955, *15 (E.D.N.Y. July 21, 2010) (noting that the applicable standard under the GBL is whether a "reasonable consumer would have been misled by the defendant's conduct"); *Alpine Bank v. Hubbell,* 506 F.Supp.2d 388, 410 (D.Colo.2007) (noting that the applicable standard under the CCPA is whether the conduct has a "capacity or tendency to deceive a reasonable consumer"); *Pearson v. Philip Morris, Inc.*, 257 Or.App. 106, 155–56, 306 P.3d 665 (2013) ("[W]hether plaintiffs in this action can prove reliance on a class-wide basis depends on whether it is likely that significant numbers of class members did not rely on defendant's representations"); *Shumaker v. Hamilton Chevrolet, Inc.,* 184 Ohio App.3d 326, 920 N.E.2d 1023, 1031 (2009) ("[A] deceptive act 'has the likelihood of inducing a state of mind in the consumer that is not in accord with the facts' "); *Office of the Attorney General v. Wyndham International, Inc.,* 869 So.2d 592, 598 (Fla.App.2004) ("When addressing a deceptive or unfair trade practice claim [under the FDUTPA], the issue is ...

whether the practice was likely to deceive a consumer acting reasonably in the same circumstances").

Although the court concluded that individualized inquiries would predominate over common issues with respect to plaintiffs' Colorado, Florida, New York, and Texas unjust enrichment claims, the claims as to which predominance was satisfied, i.e., the Illinois, Indiana, Nebraska, Oregon, and South Dakota unjust enrichment claims, require resolution of substantially the same question—whether ConAgra received some benefit from plaintiffs that it would be inequitable to allow it to keep in light of its conduct. Finally, the breach of warranty claims that satisfy Rule 23(b)'s predominance requirement—i.e., the California, Colorado, and New York express warranty claims and the Colorado, Indiana, and Nebraska implied warranty claims—raise common questions regarding the warranty, i.e., ConAgra's "100% Natural" label, and whether it was breached because Wesson Oils contain GMO-ingredients.

As plaintiffs note, moreover, the MDL Panel consolidated the actions in this court for pretrial purposes, and the court could, in its discretion, sever the classes following certification for separate adjudication of the claims of the state classes. *Seiko Epson Corp. v. Abacus 24–7 LLC,* No. 09–CV–477–BR, 2009 WL 5064950, *1 (D.Or. Dec. 15, 2009) ("[W]here certain claims in an action are properly severed under Fed. R.Civ.P. 21, two separate actions result [and the] district court may transfer one action while retaining jurisdiction over the other,' " citing *Chrysler Cred. Corp. v. Country Chrysler, Inc.,* 928 F.2d 1509, 1519 (10th Cir.1991) (citing *Wyndham Assoc. v. Bintliff,* 398 F.2d 614, 618 (2d Cir. 1968))). Thus, the court concludes that, at this stage, plaintiffs have carried their burden of showing that class treatment is

superior to the maintenance of individual actions.

### (3) Conclusion Regarding Rule 23(b)(3)

For the reasons stated, plaintiffs have established that common questions predominate over individualized inquiries with respect to certain of the class claims they seek to pursue, and that a class action is a superior vehicle for adjudicating the claims. Accordingly, the court grants plaintiffs' motion to certify ten putative state classes to pursue enumerated claims under Rule 23(b)(3).

### f. Rule 23(c)(4)

Plaintiffs argue alternatively that if the court determines that classes cannot be certified under Rule 23(b), it should certify relevant issue classes under Rule 23(c)(4). This rule provides: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." FED.R.CIV.PROC. 23(c)(4). The Ninth Circuit has endorsed the use of issue classes where individualized questions predominate and make certification under Rule 23(b)(3) inappropriate. See *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996) ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues"); see also *Dukes,* 603 F.3d at 620 n. 43 ("Relying on Rule 23(c)(4), our own precedent also generally allows class treatment of common issues even when not all issues may be treated on a class basis"). As Judge Stephen Wilson noted in *Amador v. Baca,* 299 F.R.D. 618, 636 (C.D.Cal. 2014), the Ninth Circuit "did not explain which cases might be 'appropriate cases' for severance of particular issues" because

"[i]t was unnecessary to address th[at] question in view of the numerous 'deficiencies in th[e district court's] certification [order].'" *Id.* at 636.

Plaintiffs propose that the court certify an issue class to litigate the falsity of ConAgra's statement—i.e., "whether ConAgra's labeling of Wesson Oils as '100% Natural,' despite making them from GMO ingredients, is false, unfair, deceptive, and/or misleading to a reasonable consumer." [288] Because the court concludes that several of plaintiffs' class claims can be certified, and because plaintiffs request this relief only if the court refuses to certify classes under Rule 23(b)(2) or Rule 23(b)(3), the court denies plaintiffs' request to certify an issue class under Rule 23(c)(4).

### III. CONCLUSION

For the reasons stated, the court grants in part and denies in part plaintiffs' amended motion for class certification. The court denies plaintiffs' motion to certify injunctive relief classes under Rule 23(b)(2) of the Federal Rules of Civil Procedure because the named plaintiffs have not shown that they have Article III standing to represent such classes.

As respects plaintiffs' motion to certify damages classes under Rule 23(b)(3), the court grants plaintiffs' motion in part, and certifies classes for California, Colorado, Florida, Illinois, Indiana, Nebraska, New York, Ohio, Oregon, South Dakota, and Texas.

The certified classes may pursue the following claims:

- *California:* (1) violations of the UCL, CLRA, and FAL; and (2) breach of express warranty

---

**288.** Class Cert. Motion at 2, 73–74.

- *Colorado:* (1) violation of the CCPA; (2) breach of express warranty; and (3) breach of implied warranty
- *Florida:* (1) violation of the FDUTPA
- *Illinois:* (1) violation of the ICFA and (2) unjust enrichment
- *Indiana:* (1) unjust enrichment and (2) breach of implied warranty
- *Nebraska:* (1) unjust enrichment and (2) breach of implied warranty
- *New York:* (1) violation of the GBL; and (2) breach of express warranty
- *Ohio:* (1) violation of the OCSPA
- *Oregon:* (1) violation of the OUTPA; and (2) unjust enrichment
- *South Dakota:* (1) violation of the SDDTPL; and (2) unjust enrichment
- *Texas:* (1) violation of the TDTPA